UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


STEPHANIE ROSENFELD,          *     Case No. 17-CV-07299(NGG)
                              *
            Plaintiff,        *     Brooklyn, New York
                              *     June 7, 2018
      v.                      *
                              *
TARA LENICH,                  *
                              *
            Defendant.        *
                              *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *

        TRANSCRIPT OF CIVIL CAUSE FOR INITIAL CONFERENCE
            BEFORE THE HONORABLE PEGGY KUO
            UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:            SAMUEL SHAPIRO, ESQ.
                             RICHARD D. EMERY, ESQ.
                             Emery Celli Brinckerhoff &
                              Abady, LLP
                             600 Fifth Avenue, 10th Floor
                             New York, NY  10020


For Defendant, Tara Lenich:   ERIC M. CREIZMAN, ESQ.
                             Creizman, PLLC
                             747 Third Avenue, Suite 200
                             New York, NY  10017


For Defendant, City of        ASHLEY R. GARMAN, ESQ.
 New York, et al:            BARRY MYRVOLD, ESQ.
                             New York City Law Department
                              Office of Corporation Counsel
                             100 Church Street
                             New York, NY  10007


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1          (Proceedings commenced at 10:36 a.m.)

2          THE CLERK:  The Honorable Magistrate Judge Peggy Kuo

3    presiding.  Civil cause for initial conference docket no. 17-

4    CV-7299, Rosenfeld versus Lenich.

5          Counsel, please state your name for the record,

6    starting with plaintiffs.

7          MR. SHAPIRO:  Good morning, Your Honor.  Sam

8    Shapiro, Emery Celli Brinckerhoff & Abady, for the plaintiff.

9    I'm here with my colleague, Richard Emery, and our summer

10   associate Ryan Wheeler.

11         THE COURT:  Good morning.

12         MR. EMERY:  Good morning.

13         MS. GARMAN:  Good morning, Your Honor.  For the City

14   defendants, Assistant Corporation Counsel Ashley Garman and

15   with me is my colleague, Barry Myrvold.

16         MR. MYRVOLD:  Good morning.

17         THE COURT:  Good morning.

18         MR. CREIZMAN:  Good morning, Your Honor.  Eric

19   Creizman for Tara Lenich.

20         THE COURT:  Okay.  Good morning.

21         So we're here to figure out what we're going to do

22   about discovery and what that timetable will look like.  I

23   know you've had a conference already with Judge Garaufis and

24   there's some dispute as to what the scope of the discovery is

25   that he authorized.

1          The way I read the transcript is that the scope

2      somewhat's changed and that's why there's somewhat conflicting

3      statements.  Judge Garaufis' original concern was about

4      identifying potential other victims so that their potential

5      claims would not run outside the statute of limitations.

6          But then toward the end there was an issue raised I

7      believe by counsel for the defendant Lenich about other

8      discovery and so Judge Garaufis basically said, okay, fine, go

9      to the magistrate judge and figure this all out.  Okay?  So

10     that's how I read it.

11         So we're here to try to figure it all out.  And it

12     may not be that you get all the discovery you want within the

13     time frame that you want, but I think we should set out a

14     sequence for how that discovery should happen and then figure

15     out what the timetable will look like.  Okay?  So I think

16     that's the best way to proceed.

17         So, first, I need to see if I understand the case.

18     So this action's being brought by the plaintiff against not

19     only the defendant -- the individual defendant Lenich for the

20     wiretapping activity, but also against the City of New York

21     and some of her supervisors, and then also some individuals.

22         And as I understand it, part of the claim is about

23     the wiretapping itself, and then the other part of the claim

24     is about disclosures.

25         I understand that the state court staff and justice

4

1    are not named, and I also realize that the federal

2    investigators are not named, but the disclosure to those

3    parties are listed as an -- acts allegedly violative of the

4    Electronic Communication Privacy Act.

5            So I guess there are two areas I want to explore.

6    One is the one that Judge Garaufis talked about which is the

7    potential victims.  And those victims would be the people who

8    are on the other side of the communications.  So in other

9    words, the plaintiff's communications were tapped, but she was

10   talking to someone else.  And so what you're looking for is

11   who those someone elses are.

12           Is that right, Mr. Shapiro?

13           MR. SHAPIRO:  That's correct, Your Honor.  We are

14   looking for that.  In addition to that though, we don't want

15   any discovery to be limited to just the phone numbers that

16   were --

17           THE COURT:  Well, no.  But I'm just trying to figure

18   out the scope, right?

19           MR. SHAPIRO:  Yes.

20           THE COURT:  So you want to find out --

21           MR. SHAPIRO:  We are certainly looking for that.

22           THE COURT:  -- who those people are?

23           MR. SHAPIRO:  Yes, Your Honor.  Absolutely.

24           THE COURT:  Okay.  And then on the other side, it

25   sounds like you're also looking for who else the defendants

5

1     may have shared this information with and that would

2     constitute a violation.

3          So in other words, let's put aside the official

4     disclosures to investigators and the state court, or even the

5     communications that you know has been shared within certain

6     people so that this matter could have been referred to the

7     federal investigators for prosecution, you're looking also for

8     who else may have been privy to the contents of the

9     communication in an inappropriate way.

10          And let's just put that -- let me characterize it as

11    people passing around private communications and laughing,

12    having a good laugh about it.  All right?

13          MR. SHAPIRO:  That's fair, Your Honor.  I think in

14    addition we don't know the status currently of these

15    communications.  We believe they may be just still be on the

16    District Attorney's Office server and accessible.

17          THE COURT:  Okay.  Right.

18          MR. SHAPIRO:  Yes.  Absolutely.

19          THE COURT:  So that's what I'm just trying to figure

20    out is that there are two categories of information that

21    you're trying to get.  Right?

22          MR. SHAPIRO:  At least two.  But, yes, certainly

23    whether --

24          THE COURT:  Well, what's the other?

25          MR. SHAPIRO:  Well, all of discovery are you talking

6

1    about or just related to who else --

2         THE COURT:  Well, okay.  So those are the things

3    that seem -- all right.  So then you have everything else you

4    want, right?

5         MR. SHAPIRO:  We do want to proceed with discovery,

6    Your Honor.

7         THE COURT:  Right.  Okay.

8         MR. SHAPIRO:  Yes, correct.

9         THE COURT:  Okay.  Let me just focus on those two

10   things --

11        MR. SHAPIRO:  Okay.

12        THE COURT:  -- because those seem more pressing for

13   purposes of the complaint.  All right.  Because they may lead

14   to additional parties and allegations.  Okay.

15        So then let's -- let me find out from the City, do

16   you -- does that sound right in terms of categorizing areas

17   that are being requested at the beginning?

18        MS. GARMAN:  It sounds right that those are what are

19   being requested.  We certainly would object to, at this point

20   in time, being required to produce all of that information,

21   given that it's our position that no claim has been stated

22   against any of the City defendants under the ECPA.

23        So it's our position that, especially with the

24   second category, it's completely, you know, sort of

25   inappropriate to be engaging in that discovery at this point.

7

1          THE COURT:  Okay.  But the -- you represent not just

2     the City of New York, but also individuals?

3          MS. GARMAN:  Correct.

4          THE COURT:  All right.  So when you say the City

5     defendants, do you mean everybody?

6          MS. GARMAN:  Yes.

7          THE COURT:  Okay.  Not the -- excluding Ms. Lenich?

8          MS. GARMAN:  Yes.  Sorry.

9          THE COURT:  Yes.  Okay.  But the issue of who the

10    other let's say victims were was explicitly something that

11    Judge Garaufis was concerned about.  So why can't you turn

12    over the information as to who were the counter parties to

13    these telephone conversations?

14         MS. GARMAN:  Your Honor, I mean, we just -- we

15    generally object to the notion of us turning over discovery in

16    order for Mr. Shapiro to solicit additional clients, but --

17         THE COURT:  But it's not soliciting additional

18    clients.

19         It is -- if at some point in the discovery, let's

20    say, you know, months later after the motion to dismiss has

21    been decided, and let's assume that there's still a viable

22    case, okay, and that information is turned over, at that

23    point, if the defendant -- if the plaintiff then seeks to

24    amend the complaint to add additional plaintiffs, that seems

25    like we've wasted a lot of time not knowing who they were

8

1    because that's going to happen anyway.  That's information

2    that's going to come out in discovery.

3           MS. GARMAN:  Yes, Your Honor.  And with that

4    specific -- with this first category of information that would

5    elucidate other potential victims, we certainly recognize that

6    that is explicitly what Judge Garaufis contemplated being

7    exchanged at this stage.

8           So we don't -- you know, sort of over our objection

9    we sort of -- we recognize that that, you know, is discovery

10   that could take place now.  Very different with respect to the

11   second category.

12          THE COURT:  Okay.  So let me hear about that.

13          MS. GARMAN:  Certainly.  And I guess just -- I guess

14   I'll preface all of this with saying we do somewhat disagree

15   with Your Honor's interpretation of what the -- what occurred.

16          THE COURT:  I'm only saying the allegations.  I'm

17   not saying that people sat around in a room and laughed about

18   it.

19          MS. GARMAN:  Okay.

20          THE COURT:  I'm just saying the allegation is that

21   there were improper disclosures.

22          MS. GARMAN:  Yes.

23          THE COURT:  And so I'm just putting it in the --

24   setting aside the official disclosures, which were discussed

25   at the conference with Judge Garaufis, disclosing to the

1     federal investigators, disclosing to the court, the state

2     court, just putting those things aside, there seems to be --

3     there seem to be allegations that the communications were

4     shared with other people and that was improper.

5              And so that's why I very flippantly said, you know,

6     let's suppose that people did have that -- have these

7     communications and shared it in a room and laughed about it,

8     that would be improper.

9              And so I'm not saying it happened, but to find out

10    who shared this information might elucidate whether they, you

11    know -- I don't know whether they would then become a party

12    somehow or that would then lead to further amendments to the

13    complaint.

14             MS. GARMAN:  Understood, Your Honor.

15             I was actually referring to Your Honor's

16    interpretation of the proceedings before Judge Garaufis.

17             It seems clear that Judge Garaufis was contemplating

18    limited discovery out of a concern of a potential running of

19    statute of limitations while briefing was going on.

20             And that the issue is really, you know, he wants

21    parties to be able to narrow the claims in this case and

22    narrow what the claims are before full fledged discovery goes

23    on.

24             And I think in reference to a concern raised by Mr.

25    Creizman that he would somehow be prejudiced because he also

1    -- his client also needed immediate discovery of a similar

2    urgency to that of the issue with this running of the statute

3    of limitations, her potential victims, Judge Garaufis seemed

4    to contemplate, well, I'm not going to prohibit you from

5    getting things that are of equal urgency.

6            So our position is that Judge Garaufis very clearly

7    limited this initial discovery to what is absolutely needed.

8    And the only specific example of that that was discussed at

9    the conference was what was needed to identify potential

10   additional victims.

11           THE COURT:  No.  So I'll read you the transcript.

12   Okay?

13           So toward the end of the proceedings, Mr. Creizman

14   stands up and says, "The only thing that concerns me is

15   whether Your Honor is issuing some sort of stay of discovery

16   against the City."  And he discusses some of his concerns.

17   And Judge Garaufis says, "Well, I am not saying anything that

18   would prohibit the magistrate judge from giving you reasonable

19   opportunity."

20           And then he says, "But obviously if you're not happy

21   with the outcome, you can always come to appeal."  So he's not

22   issuing -- he specifically is saying he's not issuing a stay

23   of discovery.

24           And so from my perspective, I'm in a position to

25   consider whatever is valid.  And I'm not saying I'm going to

1      open discovery full blast, but I think there is -- there's

2      room for us to have a well thought out plan for discovery so

3      that the parties can get what they need early so that we don't

4      have delays in terms of amendments, bringing in parties, any

5      of that, so that we can get that all sorted out early on in

6      the case.

7             And, of course, in making those determinations, I

8      will be weighing the proportionality and the difficulty and

9      the need for the information, but I'm going to look at what

10     makes sense in terms of disclosing that information early in

11     the case rather than later.  All right?

12            So that we're not stuck, you know, several months

13     down the line with a brand new, amended complaint because

14     there wasn't information that was given early on.

15            So, for example, there are John Does named.  So

16     perhaps this would be a good time to see whether these John

17     Doe potential names, if they exist, could be disclosed.  Okay?

18            That's what I'm trying to say is that I'm not -- I

19     understand the victims' issue was clearly on the table, but I

20     do not read what Judge Garaufis was saying to say you are

21     limited, because there was a specific question asked about a

22     stay of discovery and he said no.  All right?

23            So we're going to talk about it.  And whether I

24     ultimately rule that it should be turned over or not, is

25     something that we can have a discussion about.

1          And if you don't like my ruling, you can go back to

2     Judge Garaufis, but I don't think that we're limited today to

3     talking about just the victims.  So I just want to get that

4     issue off the table.  Okay?

5          MS. GARMAN:  Yes, Your Honor.  And we just wanted to

6     note our position.

7          I will answer your specific question now which was

8     our position with respect for the second category of the ECPA

9     discovery.

10         Our position is that, again, that there has been no

11    claim, no viable claim asserted against the City or any of the

12    City-represented defendants under the ECPA and, therefore,

13    without having stated a claim, the plaintiff is not entitled

14    to any discovery.

15         You know, it's obviously well settled that you

16    cannot get discovery in order to state a claim.  You need to

17    first state a claim to be able to unlock the doors of

18    discovery.

19         And here especially -- I mean, I know Your Honor

20    said setting aside the disclosures to the U.S. Attorney's

21    Office and to the Court so I won't address those because our

22    position on those is very clear.

23         With respect to whatever other allegedly

24    inappropriate transmissions I guess within the Kings County

25    DA's Office that are being alleged, there is nothing in the

1    complaint -- there's no factual content that specifies times,

2    dates, individuals, anything like that.  Everything there is

3    pleaded upon information and belief.

4            And it is our position that that is not sufficient

5    to unlock the doors of discovery to a fishing expedition with

6    which then they could attempt to try to, you know, get the

7    information they need.

8            In the first instance, they have to state a claim,

9    which is the purpose of us making this motion to begin with.

10           THE COURT:  All right.  So then let me hear from Mr.

11   Shapiro as to what your specific claims are in that regard,

12   rather than just conclusory statements.

13           MR. SHAPIRO:  Yes, Your Honor.  So I'll put aside

14   the allegations with respect to the disclosures to the

15   Department of Justice and the State Supreme Court.

16           We do allege in the complaint that there was

17   disclosure that Your Honor stated amongst the Kings County

18   District Attorney's Office.  Admittedly we don't know when

19   those disclosures took place or to whom they were made.

20   There's no way for us to know that information.  We need to

21   discover.  We need --

22           THE COURT:  But what makes you think that that

23   happened?

24           MR. SHAPIRO:  Well, one thing we know that has

25   happened since we filed the complaint, we appeared before a

14

1      state supreme court justice, spoke with a Kings County

2      district attorney who had reviewed communications that our

3      plaintiff was on.

4              We didn't know that before when we filed the

5      complaint, but that has subsequently happened.  There's no

6      reason to believe that others haven't reviewed it as well.

7              THE COURT:  But that sounds like it was reviewed in

8      the course of turning -- in the course of complying with a

9      court order to turn it over.

10             MR. SHAPIRO:  I don't know that.  Maybe it was.

11     Maybe it was reviewed beforehand.

12             THE COURT:  But that's what you just told me --

13             MR. SHAPIRO:  It was --

14             THE COURT:  -- that the information you got was

15     pursuant to the court order.

16             MR. SHAPIRO:  No.  The information I got was that

17     the district attorney reviewed all the communications.  I

18     don't know that the Court ordered him to do that.  I really

19     don't know that.

20             THE COURT:  So you're saying that if there's an

21     allegation of misconduct within the office, the boss cannot

22     look at -- look into it?

23             MR. SHAPIRO:  This was not a boss.  This was a line

24     assistant district attorney --

25             THE COURT:  Okay.

15

1          MR. SHAPIRO:  -- who is a colleague of my plaintiff

2     I should also note.

3          THE COURT:  Okay.

4          MR. SHAPIRO:  And so who else reviewed it in the

5     office, we don't know.  But we need discovery on that.  And --

6          THE COURT:  All right.  So what you want is to find

7     out who reviewed it and then you can sort out whether it was

8     proper or not?

9          MR. SHAPIRO:  We certainly want to know who reviewed

10    it.  We want to know where it is now and who has access to it

11    because it may just be that it's on the server --

12         THE COURT:  Okay.  So let --

13         MR. SHAPIRO:  -- and we want to know that.

14         We also want the contents of the communications

15    themselves.  I want to be very clear about that.

16         And I think we have an obligation to do all we can

17    to receive that because I really cannot overstate how much

18    emotional damage this is causing my client to not know what of

19    her communications were intercepted, what was being said and

20    who was saying them.

21         And I think we have an obligation to try to mitigate

22    those damages so that she can see what, in fact, was

23    intercepted.

24         THE COURT:  So one of the -- so I'd like to find out

25    from the City in a moment how this is all being stored now.

1       But one of my concerns with your approach is that if

2   all those communications are turned over to you, even in

3   attorney's eyes only, that that will then create a claim for

4   the counter parties to those telephone conversations to say,

5   look, now all these other people have seen these private

6   communications and that in itself is causing me humiliation

7   and harm.

8       MR. SHAPIRO:  We don't believe so, Your Honor,

9   because the communications that are being turned over took

10  place between a third party and our client.

11      THE COURT:  Yes.  But you're --

12      MR. SHAPIRO:  So our --

13      THE COURT:  -- so I'm talking about the third party

14  who are your potential clients.

15      MR. SHAPIRO:  I understand the concern, Your Honor.

16  Our client has a right to see those communications.

17      THE COURT:  I understand that, so we can talk about

18  that, but you're asking for them to be turned over to you.

19  You said attorney's eyes only.

20      MR. SHAPIRO:  We are, Your Honor.  And we --

21      THE COURT:  So that's different.

22      MR. SHAPIRO:  Pursuant to a court order, we believe

23  that's permissible.

24      THE COURT:  Well, but -- okay.

25      So let me find out from the City how are these

1    communications currently stored?

2              MS. GARMAN:  Your Honor, my --

3              THE COURT:  And what's the scope of them?  How many

4    are there, et cetera?

5              MS. GARMAN:  I can answer part of that.  My

6    understanding is that they are stored in two ways.  Just to be

7    very clear, the Kings County DA's Office takes the position

8    that these communications and everything else related to their

9    internal investigation of this incident are sealed and cannot

10   be accessed unless there is an unsealing order from the Court

11   or a 160.50 has been signed by Ms. Lenich.  That's why we

12   provided --

13             THE COURT:  Well, I think that's what's being

14   requested now.

15             MS. GARMAN:  -- we provided that release but haven't

16   gotten a signed one back.  So for that reason, no one is being

17   able to actually look at these --

18             THE COURT:  Wait.  Okay.  Hold on.  Let me -- sorry

19   to interrupt you.

20             Are you saying that you have given the plaintiff --

21   if the plaintiff -- because they are her communications --

22   that if she signs a release, that you can then turn it over?

23             MS. GARMAN:  No.  I guess there are sort of two

24   layers here.  First, the Kings County DA's Office takes the

25   position that everything related to this investigation of Ms.

1    Lenich is sealed by operation of law because that

2    investigation did not result in a conviction.  It was then

3    turned over to the U.S. Attorney's Office.

4         The DA's Office did its own internal investigation,

5    initially had Ms. Lenich arrested and charged.  And so with

6    respect to all of their entire file on this case -- basically,

7    which includes the communications themselves, but also

8    includes an awful lot more -- their position is that they are

9    sealed and can only -- and it is Ms. Lenich who has to sign a

10   waiver to authorize the disclosure of those.

11        THE COURT:  That's one route.  The other is a court

12   order.

13        MS. GARMAN:  Or a court order, of course.

14        THE COURT:  Okay.  All right.

15        MS. GARMAN:  The other issue with respect to the

16   actual communications themselves, for the reasons that Your

17   Honor actually -- out of concerns that Your Honor pointed out,

18   you know, it would take -- certainly take a court order for

19   the Kings County DA's Office to even think about releasing

20   those.  You know.

21        The irony does not escape defendants that, you know,

22   part of the claim against the City and the City defendants is

23   that they improperly disclosed these communications to other

24   law enforcement authorities, but then they would like us to

25   turn them over.

1          And as Your Honor said there are at least other

2     third parties who would be aggrieved persons under the ECPA.

3     And under Mr. Shapiro and Mr. Emery's theory, would have --

4     all would have claims against us if we just released these

5     communications.

6          So, no, it is not our position that Ms. Rosenfeld,

7     the plaintiff, could simply sign a release and we would be

8     able to give over the communications.  That would absolutely

9     need a court order.

10         But there's just -- there's sort of two layers to

11    it.  It's the 160.50 issue with respect to the overall

12    investigation.  And then, you know, the issue with respect to

13    the actual communications and the ECPA issues.

14         THE COURT:  Okay.  So the 160.50 issue seems like an

15    alternative route for the release of the communications and

16    the file.  A court order creates a different route.  Right?

17         MS. GARMAN:  I would say we need sort of -- we need

18    sort of both issues taken care of.

19         THE COURT:  Why?

20         MS. GARMAN:  Because the -- with respect to the --

21    the entire file, you know -- and again this sort of goes back

22    to I can't -- I don't know what is in the file or how many,

23    you know, hours or megabytes of information we're talking

24    about because all of that is sealed and no one is able to look

25    at it to give me those answers, but the Kings County District

1      Attorney's Office file related to their investigation of Ms.

2      Lenich contains a lot more than just the actual communications

3      themselves.

4                 THE COURT:  Right.  Well, at the moment --

5                 MS. GARMAN:  So that, plus the unsealed --

6                 THE COURT:  Right.  At the moment, all that's being

7      requested are the communications, not the file itself.

8                 MS. GARMAN:  Yes, Your Honor.  But for anything in

9      that file, the DA's Office's position is that for anything in

10     that file to be released, whether it's communications or, you

11     know, pieces of paper, we either need a 160.50 release signed

12     by Ms. Lenich or Your Honor's explicit court order deeming

13     that that file unseal.

14                That is sort of a separate issue of then the

15     underlying communications which we would also submit that

16     regardless of the 160.50, we also need a court order.  Because

17     again even when the DA's Office has had a grand jury subpoena

18     or a court order and has done the limited disclosure of these

19     communications, they're now here being sued for that.

20                THE COURT:  Okay.  So let me try to see what the

21     bottom line is of what you're saying.  You don't know how big

22     this -- what the scope of the communications is?  You can't

23     tell me how many there are because you don't have access to

24     them?

25                MS. GARMAN:  Correct.  I can tell you I do know that

1    they are stored at the DA's Office in two different ways.

2    They are on the hard drive under -- again all sealed, can only

3    be accessed, you know, again, only with a court order.

4              THE COURT:  So no person has access to that?

5              MS. GARMAN:  There are -- I believe there is an

6    administrator who given a court order could go in there.  But

7    certainly absent that -- absent a court order, no, no one can

8    access it.  But there is an administrator who would be able to

9    get the communications from the hard drive.

10             In addition, my understanding is that because there

11   was material turned over to the U.S. Attorney's Office

12   responsive to the grand jury subpoena, there is, I guess, a

13   hard copy of those.  Of everything that was turned over,

14   there's also a hard copy.  Same thing under seal --

15             THE COURT:  When you say hard copy, what do you

16   mean?

17             MS. GARMAN:  I don't specifically --

18             THE COURT:  A thumb drive?

19             MS. GARMAN:  I would assume either a thumb drive or

20   disks.  Admittedly, I don't know.  But in any event, something

21   separate from the hard drive.  And again under seal, not to be

22   accessed by anyone.

23             THE COURT:  Because it's Rule 6, grand jury

24   material?

25             MS. GARMAN:  Yes.  Among -- yeah -- in addition to

1    the other, you know, the other issues that I just mentioned

2    about, the 160.50 issue.

3             So no one is able to tell me exactly what there is

4    and how much there is until there is, you know, court orders

5    unsealing all of that.  But my understanding again is that

6    it's stored in those two different ways.

7             THE COURT:  Okay.  So if the request were for you to

8    provide the names of who the third parties are, are you saying

9    you can't do it because there's no list and you or somebody

10   would have to listen to the conversations to get it?  Or is

11   there a list?

12            MS. GARMAN:  So again the answer is I don't know,

13   but with an explanation as to what I do know.

14            So with respect to what was turned over to the U.S.

15   Attorney's Office, these what I've called hard copies of

16   things, we don't know at this point in time just because it's

17   been several years -- and, again, no one's been able to go

18   back and look at this material because it's sealed -- we don't

19   know if this actually happened, but it is suspected that in

20   addition to turning over the actual communications, like the

21   recordings, the DA's Office may have extracted certain, I

22   guess, metadata, so the phone numbers that were picked up on a

23   given date and sent -- and they have also produced that.  We

24   do not know if that happened --

25            THE COURT:  Produced that to whom?

1          MS. GARMAN:  To the U.S. Attorney's Office, which

2     would mean that that information would already have been

3     extracted and would somehow be -- would be contained in this

4     hard copy file.

5          If that did not take place, my understanding is that

6     one could, again, with a court order, access the hard -- the

7     hard drive -- the actual communications that are on the hard

8     drive and could extract phone numbers and I guess and dates.

9     I do not believe it would give names, but it would give phone

10    numbers and the dates of when the conversations with those

11    phone numbers occurred.

12         Beyond that, I don't know what other information can

13    be pulled, but I do know that there's a way to extract that

14    information.

15         Again, not knowing the scope of things, I do not

16    know how burdensome that would be or how much time that would

17    take.  And again I don't know if it's already been done.

18         THE COURT:  Okay.  So it seems like as far as this

19    issue of the potential victims, what could happen is that you

20    get the phone numbers.  Okay.

21         Yes.  I realize I haven't had you speak.

22         MR. CREIZMAN:  Sorry, Your Honor.

23         THE COURT:  No, that's all right.

24         MR. CREIZMAN:  I just want to --

25         THE COURT:  Thank you for reminding me of your

1    presence, Mr. Creizman.

2            MR. CREIZMAN:   Thank you.   I appreciate that.

3            I just want -- I want to just make at least a point

4    on the record at this time about the plaintiff's request for

5    the wiretaps, the purposes of identifying other victims and

6    potential plaintiffs.

7            I think I -- we take no position really whether

8    plaintiff should be permitted to have the wiretaps.   I'm not

9    sure what the statute says, but it seems as an equitable

10   matter, plaintiff was the one who was victimized by these

11   recordings and plaintiff should be able to have that.

12           My issue is for the purposes of identifying

13   potential plaintiffs, that's, I think, something I think

14   should be limited or prevented actually for a number of

15   reasons.

16           Number one, these wiretaps happened from June 2015

17   through January of 2016.   As plaintiff's complaint plainly

18   says there was -- the effect of Ms. Lenich -- the discovery of

19   these wiretaps had an enormous impact on plaintiff within her

20   office, within the Brooklyn courts, with the law enforcement

21   and with defense lawyers who practice in those courts.   So

22   that's number one.   Okay.

23           And no one has come forward who has heard about that

24   and has said, okay, we want to join in this action.   There's

25   been extensive media coverage since about not only what Ms.

1  Lenich did, but about plaintiff's civil case.  In fact,

2  plaintiff's counsel has talked to the media on occasion.

3       And the U.S. Attorney's Office is in the course of a

4  sentence, preparing for sentence, probation -- the probation

5  department of the U.S. Attorney's Office are supposed to work

6  together to identify potential -- who are the victims of a

7  crime and get -- and solicit victim impact statements for

8  something else.  No one other than plaintiff came forward and

9  I think that's telling.

10      And that raises the concern that by identifying

11  victims and then approaching them, people who are on these

12  calls, we are creating a claim that never existed, that the

13  plaintiffs are in a sense causing damage that never would have

14  happened had they not approached these people.

15      And you would -- and one would assume that most of

16  the people who spoke to plaintiff on the phone during that

17  time period know, pretty much can guess, that they might have

18  been captured on these recordings.

19      And one other additional point.  I don't know what

20  the statute says about necessarily -- I'm still researching

21  this issue -- but a third party on a legal wiretap, I'm saying

22  an absolutely lawful wiretap, a third party who is captured on

23  a lawful wiretap doesn't have a privacy interest to suppress a

24  wiretap or to sue someone because they happen to have been

25  captured.

1            Now I understand that these were unlawful wiretaps.

2     But it seems to me that what -- if people -- what certain

3     people don't know -- and it seems like here a lot of people

4     would guess that they were captured -- but what certain people

5     don't know, let's say the plumber who plaintiff called to fix

6     a leak in the ceiling, that person -- maybe what that person

7     doesn't know won't hurt him or her.

8            And so that's why I am objecting.  And I would like

9     the opportunity to brief the issue as to whether plaintiff

10    should have the wiretaps -- were to limit the use of the

11    wiretaps, so that it's not used for the purposes of soliciting

12    or informing other potential claimants.  That's my piece.

13            THE COURT:  Okay.  All right.  Thank you for that.

14            And I think that reminds me of a point as far as

15    these additional victims go.  The allegations with regard to

16    the damages of the plaintiff have to do with humiliation and

17    et cetera.

18            And so there is a good point that what people don't

19    know didn't harm them.  So if all these other third parties

20    have not come forward and said as a result of what happened

21    here they were humiliated or caused stress or whatever then,

22    you know, they haven't come forward.  And certainly they would

23    have had an opportunity to come forward.  So I do wonder about

24    that aspect of things.

25            MR. SHAPIRO:  Your Honor, two points in response to

1     that.  The first is that this whole scheme was not uncovered

2     until November of 2016, so nearly a year after all of these

3     wiretaps happened.

4              To say that these third parties would have

5     necessarily known that they were captured, would have

6     appreciated a phone call that they had with plaintiff a year

7     earlier, I think there's no way to know that.  Yes.  Perhaps

8     her mother spoke to her once a week or something like that,

9     but other parties --

10             THE COURT:  I don't mean that point.  I mean the

11    harm that your client is saying was caused to her was that

12    once the scheme was revealed somehow it became public.

13             And when it became public -- or, you know, that

14    people, that reporters were parked outside her apartment, that

15    she was being harassed, that her family was being harassed,

16    that her coworkers were looking at her funny, and so, you

17    know, all those things are a result of the disclosure of this

18    information.

19             And if the counter parties to those phone

20    conversations were having the same problem, we haven't heard

21    of them.  And certainly if they did, I would assume you would

22    have heard from them.  So that does cause in my mind a

23    question as to who else you think is -- not who else is on

24    phone calls, but who else was damaged.

25             MR. SHAPIRO:  Well, I understand your point, Your

1      Honor.  I think Congress, in enacting statutory damages under

2      the ECPA, there are specific statutory damages for every day

3      that a violation occurs, there's no need to show emotional

4      damage.  There are statutory damages here.  So our --

5              THE COURT:  So you're saying the mere fact that

6      somebody was a counter party to an illegal wiretap means that

7      they're entitled to statutory damages?

8              MR. SHAPIRO:  That's right, Your Honor.

9              THE COURT:  I haven't looked into that issue, so I

10     don't know.  But if you're alleging that, then that might be a

11     basis.  Yes, Mr. --

12             MR. EMERY:  Your Honor, if I may add to what my

13     colleague, Mr. Shapiro, has said.

14             I'm not -- I'm confused for the moment as to the

15     structure of what we're talking about because, number one, the

16     City has not made a motion to stay discovery.  That's their

17     initial question.  They have not done that before you and they

18     have the burden on that under the applicable case law that you

19     know better than I to show that there are compelling reasons

20     to stay discovery.

21             Secondly, with respect to their claims, they're

22     inherently, as you've already heard and already been able to

23     figure out from what you've said so far, these are deeply

24     factual issues as to whether the *Monell* claim stands as a --

25     she's a final authority figure to make the decisions about

1    wiretaps, or whether there was a policy in the office which

2    was so bereft of constitutional guarantees that it put people

3    in a position of being wiretapped without any protections by

4    the office itself, whether there were -- and whether it was

5    respondeat superior whether she's acting in the scope or not.

6         At her sentencing, on pages 25 and 27 of her

7    sentencing, she implies that she was doing this in a state of

8    emotional distress about her work in order to save a very

9    important case that she was handling at the time.  These are

10   all very, very intense factual issues.

11        THE COURT:  Okay.  So, Mr. Emery --

12        MR. EMERY:  Yeah.

13        THE COURT:  -- what I understand my job is today is

14   to structure your discovery.

15        And it sounds like the City did try to make a motion

16   to stay before Judge Garaufis.  My reading of the transcript

17   is that he denied it.  And so -- but he asked me structure

18   this in a way that makes sense.

19        MR. EMERY:  And I --

20        THE COURT:  And so even though it's not a, well, if

21   your motion to stay has been denied, full steam ahead.  I

22   don't read it that way.  I read it as we're here to figure out

23   what makes sense.

24        MR. EMERY:  And I completely agree with you.  And I

25   was very heartened to hear your citation of the end of the

```
 1    transcript because I think the upshot of what Judge Garaufis
 2    said -- I was there -- was that you have the discretion.
 3                THE COURT:  Which is what I'm doing.
 4                MR. EMERY:  He is leaving it to you.  Yes.
 5                THE COURT:  Right.
 6                MR. EMERY:  But the way we're fashioning this, if
 7    you think about it, the way you're -- at least I'm hearing,
 8    maybe I'm hearing it wrong and maybe you're --
 9                THE COURT:  I haven't ruled yet.
10                MR. EMERY:  I know you haven't ruled yet.  But there
11    are things that -- you said you've got the numbers, for
12    instance, you've got the phone numbers, that seemed reasonable
13    to you.
14                And what I'm wondering about is we need far more
15    than the phone numbers to properly conduct this case.  And as
16    memories are lost as time goes on, we want to aggressively
17    pursue this case.
18                And what's more, our client on a daily basis,
19    suffers from not knowing what was -- she said in those phone
20    calls.
21                You know, at a minimum, you'd get her side of the
22    conversations, but I think you should get attorney's eyes only
23    under a court order, which doesn't create a claim by any third
24    party, all of those conversations that she was privy to.
25                The alternative here is that we file a class action.
```

1    And we don't really want to file a class action that asserts

2    that all of these people have statutory damage rights and that

3    we're going to have to identify the class.

4           THE COURT:  Well, I don't --

5           MR. EMERY:  And to handle it differently --

6           THE COURT:  Well, I don't think under these

7    circumstances class action makes sense because the numbers are

8    readily identifiable.  It's a question of when they will be

9    identified.

10          MR. EMERY:  Well --

11          THE COURT:  And what I'm hearing -- partly, I'm

12    trying to be very practical.  Okay.

13          So that's why I'm trying to figure out what the City

14    has access to right now that they can give you without a lot

15    of trouble and then what kind of effort would be needed to

16    produce more.  I'm not saying that they're not going to

17    produce it.  I'm just trying to figure out when.

18          MR. EMERY:  And just let me say as to that point,

19    it's completely unbelievable to me that they don't know the

20    scope and the details of this , because well before it was

21    turned over to the U.S. Attorney's Office, when they were

22    doing the investigation themselves at the Kings County

23    District Attorney's Office, they reviewed all this material.

24          THE COURT:  The DA's Office may know.

25          MR. EMERY:  Yes.

1          THE COURT:  The assistant corporation counsel may

2     not know.

3          MR. EMERY:  She has clients.  They can tell her.

4          THE COURT:  Well --

5          MR. EMERY:  I mean --

6          THE COURT:  Okay.  So --

7          MR. EMERY:  -- they're smart people over there.

8     They know what they have.

9          THE COURT:  It's not about being smart.

10          MR. EMERY:  Yeah.

11          THE COURT:  It's about what information's being

12     conveyed.  So you make a good point.

13          Has your client told you what the scope is?  You've

14     told me you don't know.  Is it one of those things where you

15     just haven't asked?

16          MS. GARMAN:  Certainly not, Your Honor.

17          THE COURT:  Okay.

18          MS. GARMAN:  Again the issue is that all of this

19     material is sealed so no one can go back and look at it.

20          THE COURT:  Right.  But somebody did look at it,

21     right, before turn this over to the U.S. Attorney's Office?

22     So somebody knows the information?

23          MS. GARMAN:  Years ago, yes, Your Honor.

24          THE COURT:  Yes.  Okay.  So that's -- I think Mr.

25     Emery does make a good point that somebody knows how much

1    there is.  So the fact that you haven't informed yourself as

2    to how much there is doesn't mean you, plural, don't know it.

3         MS. GARMAN:  Yes, Your Honor.  First of all, I don't

4    think that it's accurate to say that all of this material was

5    listened to.  First of all, I don't -- I don't think anybody

6    at this point in time knows that.

7         Yes.  At some point in time, obviously, someone knew

8    how much information was being turned over.  But the issue is

9    we've certainly made inquiries and we have not been able to

10   find out.  And it's not a matter of having someone just go

11   check the file because that's not possible.

12        THE COURT:  Okay.  So let me -- given this

13   discussion today and the gaps in knowledge, both factual and

14   perhaps legal, I think I need to have some further briefing on

15   the issue.  Okay.

16        So the questions will be for the City to get their

17   arms around what is in these sealed files, not the content

18   necessarily, but, you know, what the scope of it is, how

19   difficult it is to get them, how they're stored, who has

20   access, the numbers of people, that kind of thing.  Okay?  I'm

21   not saying to go and listen to everything.  I'm just saying

22   get your arms around what there is.

23        MS. GARMAN:  When you say the numbers of people, you

24   mean physically how many people are these other potentially

25   other victims?

34

1          THE COURT:  How many phone calls are we talking

2     about?

3          MS. GARMAN:  How many -- okay.

4          THE COURT:  I guess I misstated it, because I don't

5     -- I don't mean -- you know, these communications were between

6     the plaintiff and someone.

7          And so if you can find out how many someones there

8     are, that's great.  If you can't, because all you have are

9     phone numbers -- I mean, right, a phone number can be listened

10    to by different people.  If you're in a home, you call the

11    home, all the residents are potential parties to that, so I

12    get that.

13         So if you can say, you know, either how many

14    communications there are, or better yet how many discrete

15    phone numbers those communications were with, that would be

16    useful.  Right?  And so how they're stored, who's got access

17    to them.  And you named a few of the barriers to disclosing,

18    but if there are other problems, you should let the Court

19    know.  All right?

20         And then from the plaintiff's perspective, you need

21    to let me know why you need all of that information.  Okay?

22    And if you are saying that it's a matter of equity because

23    your client should know everything that's there, you can make

24    that argument.  I'll consider it.

25         If you're saying there's a statutory violation as to

1  the third parties because this is an illegal wiretap, and so

2  even if they don't know about it, they're entitled to damages,

3  then I'd like to hear that argument with legal citations.

4          And then, you know, if you have a proposal for -- on

5  both sides -- a proposal if you want to have a tiered or

6  staggered discovery as far as being able to get the

7  information in steps and why you need to do that, then that

8  would be useful too.

9          So, for example, if the City says we've got all the

10  phone numbers so we can turn that over fairly easily, even

11  though we don't want to, but to get the communications

12  themselves is difficult for XYZ reasons, then I'll hear those

13  reasons.  Okay?

14          So I'd like that briefing on the question of the

15  communications and the information contained in those

16  communications.

17          But it sounds like for the moment they are in a

18  secure place.  I want to have more details about how secure

19  that is.  But it sounds like they're in a secure place, so

20  that give me some comfort.  Okay.  But I do think that counsel

21  for the City needs to be better informed about what's there.

22  All right?

23          MS. GARMAN:  Yes, Your Honor.  Just a couple of

24  things.

25          First, in order for us to be better informed and to

1    even make these inquiries, we will need a court order

2    explicitly stating that, you know, for the purposes of at

3    least this limited exercise those materials are unsealed and

4    should be looked at by members of the Kings County DA's Office

5    and corporation counsel.

6              THE COURT:  Well --

7              MS. GARMAN:  The position --

8              THE COURT:  Okay.  So Mr. Creizman's here.  Would

9    your client permit, for purposes of this exercise, someone to

10   look into those files?

11             MR. CREIZMAN:  Your Honor, I'm meeting with my

12   client next Saturday at the Federal Correctional Facility

13   Institution in Danbury.

14             So this issue is something that I've been

15   communicating with her about, but it's harder to do it outside

16   of the prison.  So when I actually get there, I will have an

17   answer sometime on this Saturday.

18             THE COURT:  All right.

19             MR. CREIZMAN:  So I could actually -- after

20   Saturday, I'll be able to --

21             THE COURT:  Bring a copy of the 160.50 with you and

22   see.

23             MR. CREIZMAN:  Okay.  Yes.  Absolutely.

24             THE COURT:  If she's giving permission, then a lot

25   of these problems are solved.

37

1          MR. CREIZMAN:  Yes.  Another thought, if I may --

2          THE COURT:  Yes.

3          MR. CREIZMAN:  -- is it possible for the Court to

4    issue an order to -- or a request that the U.S. Attorney's

5    Office Victim's Rights Coordinator, if they have discovered

6    information, if they have a list already drawn up, whether

7    they can turn that over to just the Court under seal and the

8    parties.  Something along those lines might be useful in that

9    regard.

10          THE COURT:  Okay.

11          MR. CREIZMAN:  And if I have any other homework to

12    do, please let me know.

13          THE COURT:  Okay.  Well, that's a good idea too.

14          MR. CREIZMAN:  Okay.

15          THE COURT:  So if somebody wants to do that --

16          MR. CREIZMAN:  I can --

17          THE COURT:  -- then you can draw up a draft of

18    something for me to consider.

19          And also, Ms. Garman, if there's a draft order that

20    you think would useful in giving you access, then that would

21    be useful, then please submit that as well.

22          MS. GARMAN:  Yes, Your Honor.  Certainly we will.

23          My other -- really just some points of clarification

24    as to the scope of what the communications are.

25          As Your Honor is probably aware, so this wiretapping

1    scheme involved not just the plaintiff but there was another

2    phone.

3          And so I just want to be clear that when we're

4    talking about identifying, you know, what communications there

5    are, we are only talking about Ms. Rosenfeld, the plaintiff in

6    this case, her -- the communications that were taken from her

7    phone, not the other person.

8          THE COURT:  What is the other phone?  What is the

9    other phone, another person?

10         MS. GARMAN:  Yes.  Another person who is not a party

11   to this case.

12         THE COURT:  Another private person?

13         MS. GARMAN:  Yes.

14         THE COURT:  That person's private phone?

15         MS. GARMAN:  Correct.

16         THE COURT:  All right.  Okay.

17         MS. GARMAN:  So just we're clear --

18         THE COURT:  That that makes --

19         MS. GARMAN:  -- we're limited to the communications

20   taken from --

21         THE COURT:  -- that makes sense to me.

22         MS. GARMAN:  Okay.  And --

23         THE COURT:  But let me just find out.  I hear --

24         MR. SHAPIRO:  Let me just --

25         THE COURT:  -- chatter on the plaintiff's side.

1          MR. SHAPIRO:  Yeah.  Let me just make sure I

2     understand.  Our position is certainly that we're entitled to

3     all communications that our client was party to that were

4     taken from the other phone as well.

5          THE COURT:  Okay.  Well, so if -- let me get some

6     clarity on that.  This other phone, if that other phone was

7     communicating with the plaintiff, then that is probably

8     something that should be turned over.

9          MS. GARMAN:  Understood, Your Honor.

10         THE COURT:  Or should be considered as part of this

11    exercise.

12         MS. GARMAN:  We would just point out that that --

13    those communications on this other individual's phone, that

14    included another party, the plaintiff, they will not elucidate

15    anything about other potential victims because we know who the

16    two parties are.  They were this other person whose phone it

17    was and the plaintiff.  So if the exercise --

18         THE COURT:  But that's information that at some

19    point will be turned over?

20         MS. GARMAN:  Yes.  Yes, Your Honor.  But I'm just

21    saying in terms of staging discovery, and if the limited

22    purpose of this exercise is to identify additional victims,

23    that those communications will not help.

24         The only other issue --

25         THE COURT:  But the only thing I would say for that

1    is I want you to get the information on that from the get go

2    so that I can make that consideration.  It may be that it's

3    not disclosed early on, but I want you to become informed as

4    to the status of those other communications.

5               MS. GARMAN:  Meaning how many phone calls, text

6    messages, whatever there were?

7               THE COURT:  Yes.

8               MS. GARMAN:  Okay.  And, yes, again, another point

9    is that they were talking about both oral communications, so

10   actual recordings of conversations.  And also one of the

11   phones there were text messages, so I'm --

12              THE COURT:  So wiretaps can take -- can record text

13   messages?

14              MS. GARMAN:  No.  There was additional -- in

15   addition to actually physically doing the wiretaps, my

16   understanding is that there were grand jury subpoenas and

17   search warrants that were fabricated and sent out to

18   telecommunication providers to get text messages and other

19   things.

20              THE COURT:  So everything that's the subject of the

21   wiretap, the search warrants, the subpoenas.  So I think that

22   all falls within the scope of the communications because all

23   of those are potentially part of the fraud, right?

24              MS. GARMAN:  Okay.  Yeah.  I just wanted to make

25   sure --

1          THE COURT:  Yes.

2          MS. GARMAN:  -- because we're talking about

3    communications and I just wanted to be clear what we're --

4          THE COURT:  Yes.  We've been talking wiretap and

5    phone calls.  But yes, thank you for clarifying.  And yes, I

6    do think all of that falls within the scope.  And if you need

7    to parse them out, go ahead and do that.

8          But what I'm concerned about in terms of our being

9    able to have some finality today is that you don't know

10   enough.  And I know that there have been barriers to it.

11         But I think the most important thing is that you

12   start to learn more about the case so that we could have these

13   conversations and for me to then fashion an order that makes

14   sense.

15         So I want you to get a good view of all the

16   communications.  And what part of it gets turned over is

17   something that I will consider after I've seen everything.

18   But at the moment, I can't even talk about it because I don't

19   -- you can't tell me what we're, you know, what we're talking

20   about specifically.  Okay.

21         MS. GARMAN:  Understood, Your Honor.  And I think

22   the approach makes sense.  I just want to make sure that we're

23   clear so we do this one time.

24         THE COURT:  Yes.

25         MS. GARMAN:  And so --

42

```
1              THE COURT:  Yes.  That's why I'm making it very
2     broad at the beginning.
3              MS. GARMAN:  But the communications are limited to
4     those involving Ms. Rosenfeld, the plaintiff, as one party.
5              So we're not talking about this other phone
6     communications that that person might have had with his
7     mother, aunt, you know, other people.  We're just talking
8     about ones with which plaintiff was a party?
9              THE COURT:  In the first instance, that is what we
10    are talking about.
11             MS. GARMAN:  Okay.
12             THE COURT:  But it behooves you to understand more
13    so that if we get to that place you are prepared to talk about
14    it.
15             MS. GARMAN:  Yes, Your Honor.  Thank you.
16             THE COURT:  Okay.  Yes.
17             MR. SHAPIRO:  Just to clarify, Your Honor.  So
18    you're directing us to put this in the briefing that you're
19    ordering today, is that right?
20             THE COURT:  Yes.
21             MR. SHAPIRO:  So we'll be privy to this information
22    as well?
23             THE COURT:  Yes.
24             MR. SHAPIRO:  Okay.  Great.  And it's -- in our
25    view, this should include not just the numbers, but the number
```

1    -- the length of calls, if they can get that information, the

2    number of text messages that were exchanged.  We need to know

3    really the scope of this.

4            THE COURT:  Well, that's what I've asked for is the

5    scope.

6            MR. SHAPIRO:  Okay.  I just wanted to clarify that.

7            THE COURT:  So I don't know whether the length of

8    the phone calls is -- whatever the -- you made mention of

9    metadata, so you can just describe what the metadata would

10   show.

11           MR. SHAPIRO:  And that would include --

12           THE COURT:  So you don't have to give me a list of

13   all the phone numbers, all the phone calls and the length.  I

14   don't need that at this moment.

15           I just need to know that you know it so that you can

16   talk about the scope.  If you tell me there are 10,000 of

17   them, that's going to be different from saying there are 10.

18   Right?  At the moment, I don't know.  And you don't know?

19           MS. GARMAN:  Right.  Right.  So just to be clear,

20   you're not asking us to say, okay, there were 10,000 phone

21   calls, and here are the parties to each one, and this is the

22   date.  You just want us to ascertain, yes, okay, there were

23   ten.  You know, the --

24           THE COURT:  And tell me how difficult it will be to

25   generate that.

1          MS. GARMAN:  Right.

2          THE COURT:  I'm not asking to actually generate it

3    now because maybe it's difficult.

4          MS. GARMAN:  Right.

5          THE COURT:  I don't want to impose that burden at

6    the beginning, but I just need for you to be able to talk

7    knowledgeably and describe what is there.  And then if it

8    turns out it's going to be easy, it already exists, then, you

9    know, once I weigh the proportionality, I might say it's easy,

10   just turn it over.

11         But if you tell me it's going to take months with

12   outside vendors or whatever, then, you know, that might be a

13   different issue.  But at the moment, like I said, I just don't

14   have the information.

15         MS. GARMAN:  Yes, Your Honor.

16         THE COURT:  All right.  So you need to tell me the

17   information.

18         I'm not telling them to generate that information

19   yet because I don't know how difficult it is.  Okay?

20         So just provide that information.  Get yourself

21   informed.

22         So the first step is, if there are barriers to you

23   getting information, create what you think is necessary as an

24   order.  I'll look at it.  It's going to be filed on -- a

25   proposed order on the public -- all of this is public filings.

45

1    Okay.  Because at the moment we're not talking about anybody's

2    names.  We're not talking about the content.  So this is all

3    public.

4              So just file it as a proposed order and I'll look at

5    it.  And if it's good, I'll sign it and then that will open

6    the door for you to get that information.

7              If Ms. Lenich provides authorization, then that's

8    another avenue for you to, you know, rely on.

9              And then I would like to get briefings by everybody

10   on the things that I've asked you to brief on.  And then I'll

11   give each side a time to respond to each other.  And then I'll

12   look at it and I think I'll have a better idea of what to do

13   as far as the communications.

14             Now we haven't even talked about the other side,

15   which is who had access.  Is that information that you can

16   readily ascertain?  Ms. Garman?

17             MS. GARMAN:  I --

18             THE COURT:  Because you've told me that this

19   information was very, very corralled.  And so it would seem to

20   me that if people were taking pains to make sure that it --

21   that that wasn't a lot of access, that it would be easily

22   ascertainable as to who did have access.  So I think you

23   should get that information.  Okay?

24             MS. GARMAN:  Okay.  I do not know how easy it will

25   be to get that information.  I mean, we can -- just note our

1    objection to, at this point in time, you know, engaging in

2    that kind of discovery, but I will -- I will look into --

3              THE COURT:  Well, I note your objection.

4              But like I said before, it's important to understand

5    -- if the allegations are that the information -- the

6    communications were given to people who were not supposed to

7    get them, you know, just to use a very generic description,

8    then they -- there may be other claims.  Right?  And so I

9    think it's important to get that out up front.

10             So I want you to ascertain who had access to this

11   information, and then you can make an argument as to, you

12   know, whether it should be disclosed at a point when you have

13   better information.

14             Because if you say these people were the only ones

15   who looked at it, then we're done.  But if you say, you know,

16   there were clerks who might have looked at it, or there were

17   people who photocopied things -- you know what I mean -- it's

18   just if you can't -- or it was shared with somebody maybe at

19   another DA's office to get their input -- I don't know, I'm

20   just making that up -- but we don't know.

21             So again we're trying to deal with this issue in a

22   vacuum without knowledge.  So I want you to be informed as to

23   who may have had access to this other information and then we

24   can talk about it.

25             MS. GARMAN:  Okay.  So Your Honor is not ordering us

1    to produce that information?

2              THE COURT:  No.  I just want you to know so that you

3    can make arguments on it.  And then when you make those

4    arguments, the other side will have a chance to argue against

5    it.

6              MS. GARMAN:  Yes, Your Honor.

7              THE COURT:  All right.  But I can't -- I'm supposed

8    to -- in these discovery -- in the new world of discovery, I'm

9    supposed to make portionality considerations.  And so I can't

10   do that if I don't know what this entails and how important it

11   is to you.  I have an inkling of why it's important to you,

12   but I need to see.

13             You know, if you tell me it's impossible, you know,

14   it's really difficult or whatever -- or you might come back

15   and say the answer is no, zero, nobody else had access other

16   than these named people, then we're done.  We don't have to

17   keep chasing this.

18             But if there are other people, then I think we can

19   have a discussion about whether those -- providing those names

20   is important in this case.  Okay?

21             MS. GARMAN:  Yes, Your Honor.  So you'd like that

22   also sort of in our briefing?

23             THE COURT:  In the briefing, yes.  Okay.

24             So let's now turn to timing.  So today is June 7th.

25   How much time do you think you'll need to brief this?

1          MR. SHAPIRO:  Is the City going to be brief -- are

2     we going to be responding to the City's brief?

3          THE COURT:  Let me think about this.

4          So the City is the one with the information and

5     you're the ones who are saying you need it.  Okay.  Yeah.  I

6     think so.  I think it's the City that will need to make the

7     first filing, and then you can make your legal argument as far

8     as why you need it in your response.

9          So, Ms. Garman?

10         MS. GARMAN:  Your Honor, we'd ask for three weeks.

11         I mean, we do need some time to get the appropriate

12    order and then discuss with the appropriate folks at the DA's

13    office how this is to be done.

14         THE COURT:  Okay.  So three weeks gets us to June

15    28.  And I'll call it a motion for protective order.

16         And then how much time will the plaintiff need?

17         MR. SHAPIRO:  Yeah.  I was just looking at my

18    schedule, Your Honor.  I'd like to do this quickly.  Could we

19    have until July 13th?

20         THE COURT:  All right.  And then how much time will

21    you need to reply?  Is a week enough?

22         MS. GARMAN:  Your Honor, I do apologize.  I was just

23    looking at the calendar.  So our motion papers for the motion

24    to dismiss are due June 29th.  So we would actually ask, in

25    light of that, for four weeks.

1          THE COURT:  So a week after that date deadline?

2          MS. GARMAN:  Yeah.

3          THE COURT:  All right.  So --

4          MS. GARMAN:  I apologize.

5          THE COURT:  That's okay.  So a week after that would

6    be July 6.

7          MS. GARMAN:  Okay.

8          THE COURT:  July 4th is a holiday.  I hope that

9    doesn't cause a problem.

10          MS. GARMAN:  Fine.

11          THE COURT:  Okay.  There will be fireworks

12   regardless.  Okay.

13          So then if it's July 6th, is it then July 20th for

14   you or more than that, Mr. Shapiro?

15          MR. SHAPIRO:  No, that's fine.

16          THE COURT:  All right.  July 20th.  And then?

17          MS. GARMAN:  A week to reply.

18          THE COURT:  The 27th.  Okay.

19          So at that point, I will look at everything.  If I

20   need further argument, I will schedule that shortly

21   thereafter.  And if not, I'll just make a ruling on the

22   papers.  Okay?  So that's for that first part.

23          At that point, I think we can look at what other

24   discovery might be in order.

25          MR. SHAPIRO:  Well, Your Honor, on that point, we

1    believe discovery against at least Ms. Lenich should go

2    forward.  She's answered the complaint.  There's really no

3    reason for a stay to stay that discovery.

4              THE COURT:  So what are you asking her to produce?

5              MR. SHAPIRO:  Well, we would like to take her

6    deposition for starters.  At least an initial deposition so we

7    can get some information.  We really don't have a lot of

8    information.  We'd like to do that.

9              We also would like -- I'm not sure how many

10   documents Ms. Lenich has, but the City is in possession of a

11   lot of documents that are relative to the case against Ms.

12   Lenich.  I mean, we believe we should be able to take

13   discovery --

14             THE COURT:  But what I'm hearing is that all of that

15   is what is sealed as part of her files.  So if she's in

16   control of it, then either she'll give authorization for it to

17   be released or she can release it herself.

18             MR. SHAPIRO:  I understand.  There are -- certainly

19   I understand you're dealing with the stuff that is sealed.

20   And that I understand from Ms. Garman today that that

21   encompasses all the investigation material.

22             THE COURT:  Yes.

23             MR. SHAPIRO:  I don't know whether that encompasses

24   materials, communications that Ms. Lenich had over the course

25   of the 18 months that she was conducting this wiretap scheme.

1          THE COURT:  Communications with?

2          MR. SHAPIRO:  With other ADA's in the office about

3     the wiretap scheme and how she actually did it, whether there

4     were emails to other ADA's directing them to take actions

5     relevant to the wiretap scheme.  I'm not sure that that is

6     sealed.  I'm not sure why those emails would be sealed.

7          Other emails that may exist between Lenich and

8     others, that is certainly information at the very least.  And

9     there may be more stuff that we would want from the City.

10          I recognize that you're dealing with the sealed

11    investigation materials separately, but other communications

12    we think we should be entitled to now.  And certainly a

13    deposition of Ms. Lenich And potentially document requests to

14    Ms. Lenich.  I don't know what she has, but we'd like to

15    determine that.

16          THE COURT:  Okay.  Yes.

17          MR. CREIZMAN:  I want to object to an initial

18    deposition of Ms. Lenich, to try to work something out with

19    plaintiff so that we can avoid what really would be a

20    tremendous burden on Ms. Lenich of having her two depositions

21    in federal prison, and not to mention some potential security

22    issues for her if she's exposed in some way, shape or form.

23          THE COURT:  Yes.

24          MR. CREIZMAN:  And I had talked to plaintiff's

25    counsel before this appearance and we did discuss that we

52

1    would try to figure out a way short of a deposition if we can

2    get the answers that they need.

3              And I think we can continue to do that and don't

4    have to join issue on this particular dispute right now.

5    If so, I mean, I'm happy to brief it or whatever we can do.

6              THE COURT:  Okay.

7              MR. CREIZMAN:  But I think there's a way.

8              THE COURT:  That sounds good.  Okay.

9              MR. CREIZMAN:  Okay.

10             THE COURT:  So what it sounds like is that, Mr.

11   Creizman, you're not asking for a complete stay on discovery?

12             MR. CREIZMAN:  No.  I mean, if Your Honor issued a

13   complete stay, then of course I would not oppose.  But if Your

14   Honor is ordering a full -- discovery against Ms. Lenich, I

15   think that Ms. Lenich needs documents from the City as well,

16   because then we can't really defend our case.

17             THE COURT:  All right.  Okay.  So here's what I'll

18   say as far as Ms. Lenich.

19             Since it sounds like you're okay with proceeding

20   with discovery, why don't the parties -- why don't counsel try

21   to work what makes sense for you.  Okay?  So you can make some

22   initial -- exchange some initial interrogatories, some initial

23   document exchanges and requests.

24             And then to the extent that any of those requests

25   would entail Ms. Lenich seeking the documents from some other

1    party, including some other entity, either third parties or

2    the City, then we can have a further discussion about those on

3    a motion to compel.

4            Yes, Ms. Garman.

5            MS. GARMAN:  I think Your Honor probably

6    anticipated, you know, we would sort of object to -- you know,

7    it sounds like all other parties are looking to the City to

8    produce documents.

9            And I think that goes back to the heart of Judge

10   Garaufis' concern that if discovery is taking place while

11   briefing is happening, it's going to delay the --

12           THE COURT:  Well, I'm --

13           MS. GARMAN:  -- ability to really narrow down the

14   issues.

15           THE COURT:  All I'm talking about right now is Ms.

16   Lenich's discovery.

17           MS. GARMAN:  Right.

18           THE COURT:  And so if she needs discovery from you,

19   then that can be brought.  I mean, I'm assuming there's

20   certain things that she can disclose without involving the

21   City.  So if she can just disclose it, she should just do

22   that.

23           But if there are things that involve the City, then

24   those issues can be raised as they arise.  And by the time

25   these issues come up, I think you'll be done with your

54

1    briefing.

2              MS. GARMAN:  Okay.

3              THE COURT:  Okay?

4              MS. GARMAN:  Thank you.

5              THE COURT:  Yes, Mr. --

6              MR. EMERY:  And I do think we can work well with Ms.

7    Lenich's counsel.

8              I would say this, however.  I do think the case

9    would be expedited quite a bit if we had a short deposition in

10   Danbury -- at Bedford or wherever it is --

11             MR. CREIZMAN:  Danbury.

12             MR. EMERY:  Danbury.

13             THE COURT:  So you --

14             MR. EMERY:  -- and to work out a short deposition

15   and then we could even contemplate, given the schedule here,

16   that any other further deposition, within the seven hours

17   allotted, we obviously hold to that, could be done after she

18   is released.  Because she's going to be released in the next

19   many months, so I do think realistically that's viable.

20             THE COURT:  Whatever the parties want to agree to is

21   fine.

22             MR. EMERY:  Okay.

23             THE COURT:  And if Mr. Creizman and his client are

24   fine with it, then go ahead and do that.  But I'm not going to

25   order that it be done because it's a little bit irregular.  So

1    I think if you can work it out, great.  If you want me to

2    order it, then you need to make a motion.

3              MR. EMERY:  Well, I understand.  But I don't -- I

4    don't understand why there has to be an order.  They've

5    answered.  We're doing this in the normal course.  We would

6    note their deposition.

7              THE COURT:  Well, you're asking for two depositions.

8              MR. EMERY:  Well, I'm --

9              THE COURT:  Because you called it an initial

10   deposition.

11             MR. EMERY:  I'm asking for to use seven hours and

12   use a portion of it one day and then the rest of it later.

13             THE COURT:  Okay.  So that like I said, if Mr.

14   Creizman agrees to it, great, go ahead and do it.  If he

15   doesn't agree to it, then you do need me to order it.

16             MR. EMERY:  Okay.

17             THE COURT:  And at the moment, I don't have enough

18   information to make that decision.  It doesn't sound like

19   you're even asking me yet, because if Mr. Creizman agrees --

20             MR. EMERY:  We will work -- we'll try and work it

21   out.

22             MR. CREIZMAN:  I think we've been able to so far

23   work with --

24             THE COURT:  Great.

25             MR. CREIZMAN:  -- the other side.  We will be able

1      to work something out.

2                 THE COURT:  Okay.  Fantastic.  Glad to hear that.

3      All right.

4                 So, Mr. Emery, is there anything else?

5                 MR. EMERY:  No.  We're good.  Thank you.

6                 THE COURT:  Okay.  Ms. Garman, you were standing.

7                 MS. GARMAN:  I'd just like to know that with respect

8      to any deposition that's going on, I mean, the City and the

9      City defendants are still a party so we would, you know, be

10     able to weigh in on that --

11                THE COURT:  Weigh in on participating or on it going

12     forward?

13                MS. GARMAN:  Oh, no.  I mean, our position is that

14     it shouldn't go forward, but I just want to make it clear that

15     we should also be part of the conversation.

16                THE COURT:  Well, sure, that's fine.  But I think in

17     terms of it not going forward, I'm not sure that it makes

18     sense for me to say that it shouldn't go forward.  But if you

19     want to be there, of course you can be there.  See what I'm

20     saying?

21                Because whether or not it goes forward doesn't have

22     anything to do with whether the City's motion to dismiss is

23     successful.  In fact, if you're successful, then you would be

24     excluded from that deposition.

25                And I'm saying that at the moment you're right.  You

1      are in this case and so you're entitled to be at the

2      deposition.  But you're not entitled to say the deposition

3      shouldn't go forward.

4                  MS. GARMAN:  Yes, Your Honor.

5                  THE COURT:  Right?  Because if you want to depose,

6      that's a separate issue.  That's a completely separate

7      deposition.

8                  If you're seeking a City -- I'm not saying you have

9      to, but I'm just saying that that's not the issue.  The issue

10     isn't about your deposition.  It's about the plaintiff's

11     deposition of Ms. Lenich.

12                 MS. GARMAN:  Yes, Your Honor.  Understood.

13                 THE COURT:  Okay.  All right.  So I think we've got

14     a timetable.  And after this issue -- I just want to get this

15     issue done with and then we'll talk about what happens after.

16     Okay?

17                 So I'm going to proceed in a structured way, but I'm

18     not -- I'm not staying the discovery, but we're going to move

19     forward by steps focusing on the things that are important at

20     the beginning and leaving things that can wait, I suppose,

21     until a later point.

22                 But I just want to get my arms around this issue

23     because I don't think if anybody really knows enough about it,

24     including me.  You don't know enough about it to educate me in

25     a way that allows me to make a ruling.  Okay?

1            So we've got those deadlines in place for the

2    pleadings -- I will -- for the briefing.  I will deal with

3    this expeditiously so that everybody can keep moving forward.

4            All right.  Any questions?

5            ALL COUNSEL:  Thank you, Your Honor.

6            THE COURT:  All right.  Thank you.

7        (Proceedings concluded at 11:44 a.m.)

8    I, CHRISTINE FIORE, court-approved transcriber and certified

9    electronic reporter and transcriber, certify that the

10   foregoing is a correct transcript from the official electronic

11   sound recording of the proceedings in the above-entitled

12   matter.

13

14   *Christine Fiore*

15   _____        June 21, 2018

16       Christine Fiore, CERT

17

18

19

20

21

22

23

24