UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


STEPHANIE ROSENFELD,          *     Case No. 17-CV-7299(NGG)
                              *
                              *
              Plaintiff,      *     Brooklyn, New York
                              *     June 26, 2018
      v.                      *
                              *
TARA LENICH,                  *
                              *
              Defendant.      *
                              *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *

        TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
              BEFORE THE HONORABLE PEGGY KUO
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          SAMUEL SHAPIRO, ESQ.
                            Emery Celli Brinckerhoff &
                             Abady LLP
                            600 Fifth Avenue
                            New York, NY  10020


For the Defendant,          ERIC M. CREIZMAN, ESQ.
 Tara Lenich:               Creizman PLLC
                            747 Third Avenue
                            Suite 200
                            New York, NY  10017


For the Defendant,          ASHLEY REBECCA GARMAN, ESQ.
 City of New York:          New York City Law Department
                            100 Church Street
                            New York, NY  10007



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1              (Proceedings commenced at 2:05 p.m.)

2              THE COURT:  Good afternoon.  This is Judge Kuo.  Can

3      you please state your names for the record.

4              MR. SHAPIRO:  Sam Shapiro and Richard Emery, Emery

5      Celli Brinckerhoff & Abady, on behalf of the plaintiff.

6              MS. GARMAN:  Good afternoon, Your Honor.  Assistant

7      Corporation Counsel Ashley Garman for the City defendants.

8              MR. CREIZMAN:  Good afternoon, Your Honor.  Eric

9      Creizman on behalf of defendant, Tara Lenich.

10             THE COURT:  All right.

11             So we have scheduled this call to discuss the

12     proposed order, which I think the last document that I have is

13     document 45-1.  There's nothing more recent than that, right?

14             MR. SHAPIRO:  I believe that's correct, Your Honor.

15             MS. GARMAN:  Yes, Your Honor.

16             THE COURT:  So this document --

17             MR. CREIZMAN:  This is the document -- excuse me,

18     Your Honor.  I'm sorry. I think there's a document entered

19     document no. 48.  It's a letter by plaintiff's counsel.

20             THE COURT:  I know it's a letter, but did you attach

21     a new copy -- version of the order?

22             MR. SHAPIRO:  We did not, Your Honor.

23             THE COURT:  All right.  That was my question, which

24     was --

25             MR. CREIZMAN:  Oh, I'm sorry.

1          THE COURT:  -- which text are we looking at?

2          MR. CREIZMAN:  Okay.

3          THE COURT:  So it's 45 and I've read the things that

4    you filed afterwards.  My understanding is that document 45,

5    the document that was filed at 45 now lists five individuals

6    who are supposed to have access to the communications; two in

7    the DA's office and three in the corp counsel's office.

8          My understanding is that the objection is that in

9    the first instance none of those people should be looking at

10   the content.  They should only be looking at the number and

11   the scope of that communications, as we had discussed in our

12   last conference, for purposes of identifying what is the body

13   of stuff that we're looking at.

14         Is that right, Mr. Shapiro?

15         MR. SHAPIRO:  That's correct, Your Honor.  That is

16   our principal dispute.

17         The other issue that we raised, and I have spoken to

18   Ms. Garman about this. I think we have more of an agreement on

19   this issue, although we may not be completely there.

20         The other issue is just we were requesting a

21   provision in the order that just confirms that these

22   authorized individuals, as that term is used in the order, are

23   not permitted to disclose the information to anyone else.

24         Ms. Garman raised when we spoke that they will have

25   to disclose to the court and potentially to other counsel, and

4

1    we don't dispute that.

2              And so perhaps the language that we initially

3    suggested was slightly too restrictive and we'd be willing to

4    agree to something that allows for disclosure to the court, as

5    necessary.

6              But we just want to make it clear in this order that

7    these five individuals are not permitted to go talk about what

8    they've looked at with other people in their office.

9              THE COURT:  Okay.  So, Ms. Garman, as to the first -

10   - to that point.

11             MS. GARMAN:   As to the point Mr. Shapiro was just

12   mentioning about not being able to talk to other individuals

13   in our office?

14             THE COURT:  Yes.

15             MS. GARMAN:  Your Honor, we believe that that is

16   still too broad.  Certainly -- you know, we've listed the five

17   individuals in the order with respect to who's able to

18   actually view the materials in the file, including the

19   communications.

20             But certainly -- I mean, we answer to supervisors

21   here with whom we may have to generally talk about certain

22   characteristics -- again, not about the specific content of

23   any conversation, but we may need to discuss about in terms of

24   -- and our own IT people, if we need to do some sort of

25   subsequent production and work with our IT people here to talk

5

1    about what is feasible in terms of actually packaging the

2    stuff and producing.

3          It's just not feasible that we would be able to --

4    we would be prohibited from talking to supervisors and

5    technical people in our office about, again, sort of more

6    logistical things but it still relates to the contents of the

7    file.

8          And we need a little bit of a leeway in order to

9    comply with Your Honor's order, which we are trying to do.  So

10   that's our concern there.

11         And the way it was proposed, again, it was entirely

12   too broad and it would prohibit us from even, you know,

13   submitting the letter, which Your Honor has indicated is to be

14   filed on the public docket anyway.

15         THE COURT:  Well, okay.  So it seems that there is a

16   -- there are two different things we're talking about; one is

17   content and let's say that the fear there is that there is

18   personal content, all right.  And then there is sort of

19   everything else that needs to happen in order to deal with

20   this case that the plaintiff has brought in a court of law,

21   okay?

22         So it seems that everybody dealing with this case

23   needs to be able to figure out -- needs to be able to handle

24   this package of communications, but handle it in a way that

25   doesn't cause embarrassment or pain to the plaintiff.

1          So tell me, Ms. Garman, what you know about how this

2     set of communications needs to be handled.

3          So when you were in court last, you really knew

4     nothing about it, other than that it exists and it was put in

5     a vault, let's say.

6          So now do you have more information about how it's

7     being stored, how it's going to be handled.  Tell me what that

8     process looks like so that I can draw some lines and give you

9     some guidance as to how it should be handled.

10          MS. GARMAN:  Sure. I mean -- I mean, just to be

11     clear, we have not been able to access the file because we

12     have not had the court order and, you know, just given some of

13     the allegations in this case are alleging that the DA's office

14     violated federal law by complying with federal law enforcement

15     agencies regarding these communications. The concern is very

16     real --

17          THE COURT:  Yeah, I know, but that's why --

18          MS. GARMAN:  -- so --

19          THE COURT:  Yes, Ms. Garman, so I hear you on that

20     and I know because of the way the plaintiff's counsel has been

21     framing this case, nobody wants to touch anything, all right?

22          But we've got to move forward and I guess what do

23     you know about the communications?  Are they stored in a pdf

24     file?  Is it a thumb drive?  Is it -- what is it?

25          MS. GARMAN:  So -- and I believe -- the answer is I

7

1    don't have much more information than I had at the conference,

2    because we've been unable to access the file.  But this is

3    what I do know.

4              There's basically two sort of separate ways this

5    information is stored.  Primarily it is on the Kings County

6    DA's Office's hard drive in I guess -- in a database.

7              I understand from speaking with the tech folks at

8    the DA's office that that database can be searched for the

9    information -- at least some of the information that Your

10   Honor is asking us to provide, such as there can be a query

11   for what telephone numbers were involved.  There can be a

12   query for what telephone numbers were involved in the oral

13   communications and dates and such.

14             There can be a query as to what telephone numbers

15   were involved in the text messages and, again, dates and

16   perhaps times. I'm not sure how specific it is.

17             So that information is basically in a database that

18   is searchable without reviewing contents of anything.  That is

19   one manner in which my understanding is things are stored.

20             The other manner, which I know even less about, is

21   that certain information -- you know, the DA's office did an

22   investigation and so I would imagine, you know, there are

23   notes of people doing the investigation of their investigation

24   for that type of material, as well as there was a grand jury

25   subpoena served by the Department of Justice on the D.A.'s

1    office.  The D.A.'s office complied with the grand jury

2    subpoena and I believe kept a copy of what they produced to

3    the Department of Justice.

4            All of that stuff is kept independently of the hard

5    drive.

6            THE COURT:  And where are those kept?

7            MS. GARMAN:  So I don't know .  I believe -- my

8    understanding, from speaking with the client is that whatever

9    was produced to the D.A.'s office -- I'm sorry.  To the U.S.

10   Attorney's Office was produced on disks.

11           In any event, it appears it was electronic.  If it

12   was a disk or a thumb drive I'm not sure.  And those are kept

13   elsewhere in, you know, files that no one is touching or

14   looking into without a court order.  So I can't be more

15   specific unfortunately.

16           So -- but that's -- I hope that that answers Your

17   Honor's question as much as I can.

18           THE COURT:  Yeah.  So that is with regard to what

19   was given to DOJ, but you said there were notes of the

20   investigation.  Is that --

21           MS. GARMAN:  I believe that it is -- I believe that

22   it is broader than what was given to DOJ and was also

23   encompassing such as notes, you know, probably -- you know,

24   the D.A.'s Office initially was prosecuting Ms. Lenich before

25   it went over to the DOJ.

9

1          So, you know, the court records, criminal
2   complaints, that type of stuff I believe would all be in that
3   -- what I'm going to call the hard copy file, just to
4   distinguish it from the -- what's on the server.
5          THE COURT:  But that won't be copies of the
6   communications.
7          MS. GARMAN:  Well, that wouldn't be, but I believe
8   that the communications were part of what was turned over to
9   the DOJ.
10          THE COURT:  Yeah, I understand that, but I'm just
11   trying to separate out the tranches. I know you said that they
12   gave things to the DOJ and those are copies of the
13   communications.
14          MS. GARMAN:  Yes.
15          THE COURT:  But the notes of the investigations are
16   just notes of the investigations, not copies of the
17   communications, right?
18          MS. GARMAN:  That's --
19          THE COURT:  Or are there copies there?
20          MS. GARMAN:  I don't -- I just don't know. I would
21   strongly assume that is the case.
22          THE COURT:  Okay.  But who did the investigation?
23          MS. GARMAN:  Personnel at the Kings County D.A.'s
24   Office.
25          THE COURT:  Who in particular?

1          MS. GARMAN:  Some of -- my understanding is it was a

2     combination of supervisory attorneys, their investigators and

3     perhaps a handful of IT people who were involved in assisting

4     with the technological aspect.

5          THE COURT:  Okay.  So let's look at the universe

6     that you talk about.

7          One is the hard drive, and that is locked down,

8     right?  Nobody has access to that.  Is it a one file folder?

9          MS. GARMAN:  I just -- it's in a database. I don't

10    know anything more than that.

11         THE COURT:  Okay.  So that's the first thing is that

12    you need to identify -- whoever put it there knows that it was

13    put there.

14         So whoever put it there should be able to tell you

15    where it's located without anyone having to look at it, right?

16    So like if it's in the U drive or the X drive, or the whatever

17    drive, under this name, then someone can tell you that's where

18    it is.

19         MS. GARMAN:  I suppose, yes.

20         THE COURT:  Okay.  So that's the first thing you

21    need to do is just identify where it is so then you know who

22    the custodian is of that, right?  Because then somebody needs

23    to do the queries and in order to do the queries I assume

24    they'd have to have that limited access to do the queries.

25         And then once the information -- the responses to

1    the queries come through, I don't know whether -- you know,

2    again, what that process will be to pull out the responses to

3    the queries.  So that's the second part of the question; how

4    will the queries be done.  Okay?

5         So that it seems like there might be a way to figure

6    out who has access now and who needs access in order to get

7    this part done and can it be done in a way that either means

8    you don't -- whoever's doing it doesn't read the content, and

9    by content I think you've specified that gave the phone

10   numbers and dates and things like that, but not the

11   communication itself of on this day I did that or, you know,

12   whatever that personal communication is.

13        So if -- so for the purpose -- what you need to do

14   is get that information and then figure out how it's going to

15   be done without actually doing it yet, and then we can figure

16   out if it can be done with a minimal contact -- contact with

17   the content.  Okay?

18        So the hard drive part seems fairly straight

19   forward, because it makes sense to me.

20        The second part of it is the compliance with DOJ's

21   grand jury subpoena.  Again, someone had to have done that.

22        So whether that someone has already looked at the

23   information before turning it over, or didn't look at it and

24   just turned it over because they downloaded whatever was in

25   the first thing we talked about, that part of the hard drive,

1    and copied it onto a disk or thumb drive.

2              So you need to find out who responded to that and

3    who -- and then that person can tell how both -- how it's

4    produced to DOJ and how they maintained a copy, if they

5    maintained a copy.

6              So, for example, it would be very typical that

7    someone would then create a sub file, maybe not in the same

8    drive but somewhere else that says this is what we gave to the

9    DOJ.  So now suddenly there's another copy of the

10   communications and you've got to find out where that is, okay?

11             MS. GARMAN:  Okay.

12             THE COURT:  And then you should find out whether the

13   person who did that either looked at the content or shared it

14   with anyone.

15             Now they may have just done a peek to see what's in

16   there and if that's the case, that's fine.  Just tell -- you

17   get that information or did they do a review of -- you know,

18   we don't want to turn anything over without actually reading

19   it first.  Again, that would not be typical.  So if someone

20   did that, we should know who did it as part of their job.

21   Okay?

22             And then -- so then we can figure out where that is

23   and if somebody ready read it, fine.  They already read it.

24   But there might not be a reason for anybody at this point to

25   read it -- someone else to read it.

1          So then the other part is this investigative file.

2     Somebody created that file.  Someone or some set of people, so

3     someone -- you need to get the information as to who did that

4     and where is that.  And then where -- what was it in?  Do they

5     -- are they literally notes of the investigation or does that

6     contain copies of communications?

7          MS. GARMAN:  Yes, Your Honor. Understood.

8          As to that last point though, then what's in it,

9     again, there's no one -- the D.A.'s office is not going to go

10    into the file --

11         THE COURT:  No, they're not going to but what's in

12    it, someone created it.  So whoever created it can tell you.

13         MS. GARMAN:  Your Honor, I'm not entirely sure. I

14    mean, I would just note a number of individuals -- it wasn't

15    one person --

16         THE COURT:  Right.  But someone was in charge.  So

17    someone can say I put a team together.  These are the five

18    people on the team.  This is what they were supposed to do and

19    here's the process.  Everything they did they were supposed to

20    put into the file, or one person was in charge and this is the

21    person.

22         You don't have to go -- no one now needs to go look

23    in order to know what was in it.  It's not -- I mean, these

24    are all humanly created things.  So someone knows what's in it

25    because that person or group of people created it, or someone

1    supervised the creation of that thing.

2          So that's what you need to find out, is this "file"

3    without you -- I mean, I know you don't know because you

4    didn't create it. So I'm not asking you to go in and look at

5    it.

6          But you need to find out whoever created it, what

7    was supposed to be in it, what is in it, without having to go

8    back and look in it to refresh their memory of what's in it,

9    right?  I mean, there's a process.  People will know, well, in

10   that notebook, I usually put this, or in that file, I usually

11   file this.  And it doesn't require you to actually go and look

12   at it.

13         There is the possibility that you're a little bit

14   wrong because you don't remember every document or everything

15   that you put in it, which is fine, given this exercise, but to

16   say there's a box in the corner and no one knows what's in it

17   and no one wants to touch it, doesn't make any sense to me,

18   because it's not an unmarked box.  It's a file of an important

19   case.   So someone knows what's in it.

20         So that's the part I just need at this point,

21   because every time we talk you don't have the information.

22         MS. GARMAN:  Yes, Your Honor. I certainly

23   understand.

24         I just -- as I'm sure Your Honor appreciates, this

25   was a very unique situation.  You know, it's not like they're

1      -- the D.A.'s Office was doing an investigation -- you know,

2      and thus the criminal investigation is the one of its own

3      employees on a regular basis --

4              THE COURT:  All the more reason they should know

5      what the process is that they followed.

6              MS. GARMAN:  Yes.

7              THE COURT:  That they created and followed.

8              MS. GARMAN:  Yes, Your Honor. I would also just note

9      -- I mean, this did take place in 2015 and 2016.  A number of

10     the individuals have left the office now.  Certainly, we'll be

11     able --

12             THE COURT:  So someone in the D.A.'s Office can

13     reach out to them. I mean, if this is going to be a problem,

14     Ms. Garman, because they're not giving you the information, I

15     might have to hold a hearing and have people come in and tell

16     me.  I mean, it's just --

17             MS. GARMAN:  Your Honor, I think what would probably

18     help -- because as was discussed I believe at the first

19     conference, the D.A.'s Office has sort of two issues.

20             We've talked already about the communications and

21     Your Honor's point that we're doing all of this without

22     accessing the content of the communications is well taken, but

23     I'll put that aside.

24             The other issue is the 160-50 issue that the whole

25     file is sealed because of -- by operation of law --

16

1          THE COURT:  Okay, so --

2          MS. GARMAN:  Your Honor, I do think that all parties

3     would agree for the portion of our proposed order that would

4     allow -- that would unseal -- the first paragraph of our

5     proposed order that would unseal the file purseuant to 160.50,

6     that would enable us to -- to the extent that people don't

7     have a recollection of -- as to what is specifically in the

8     file, that would enable us to at least, you know, open that

9     box, as Your Honor has put it, to be able to see what is in

10    there without doing any sort -- without risking any review --

11         THE COURT:  But that's my problem -- but this is my

12    point. I don't understand why you need to open the box when

13    you can ask the people who created the box what's in there.

14         And by what's in there it's not -- you know, what

15    does this document say. It's just, those are the documents

16    that I used and yes, I made copies of X, Y, Z communication or

17    no, I never made any copies because those are all

18    electronically stored so it's not in that particular box.

19    That's all I'm asking.

20         I really don't think that this -- this is not like a

21    box that was unearthed that was buried in 1800, right?  Like,

22    this was created specifically for a case.  Everyone knew what

23    this was about.  Everyone understood it was unusual, which is

24    why there had to have been care taken in how this whole thing

25    was handled.  And, therefore, someone knows how it was

1    handled.

2            So just go talk to that person and if that person

3    doesn't have the information, then you know, find out who does

4    have the information. If the person's left the office, call

5    them up.  I mean, just don't see what is so hard about that.

6    Okay.

7            So as to the 160.50 issue, Mr. Creizman, you were

8    going to talk to your client and see whether she is willing to

9    have this -- allow the opening of the sealed cases.  Did you -

10   - did your client have a view on this?

11           MR. CREIZMAN:  Yes, Your Honor, and I did speak with

12   her and she has no objection to it.

13           I think there's a form that needs a notary and -- it

14   needs to be notarized and I didn't have the notary when I went

15   with her and I didn't know how to actually get one, but I'm

16   saying that there's no objection on her part.

17           THE COURT:  Okay.  So there you have it, for as far

18   as your authorization, Ms. Garman.

19           MR. SHAPIRO:  Your Honor, just one point on that

20   issue.  We would object to a general unsealing order of a file

21   that includes these communications, which I believe is the

22   case here.

23           THE COURT:  Well, I'm not saying that --

24           MR. SHAPIRO:  We would object strongly to the sort

25   of piecemeal approach that Ms. Garman suggests.

1           There should be an order -- in our view, there

2     should be an order that explains quite clearly who is allowed

3     to access these.  In our view, no one should be allowed to

4     access the contents and that should be spelled out before

5     things are unsealed and people start opening boxes that do

6     contain these communications.

7           THE COURT:  Right. So that's why I'm trying to take

8     this in steps, right?

9           So the first -- all I'm asking at this point is to

10    get information like I stated a few minutes ago; where is the

11    stuff, how is it stored, you know, who created it?  Who

12    already had access to it?  What access is needed in order to

13    do the queries and to do the -- you know, the necessary work

14    in this phase of the litigation.

15          Now Ms. Garman brought up that there's this whole

16    160.50 issue, which Mr. Creizman seems to say should not be an

17    issue.

18          So I'm not saying all of this should be unsealed and

19    the box should be unsealed and the contents -- you know,

20    scattered about the room for everybody to read.

21          I'm just saying to the extent that the sealing has

22    created a problem to get the information I put out there, it

23    doesn't seem like that's a barrier if Ms. Lenich is willing to

24    allow the unsealing.

25          Now I'm not ordering that it be unsealed generally,

1     but I'm ordering that all this information I've just stated

2     should be gotten and Ms. Garman, that 160.50 issue should no

3     longer cause a problem.

4            So then let's move on and get the information,

5     right?

6            MS. GARMAN:  Yes, Your Honor.  Understood. I just --

7     we will certainly make every effort to obtain the information.

8            My concern is just that the various individuals

9     involved in this investigation may not recall specifically

10    what is in the file --

11          THE COURT:  Well, the only thing we really need to

12    know about the file is whether they contain the

13    communications.  That's the only question, because right now

14    we're just talking about the communications.

15          MS. GARMAN:  Right.  And it just seems to me if

16    that's the only question, if that's the question as to whether

17    or not what I term is the hard copy of the file, contains

18    copies of the communications, being able to look in the file

19    to either confirm yes or no would be -- would be exponentially

20    more efficient I think than --

21          THE COURT:  But the first thing to do is just to

22    find out who created the file. If that person is still around,

23    that person can tell you, right?

24            If that person can't tell you, that person might --

25    I might allow that person to look in the file, because that

1    person already saw the file, because that person created it.

2          But I don't know. No one knows.  So get the

3    information first before opening the box.  That's all I'm

4    saying.  Right?  Who created it?

5          MS. GARMAN:  Yes, Your Honor.

6          THE COURT:  Whoever created it already saw it.  So

7    maybe there's no harm in having that person look again.  But I

8    don't know that.  All right?

9          Or if the person remembers -- you know, I printed

10   out a bunch of the communications from the file, because I

11   needed it, then that's the answer.  If the person said I never

12   printed it out, that's an answer.  If the person says I don't

13   remember, fine.

14         But I just don't know, so get -- just start asking

15   those kinds of questions.  And you raise the 160.50 issue.

16   Mr. Creizman says his client has no objection.

17         So if you need the form notarized or whatever, get

18   it done.  It doesn't mean I'm going to unseal it.  It just

19   means that that's no longer a barrier for you.

20         So then let's talk about what you need beyond that

21   to get the things that I've asked you to get.

22         MS. GARMAN:  Your Honor, I certainly understand. I

23   apologize.   I'm just a little bit confused.

24         First of all, we've provided the 160.50 release

25   months ago and my understanding was that Ms. Lenich was not

21

1    going to sign it.  So I did not know that there was -- you

2    know, I did not know until now that that was going to be a

3    non-issue.

4              But the release unseals the file and our position

5    would be that that would allow us to open the box.  It doesn't

6    allow us to listen to the communications --

7              THE COURT:  It allows you to do it, but I'm not

8    going to -- but I may not allow you to, okay?  So that's my

9    point.  When she unseals it or she gives permission to unseal

10   it, it doesn't mean it automatically happens.  That means you

11   will no longer have that as a reason not to open it.

12             But I may put an order in place, as the plaintiffs

13   are asking, so that it's a very limited release.

14             MS. GARMAN:  Okay.

15             THE COURT:  I still have that power to do it.

16             MR. CREIZMAN:  Your Honor, if I just may add.  It's

17   Eric Creizman, again, for Tara Lenich.

18             You know, in terms of the 160.50 release falls -- I

19   mean, I think that -- we're not implying that it should be

20   released in any greater capacity than what -- you know, it

21   should be narrow or --

22             THE COURT:  Right.

23             MR. CREIZMAN:  -- however the -- we just don't want

24   it to be a barrier --

25             THE COURT:  Right.

22

1          MR. CREIZMAN:  -- to anything.

2          THE COURT:  I appreciate that.

3          MR. CREIZMAN:  And that's all we're saying.

4          THE COURT:  Yes, and that's how I understood it.

5          MS. GARMAN:  Yes, that's how I understood it.

6          MR. CREIZMAN:  Thank you.

7          THE COURT:  So, Ms. Garman, so that's how it's going

8    to go.  Again, we're trying to do this in a very structured

9    way.  So once you have what you need so that you don't have to

10   keep saying the 160.50 is a barrier, let's talk about how to

11   make this go forward, all right?

12          So if you need to have that notarized, or whatever

13   it is you need from Mr. Creizman, please work with him so that

14   his client has given the proper permissions.

15          Once she's done that, it doesn't mean that the box

16   is opened and everything -- everybody looks at everything.

17   And that's what we're going to talk about now, all right?

18          So the first thing I've said is get that information

19   about where these things are stored, and what is likely to be

20   in it, and who created it so the people who created will --

21   just for the -- the two -- I mean, for each of these you need

22   to know who created it, right?  Who created the place on the

23   hard drive and put it there?  Who created the investigative

24   file and what's in there?  Who complied with the DOJ grand

25   jury subpoena?

```
1              And those are the people who can tell you what is
2    contained in the thing they did to do their jobs.  So just get
3    that part done and then, you know, like I said, who has
4    access, how's it stored, what is the scope of it and then we
5    can move forward before we get to the content, okay?
6              Ms. Garman, is that understood?
7              MS. GARMAN:  Yes, Your Honor.
8              THE COURT:  All right.  Are there any other barriers
9    to your being able to do that?
10             (No response.)
11             THE COURT:  All right.  So --
12             MS. GARMAN:  Not that we haven't discussed.
13             THE COURT:  Right.  And if you're running into
14   problems with the D.A.'s Office, either through non-compliance
15   or whatever, let me know.  And I may have a hearing, if that's
16   the problem.
17             But if they can give you the information, then you
18   can convey it on the docket and then we can move forward.
19   Again, without the content.  Okay.  Because we want to figure
20   out how to get to the content in stages.
21             Now plaintiff has made a request to get the content.
22   I'm not going to allow that at this moment.  All right?
23   Because I don't think it's a good way to proceed to keep one
24   side completely in the dark and the other to have a release of
25   all the content at this point.
```

24

1      So we're going to move forward just on this sort of

2   metadata issue to find out where things are, how they're

3   stored, how we're going to get to it before we actually look,

4   and then we can have a conversation about how we're going to

5   in an orderly way get to the content, if we get to it.  All

6   right.

7      So Mr. Shapiro, was there anything else on your side

8   that we need to talk about?

9      MR. SHAPIRO:  I think that's it, Your Honor.  Thank

10  you very much.

11     THE COURT:  Okay.  And so Ms. Garman, please get

12  that information.

13     And then as far as this -- I'm just trying to look

14  at the proposed order. Is it too early then to do this order,

15  because we're not looking at the files themselves yet?

16  Because it says the following individuals will have access to

17  all the materials.

18     Ms. Garman, to what degree is this order necessary

19  under the -- for the things that I've talked about.  Because

20  this looks like it's about the information --

21     MS. GARMAN:  I mean, the order -- Your Honor, the

22  order we need before we look at anything.  Open a box, listen

23  to any communications.

24     My understanding of Your Honor's order today is that

25  we are not to do any of those things.

```
 1                THE COURT:  Correct.

 2                MS. GARMAN:  So it sounds like the order -- it

 3     sounds --

 4                THE COURT:  It's premature.

 5                MS. GARMAN:  Yes.  It sounds like what we are being

 6     asked to do is to have conversations with people.

 7                THE COURT:  Yeah.

 8                MS. GARMAN:  We're not contending that we need an

 9     order to do that.

10                THE COURT:  Okay.

11                MS. GARMAN:  So if that is a proper understanding,

12     then we can table the proposed order.

13                THE COURT:  Okay.

14                MR. SHAPIRO:  And, Your Honor -- this is Sam

15     Shapiro.

16                I think we don't have a problem with that, just as

17     long as it is -- we just want to make abundantly clear that

18     they are not opening the box, to use that euphemism very

19     generally here, at the moment.

20                And we believe that there shouldn't -- the moment

21     they do open the box, there needs to be an order that limits

22     how the material can be used.

23                But as long as they're not opening the box, which is

24     what I understand Your Honor's direction is here, we agree

25     that there is no need for an order right now.
```

1          THE COURT:  Okay.  Great.  So let's move forward and

2     have those conversations without opening the box, but because

3     you've had this question about what to do with the information

4     once the box is opened, then please try to iron that out so

5     that I can revise the order accordingly.

6          Let me ask Mr. Shapiro, the five people listed, do

7     you have any objection to those five people?

8          MR. SHAPIRO:  We don't, Your Honor.

9          THE COURT:  Okay.  So that's good.  So to the

10    remaining point about the further disclosures, and what is

11    necessary to get the job done, can you please craft some

12    language in advance of opening the box so that they can allow

13    IT people to access more broadly?  Or maybe you can have some

14    specific language about shall not read the content, versus

15    shall not handle or have access, or something like that, okay?

16         Because, again, we need to keep clear the handling

17    versus the reading of the content.

18         So if you can craft language on that to make a

19    revised order so when the time comes to open the box, we'll be

20    in a good position in terms of what the agreement is, okay?

21         MR. SHAPIRO:  Understood, Your Honor.  We'll do that

22    and we'll speak to Ms. Garman about that.

23         THE COURT:  Great.  All right. Ms. Garman, is there

24    anything else?

25         MS. GARMAN:  No, Your Honor.

1          THE COURT:  Okay.  Great.  And Mr. Creizman?

2          MR. CREIZMAN:  No, thank you, Your Honor.

3          THE COURT:  All right.  Thank you, everybody.

4          MR. SHAPIRO:  Thank you, Your Honor.

5          MS. GARMAN:  Thank you.

6

7

8          (Proceedings concluded at  2:40 p.m.)

9          I, CHRISTINE FIORE, Certified Electronic Court Reporter

10     and Transcriber and court-approved transcriber, certify that

11     the foregoing is a correct transcript from the official

12     electronic sound recording of the proceedings in the above-

13     entitled matter.

14

15

16     _____          July 16, 2018

17          Christine Fiore, CERT

18

19

20

21

22

23

24