# Exhibit 1

1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - - - - - - X
 3
      UNITED STATES OF AMERICA,          :    17-CR-00154
 4
                      v.                 :    U.S. Courthouse
 5                                            Brooklyn, New York
      TARA LENICH,                       :
 6                                            February 2, 2018
                        Defendant.       :    12:15 o'clock p.m.
 7
      - - - - - - - - - - - - - - - - - - X
 8
 9                    TRANSCRIPT OF SENTENCE
                  BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
10                    UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12
      For the Government:            RICHARD P. DONOGHUE
13                                   United States Attorney
                                     By:   ROBERT POLEMENI
14                                         MARIA CRUZ MELENDEZ
                                     Assistant U.S. Attorneys
15                                   225 Cadman Plaza East
                                     Brooklyn, New York 11201
16
      For the Defendant:            MORRIS FODEMAN, ESQ.
17                                   GARY FARRELL, ESQ.
18
      Court Reporter:               Anthony M. Mancuso
19                                   225 Cadman Plaza East
                                     Brooklyn, New York 11201
20                                   (718) 613-2419
21
22
23
      Proceedings recorded by mechanical stenography, transcript
24    produced by CAT.
25    2
```

2

1                    (Case called; both sides ready.)

2                    MR. POLEMENI:   Good afternoon, your.   Honor Robert

3          Polemeni for the United States.

4                    THE COURT:   Good afternoon.

5                    MS. CRUZ MELENDEZ:   Good afternoon, your Honor.

6          Maria Cruz Melendez for the government.

7                    MS. McKEOWN:   Kristen McKeown, probation.

8                    THE COURT:   Good afternoon.

9                    MR. FODEMAN:   Moe Fodeman from Wilson Sonsini

10         Goodrich & Rosati for the defendant, Tara Lenich, who is

11         present before the court.

12                   MR. FARRELL:   Gary Farrell.

13                   THE COURT:   Good afternoon.   Please be seated.

14         Ladies and gentlemen of the audience, please be seated as

15         well.

16                   Are there any other counsel who wish to note their

17         appearances here today?   Hearing none.

18                   Good afternoon, Ms. Lenich.

19                   THE DEFENDANT:   Good afternoon your Honor.

20                   THE COURT:   Are you ready to proceed?

21                   THE DEFENDANT:   Yes.

22                   THE COURT:    Ms. Lenich, you have had an opportunity

23         to review carefully your presentence investigation report

24         which was filed on August 29 of 2017, have you not?

25                   THE DEFENDANT:   Yes, your Honor.

3

1          THE COURT:   And have you had an opportunity to

2     discuss that with your counsel?

3          THE DEFENDANT:   Yes, your Honor.

4          THE COURT:   And have you also read the addendum to

5     that report, which was filed on October 30 of 2017, and the

6     second addendum to that report, which includes a victim impact

7     statement, which was filed on November 30 of 2017?

8          THE DEFENDANT:   Yes, your Honor.

9          THE COURT:   And have you had an opportunity to

10    discuss that with your counsel and have you done so?

11         THE DEFENDANT:   Yes, sir.

12         THE COURT:   Thank you.

13         Have you had an opportunity to review and have you,

14    in fact, reviewed the following items:   Your defense counsel's

15    sentencing memorandum which was filed on November 28 of 2017

16    and all the attachments thereto?

17         THE DEFENDANT:   Yes.

18         THE COURT:   And defense counsel's sentencing

19    memorandum update which was filed on January 26 of 2018 and

20    the attachments thereto?

21         THE DEFENDANT:   Yes, your Honor.

22         THE COURT:   And the government sentencing memorandum

23    which was filed on January 30 of 2018.

24         THE DEFENDANT:   Yes, your Honor.

25         THE COURT:   And in addition to those materials, my

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

4

1  files reflect, among other documents, the indictment in this

2  action, which was filed on March 23 of 2017 and the plea

3  penalty sheet which was filed on April 3 of 2017 and I note

4  for the record that I have received and reviewed the letters

5  from your counsel the other night, which also added additional

6  authorities.  So I take it you have seen that.  I just want

7  your counsel to know that I have seen that and included in my

8  reference to my own decision in the Kacamakovic case.

9           MR. FODEMAN:  Thank you, your Honor.

10          THE COURT:  So I have received and reviewed

11  everything and I have the world's best law clerks.

12          MR. FODEMAN:  Thank you for that well.

13          THE COURT:  To both sides, are there any other

14  documents that either counsel would like to mention

15  specifically at this time?

16          MR. POLEMENI:  Not from the government, your Honor.

17          MS. McKEOWN:  Your Honor, there was a third addendum

18  to the presentence report that was disclosed last evening.

19          THE COURT:  Let me ask you once again to identify

20  yourself for the court reporter.

21          MS. McKEON:  Kristen McKeown, probation.

22          There was a third addendum that was disclosed

23  yesterday evening.  I can have a copy for the court.

24          THE COURT:  I believe we have seen it.  Why don't

25  you hand it up.  Hand it to the other side as well.

5

1          MR. FODEMAN:  We have seen it, judge.

2          THE COURT:   Give it to my law clerk to hand it up.

3          MR. FODEMAN:  Judge, this is the one related to the

4    defendant's  --

5          THE COURT:  Yes.  It's the financials.  I have seen

6    that.

7          MR. FODEMAN:  Thank you, your Honor.

8          THE COURT:  As I said, I have the worlds's best law

9    clerks.

10          THE COURT:  Anything else from either side that you

11   want to mention specifically now?

12          MR. FODEMAN:  No, your Honor.

13          MR. POLEMENI:  No, your Honor.

14          THE COURT:  Ms. Lenich, do you feel prepared to go

15   forward with sentencing today?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  Ms. Lenich, you have the right, as you

18   know, to address this escort before your sentence is imposed

19   and I will give you the opportunity to do so in just a few

20   minutes and you should feel free to say anything you think

21   appropriate at that time before I finalize my judgment in this

22   case.  Do you understand?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Are you satisfied with your counsel's

25   representation?

6

1          THE DEFENDANT:   Yes, your Honor.

2          THE COURT:   Do you believe that you have received

3     the effective assistance of counsel?

4          THE DEFENDANT:   Yes.

5          THE COURT:   If you do not believe that you have

6     received the effective assistance of counsel, you may raise a

7     claim of ineffective assistance of counsel at an appropriate

8     time and in an appropriate forum.

9          Do you understand?

10         THE DEFENDANT:   Yes, your Honor.

11         THE COURT:   Now, the United States Code sets the

12    following sentencing parameters for illegal interceptions of

13    communications:   A statutory maximum imprisonment term of five

14    years per count, where multiple terms may run concurrently or

15    consecutively; a statutory maximum supervised release term of

16    three years per count where multiple terms run concurrently; a

17    fine of up to $250,000 per count and a mandatory special

18    assessment of $100 per count, which amounts to $200 in this

19    case.

20         If probation is imposed, it shall be for a term of

21    not less than one, nor more than five years per count, with

22    multiple terms to run concurrently.   The court must also

23    consider the sentencing parameters set by the United States

24    Sentencing Guidelines.   The base offense level for illegal

25    interception of communications in violation of 18 United

1    States Code Section 2511 is nine, pursuant to Guidelines

2    Section 2H3.1(a)(1).

3              Because the defendant abused a position of trust, or

4    used a special skill, in a manner that significantly

5    facilitated the commission for concealment of the offense, the

6    offense level is increased by two levels pursuant to

7    Guidelines Section 3B1.3.  Accordingly, the total adjusted

8    offense level for each count is eleven.  Here, because there

9    are two distinct offenses or units, that have the same offense

10   level, the total offense level for the two units combined is

11   determined by taking the adjusted offense level of the highest

12   unit, which is eleven, and increasing it by two points

13   resulting in a combined adjusted total offense level of 13.

14             Because the defendant has clearly demonstrated her

15   acceptance of responsibility for the offense by pleading

16   guilty, the offense level is decreased by two levels pursuant

17   to Guideline Section 3E1.1(a).

18             In sum, the defendant's total offense level is

19   eleven which, with a criminal history score of zero and a

20   criminal history category of one, yields a guideline

21   imprisonment range of eight months to fourteen months.

22             As an alternative pursuant to Guideline Section

23   5C1.1(c)(2), the court may impose a term of imprisonment of

24   one month, followed by a term of supervised release, with a

25   special condition requiring at least seven months of community

8

1    confinement or home detention.  As a further alternative

2    pursuant to Guideline Section 5C1.1(c)(3), the court may

3    impose a sentence of probation that includes a condition, or

4    combination of conditions, that substitutes intermittent

5    confinement, community confinement or home detention or

6    imprisonment according to the schedule in Guideline Section

7    5C1.1(c).

8           In addition, the guidelines suggest a term of

9    supervised release of between one and three years per count, a

10   fine of between 4,000 and $40,000, payment of the costs of

11   prosecution and that the defendant is eligible for probation.

12          Now, counsel, am I missing anything pertinent to

13   today's proceeding and do you have any objections to the

14   calculation of the guidelines parameters?

15          MR. FODEMAN:  No, your Honor.

16          MR. POLEMENI:  No, your Honor.

17          THE COURT:  Are there any other objections either

18   counsel wishes to raise at this time?

19          MR. FODEMAN:  No, your Honor.

20          MR. POLEMENI:  No, your Honor.

21          THE COURT:  That being the case, I will now turn it

22   over to defense counsel.  You may remain seated and use the

23   microphone.

24          MR. FODEMAN:  Thank you, your Honor.

25          Again, good afternoon, your Honor.

9

1          THE COURT:  Good afternoon.

2          MR. FODEMAN:  I do want to start by thanking you for

3    giving me the opportunity to speak on Tara's behalf this

4    afternoon and for your consideration here today.

5          Your Honor, as you know, I've represented Tara since

6    her arrest more than a year ago in this case and I can tell

7    you it's been a privilege and honor to do so and I only wish

8    that she wasn't seated here about to be sentenced.

9          I know your Honor has carefully reviewed all of the

10   materials that we've provided.  I know they have been

11   voluminous and thank you and your staff for assisting in that

12   effort.  I have no intention of repeating all the arguments

13   that we have raised.  That said, given the obvious tremendous

14   stake for Tara and her family with today's decision I hope

15   your Honor will indulge me as I elaborate on several of those

16   points and respond to some of the arguments that have been

17   advanced by the government in support of their extraordinary

18   above guidelines incarceratory sentence that they seek.

19         THE COURT:  I want to make it clear you can take as

20   long as you want.  I'm going to give the government as long as

21   they want.  I'm going to give you a right to respond.  I'm

22   going as to give them a right to reply.  So you can go through

23   the entirety of your argument.  They can respond to the

24   entirety of your argument.  You can break it up and go back

25   and forth.  No artificial constraints.  The day is yours.

1          MR. FODEMAN:   That is much appreciated.

2          THE COURT:   No worries.

3          MR. FODEMAN:   Thank you, your Honor.

4          Judge last week as I thought about what I would say

5     here today, I happened to remember this article that I had

6     read a few years back.   And it was about an exercise involving

7     patients battling cancer.   And in the exercise psychologists

8     showed the patient a piece of paper and on each piece of paper

9     was a small black dot and the patient was asked to describe

10    what you see.   And most patients understandably said they saw

11    a small black dot.   And then the psychologist would explain

12    that there is so much more than the black dot.   There was this

13    entire page of white, unblemished by any dot.

14          Now, of course, the point of the exercise was to

15    make the patients realize while they certainly were

16    appropriately focused on their disease, the cancer was not all

17    that they were.   They had so much more in their lives than

18    just the black dot.   And as I thought about today's sentencing

19    I just could not get this article out of my head.

20          Your Honor has before him dozens and dozens of

21    letters that you have received from people who know Tara, from

22    people who love her, from people who respect her.   In fact,

23    many of those folks are here in the audience today to show

24    their support, former colleagues from the DA's Office, family,

25    friends, people from the NYPD.   They are all in court today to

1    continue to show her support.  And, Juge Kuntz, those letters,

2    that folks and others wrote, they were submitted to show you

3    that Tara Lenich is more than the black dot of her position.

4    She is a woman that is so much more.  She has been truly

5    giving of herself to others and in times of need in ways that

6    candidly very few among us can claim.  Whether it's initiating

7    and organizing fund-raisers for sick friends and colleagues or

8    advancing causes that support veterans or volunteering her

9    time and energy to her church, or caring for the elderly,

10   dedicating her entire professional life to public service and

11   the countless other ways that Tara has helped others, not just

12   for glory, not for accolades, not for awards but only because

13   she believed it was the right thing to do and it's because of

14   who she is as a person.  Simply put, Tara is a good, generous,

15   compassionate person, who somehow lost her way and made a

16   series of terrible choices that regardless of your Honor's

17   sentence here today she will live with for the rest of her

18   life.

19          Now, I know your Honor has read every single one of

20   those letters.  I know your staff has as well.  And I truly

21   hope this they give you a fuller picture of the woman about

22   whom you are to impose sentence.  I submit, judge, that

23   there's a recurring theme that runs through all of those

24   letters.  Taken together, judge, they paint a vivid picture of

25   a woman who is incredibly humble and loyal and giving and

12

1    sensitive and caring and kind and dedicated and thoughtful and

2    hard working.

3            And I can share with you, judge, that the Tara that

4    you read about described in those letters, that's the same

5    Tara that I came to know and respect over the past year

6    working with her.  She is respectful like no other client.

7    She is hard working.  She is kind and thoughtful.  She is

8    incredibly close with her parents, who are in court today, and

9    her family and her friends who have stuck by her.  She is

10   thankful for their support and devastated, truly devastated by

11   the pain she's caused them.  She is embarrassed by her conduct

12   and perhaps, judge, I can attest most importantly she is so

13   very, very sorry for her actions and any harm that they have

14   caused.

15           I think, judge, it bears repeating that Tara is 42

16   years old and she of course has no criminal record.  Indeed,

17   she's never been in any trouble before in her life.  She's, as

18   you know, dedicated her life to serving the public, working

19   tirelessly to make our streets and our community safer for all

20   of us.  She was, as I think I recall one colleague observed

21   that she was usually the first to arrive in the morning at

22   DA's office and the last to leave and her work one noted at

23   the DA's Office was unparalleled.

24           Notwithstanding her arrest and the loss of the

25   career she's loved so much, to her credit Tara continues to

13

1   volunteer her time to good honorable causes including the

2   United War Veterans Council and Christ Church in Tarytown.

3   Present in the audience today I think is Angela Coyle, the

4   head of the United War Veterans Affairs who, as you know,

5   submitted a letter of support praising Tara for the work she's

6   done for that organization and Tara's importance to their

7   mission.

8          Also present in the audience are representatives of

9   the Focus Forward Program, a program I know your Honor is

10  familiar with.  As you read in our submission, but bears

11  repeating, Tara was selected to participate in the Focus

12  Forward Program by the court's pretrial services here in the

13  Eastern District of New York.  In the twelve-week course, as

14  you know, is dedicated to providing educational programming to

15  federal pretrial defendants and they participate and graduate

16  through the pretrial services.  Tara was, as you read, a true

17  leader in that class, judge, a mentor to the other

18  participants and her stories and her goals were inspiring.

19  Not only should Tara's success with the pretrial Focus Forward

20  Program speak to virtually nonexistent, I mean that,

21  nonexistent likelihood of recidivism, which I'll talk about a

22  little more in a bit, it should give the court comfort that to

23  the extent the offense here involves a component of the

24  probation or house arrest there is little risk of

25  noncompliance, really none.  We hope it also gives the court

14

1   insight to the type of person Tara truly is and will continue

2   to be going forward in helping her people.

3          Now, it's certainly true, judge, I'll be the first

4   to acknowledge, many people who get sentenced in this court,

5   particularly nonviolent workplace cases like this, are folks

6   that have no criminal history, that are fully invested in

7   their communities and do things otherwise that positively

8   touch people's lives.

9          But I submit to you, judge, that Tara Lenich is

10  qualitatively different than most defendants in this regard.

11  After all how many among us, how many of us can say that upon

12  hearing that a colleague at work is ill organizes a

13  fund-raiser attended by more than 500 people as Mr. Vista that

14  related in his letter.  How many people here can say that they

15  sent care packages to members of our armed forces, not just to

16  ones they know and are friends with but to total strangers who

17  are in harm's way overseas.  How many of us can say that?  How

18  many of us can say that they have spent their entire adult

19  life serving others, serving the public, making a true

20  difference in the lives of others, truly saving lives and Tara

21  Lenich's work and the work of colleagues in the Kings County

22  DAs office does that.  All done judge not for glory, not for

23  personal benefit, not to better her position for some

24  sentencing some day but only because of the person she is and

25  always has been.

15

1          Respectfully, judge, I submit that that should be

2    worth something.  The extraordinary life that Tara has

3    otherwise lived should count for something.  It should be

4    worth a second chance, not just because I say so, her lawyer,

5    because obviously the 3553(a) factors require that a

6    sentencing court take into account a person's history and

7    characteristics in meting out a just sentence.  It should

8    count.  It should matter and it should speak volumes in this

9    proceeding.

10         Now, let me just spend a few minutes talking about

11   the circumstances of Tara's crime.  As you know, judge, Tara

12   pled guilty to two counts of illegal wiretapping over the

13   course of more than a year in one instance and several months

14   in the other.  Tara illegally listened in on private telephone

15   conversations and reviewed text communications of two people

16   she knew very well.  She did this, as you know, by forging

17   judges' signatures on wiretaps and search warrant orders and,

18   if that weren't bad enough, Tara issued grand jury subpoenas

19   to obtain phone records from phone companies.  Obviously she

20   was not allowed to do that.  She used her position, and

21   several of her unknowing colleagues, to carry out this illegal

22   activity, a violation of her victims' sacred right to privacy.

23         As the government correctly points out, this conduct

24   was not a fleeting instance of digression, but occurred time

25   and time over and over again over the course of many, many

1   months.  As a former state prosecutor and federal prosecutor,

2   as a lawyer, as a citizen, I can tell you without hesitation

3   what I think we can all agree on and that is that this conduct

4   is unacceptable, to say the least, obviously, a total

5   violation of a tremendous trust that the Kings County District

6   Attorneys Office and the people of the city placed in Tara and

7   it was a complete violation of the oath we as lawyers,

8   particularly prosecutors, take to uphold the law and not

9   violate it.

10          The conduct at issue here, judge, is the antithesis

11  of everything, the antithesis of everything that Tara worked

12  for and stands for.  And while we should take some solace,

13  judge, I hope from the fact that Tara never disseminated these

14  recordings, never shared them with third parties, never used

15  them to extort people or get some pecuniary gain from the

16  recordings or put them on the internet or anything like that

17  or that any of her conduct impacted any actual prosecutions in

18  any way or pending criminal investigations.  While we may take

19  some solace in at least that, it does not make her decision to

20  violate the law less blameworthy.  As she will readily admit,

21  Tara, of all people, knew better.

22          Now, nothing that I am about to say about these

23  crimes is intended to minimize the seriousness of these

24  offenses.  But I think a few words, putting these crimes in

25  context, to attempt to give it some perspective would help.

1   First, because these crimes are so aberrant, so contrary to

2   everything that Tara's life had been about, because these

3   crimes seem to make absolutely no sense, and Tara had to know

4   that she was risking everything by committing them and was

5   bound to be caught because Tara herself to this day struggles

6   to articulate what led her to engage in this conduct.

7           We have, as you know, retained a forensic

8   psychiatrist, Dr. Michael Welner, who I would note is someone

9   that the government has retained in the past.  And we retained

10  Dr. Welner to help us, help you, understand what may have led

11  an otherwise respected, successful, dedicated prosecutor to do

12  what she did here.  We submitted that report, a lengthily

13  report.  I know you reviewed it under seal for your

14  consideration.  While the government in its submission

15  completely ignored Dr. Welner's report  -- I don't think it's

16  even mentioned in their submission  -- I know your Honor has

17  read it and I hope it gave you some context as to what may

18  have led Tara to the place she found herself descending into.

19          Tara's crimes, as serious as they were, cannot be

20  viewed in a vacuum.  Without going into too much detail about

21  what Dr. Welner's sealed report said, suffice it to say, that

22  he paints a vivid picture of extreme emotional distress that

23  Tara Lenich found herself in, unbearable pressure, personal

24  and professional, that she found herself under, in part,

25  because of choices that she made, but also in part because of

18

1    people and circumstances that she could not control.  We think

2    this backdrop is important as your Honor considers the

3    totality of the nature and circumstances of Tara's crime and

4    we hope you will, we know you will.

5         Second, with regard to the circumstances of this

6    offense, and as the government properly acknowledges, Tara's

7    effort to right her wrong have been substantial and,

8    respectfully, from my perspective, quite extraordinary.  And

9    that, too, should count for something.  Not only did Tara

10   agree to take full responsibility quickly, in fact,

11   immediately upon being confronted, she pled guilty at the very

12   first court appearance before your Honor without taking any

13   discovery, obviously, without filing any motions.  Tara had

14   made tremendous efforts to cooperate fully with the DA's

15   Office, with the NYPD, with the U.S. Attorneys Office, the

16   FBI.  She met with the U.S. Attorneys Office for hours and

17   upon hours in their offices, outlined her crimes, cleared

18   people the government suspected may have been complicit in her

19   crimes or assisted in the offenses, admitted to improper

20   conduct that the government was not yet aware of, voluntarily

21   returned recordings that she still had in her possession that

22   the government didn't recover when they executed the search

23   warrant at her home, handed over electronic devices for their

24   review.

25        In fact, judge, I mentioned a moment ago that she

1    told them about offenses, about conduct that they didn't even

2    know about yet.   Those grand jury subpoenas, for example, that

3    was something that Tara Lenich voluntarily told them.   Because

4    in an effort to come clean and be cooperative she told them

5    everything she did, that this, judge, was without any

6    protection whatsoever, no proffer agreement, no cooperation

7    agreement, no coverage, no promises.

8           As your Honor knows having presided in this

9    courthouse for as long as you have, that is extraordinary.

10   Again, that doesn't excuse Tara's actions.   I don't want you

11   to take what I am saying as that, but her extraordinary and

12   immediate acknowledgment of her wrongdoing, her efforts to

13   fully, fully accept responsibility and spare the government

14   and this court the use of additional resources and perhaps

15   most importantly, judge, her efforts to mitigate any harm that

16   she caused, to the extent it would be mitigated, should be

17   another factor that weighs in favor of leniency here.   It

18   should matter.   Of course she's getting the two points, but

19   every defendant that pleads get two points.   This is more and

20   it should matter.

21          Another factor that the court must consider, and one

22   which the parties have spent some time writing about as

23   recently as yesterday, is the need to avoid unwarranted

24   sentencing disparities.   And of course it makes sense that a

25   court would want to know what other judges have done in

1   similar cases so there's some level of consistency.  While I

2   will be the first to acknowledge that no two cases are exactly

3   the same, and Tara's case in many ways is unique, the fact of

4   the matter is that in the fourteen months since Tara's federal

5   arrest, and the two months since the government has had our

6   submissions, the government has not identified a single case,

7   not one, where any judge, any judge, has imposed a sentence

8   for the violations, or any remotely analogous violations, that

9   it seeks here, let alone one where the court sentences the

10  defendant to an above-guideline sentence as the government

11  urges here, not one, not in this courthouse, judge, not in any

12  state courthouse, not anywhere in the entire United States

13  that they have been able to find such a case.  This would be a

14  first.

15          Indeed, as we pointed out in our letter, the closest

16  they come up with is a public official in New Jersey who

17  wiretapped numerous co-workers and was ultimately sentenced to

18  twenty-one months in prison, less than the government sought

19  here, despite a higher applicable guideline range.  What they

20  didn't mention of course  -- they mentioned that he did go to

21  trial.  What they didn't mention was that he insisted he was

22  innocent at that trial, incredibly claiming that he didn't

23  realize that what he was doing was even wrong.  But most

24  importantly, it turns out that when you actually read the

25  sentencing minutes, which I think we have provided your Honor,

1    when you actually read those minutes, you'll learn that this

2    same justice department offered that same defendant a sentence

3    of probation, if he would just accept a modicum of

4    responsibility and not go to trial.

5             So, somehow for that defendant, that was sufficient,

6    and I submit for a multitude of reasons it is more than

7    sufficient here if it was sufficient there.  Of course, we

8    provided the court with analogous cases.  You mentioned your

9    own case, which no two cases are exactly the same.  We think

10   there's something to be learned from these others cases.

11   We've provided you with statistics.  The undeniable fact is

12   that the vast majority, 85 percent, I think was the number,

13   nationwide of defendants convicted of this crime here, under

14   these guidelines, even cases involving significant violations

15   of public trust, even those involving defendants who pressed

16   on to trial and never accepted any responsibility, the vast

17   majority, 85 percent of all of those cases, resulted in a

18   sentence of probation.  Yet, the government seeks an

19   above-guideline sentence here of two years.

20            Finally, judge, the last factor or factors that I

21   would like to address today is the need for general and

22   specific deterrence and the need for rehabilitation, education

23   and medical treatment.  First, can anyone honestly say that

24   Tara Lenich will be better rehabilitated being warehoused in a

25   dangerous federal prison filled with the associates of some of

22

1  the same people she prosecuted, or will a sentence that allows

2  her to continue her mental health treatment she, to her

3  credit, has sought out and fully engaged with since her arrest

4  and allows her to continue the classes she's taking to get her

5  business certificate so that she can one day reinvent herself

6  professionally, is that a more effective way of addressing the

7  important objective of sentencing, of rehabilitation or should

8  we warehouse her in federal prison?

9          Finally, with resepect to the deterrence, I will say

10  this, no matter what your Honor's sentence here is today,

11  whether that sentence is two years or whether it's one year or

12  whether it's house arrest or whether it's probation with

13  community service or time already served, I can assure you

14  this, judge, Tara Lenich will never be the poster child for

15  having gotten away with something.  Because of her conduct and

16  because of her choices, she has already been branded a

17  convicted felon for life.  She has deservedly lost her career

18  an Assistant District Attorney, a position that was so much

19  more than a job to her.  It was her true calling.  She

20  dedicated her life to serving the people of Brooklyn and the

21  city, keeping us all safe and because of her decision she's

22  lost that forever.  She has forfeited her law licenses and

23  been disbarred in two states, suffered embarrassment and shame

24  of a highly publicized arrest and prosecution.  You see the

25  members of the press here.  Finding her image on the cover of

1    city tabloids and media outlets across the country, if not the

2    world.

3           Her savings, as you've learned yesterday, have been

4    decimated.  Aside from a part interest in a mortgaged

5    apartment, she has no savings beyond a retirement account, no

6    assets and significant, ever increasing debt.  In fact, most

7    importantly, Tara has had to live with the fact, judge, that

8    her decisions have caused her parents and her other family

9    members and friends, who have done nothing wrong, so much

10   heartache, something which I know has weighed on Tara and will

11   weigh heavily on Tara every single day.

12          Does anyone truly think all that, honestly, does

13   anyone truly think that with all that, that we as a society

14   run the risk that public servants everywhere will start

15   wiringtapping their colleagues because they find out that this

16   is all that happens to you when you get caught?  It's almost

17   laughable to think that.  Or that they will do anything when

18   they hear that what has already happened to Tara and what she

19   faces going forward, no matter what her sentence is.  And as a

20   deterrent, does anyone seriously think, and I would be curious

21   to hear, and the government writes this in their submission,

22   but does anyone think that there's a real risk that Tara will

23   return to some life of crime or will commit this crime or any

24   other crime in the future?  Really?  Does anyone really think

25   that's likely?  And that a two year prison sentence that is

24

1    urged here is the only way of protecting all of us from Tara's

2    future crimes?  That it's needed, it's necessary, it's

3    required, otherwise we run the risk that woman will victimize

4    us all come tomorrow or the next day or the next day.

5          Putting aside that she, obviously, obviously will

6    never be in a position to commit this particular crime again

7    because she not going to be near wiretapping equipment ever

8    again and the fact that she continues to receive the mental

9    health treatment she probably needed, she definitely needed

10   when it was going on, to address those issues that led her to

11   committing the crime, putting all that aside, does someone who

12   leads an otherwise law-abiding life of 41 years marked by good

13   deeds and public service, does someone who accepts

14   responsibility immediately and in such an extraordinary way

15   and is so profoundly sorry, as you're about to hear, for her

16   actions, not just in words but in deeds, who has a perfect

17   records of compliance with pretrial services and is leading

18   Focus Forward classes and has this tremendous network of

19   family and friends who are here to support her, does that

20   sound like the kind of person who is a candidate to go out and

21   commit more crimes, honestly?  Of course not.  And

22   respectfully, respectfully a prison sentence is not needed to

23   prevent it or protect any of us from Tara Lenich in the

24   future.

25          Judge, you have been incredibly patient with me and

1   I appreciate it and so does Tara and her family.  I would just

2   leave you with this, judge.  While Tara's crimes are

3   undoubtedly very serious, and worthy of serious punishment,

4   she has already paid and will continue to pay a heavy, heavy

5   price for them.  To her credit, judge, though, Tara is not

6   lost.  She is not lost.  She remains dedicated to her parents,

7   to her friends who stuck by her, her pet, her church, her

8   volunteer work, her veterans, her studies, her church.  She

9   remains committed to finding a path forward.  Fortunately, she

10  has this wonderful, loving family and an extended support

11  network that will help her do it.

12          How much is enough?  How much is really, really

13  needed?  Is it necessary?  Is a far away  -- and it will be

14  far away  -- federal prison the only way to address the

15  purposes of sentencing here?  Or is the sentence that we

16  propose, which I submit is by no means easy, a sentence of

17  house arrest, a sentence that is fully contemplated by the

18  guidelines, as your Honor noted at the beginning of today's

19  proceedings, sufficient, safer and even better under all the

20  circumstances?

21          I know Tara would like to address the court, judge.

22  Unless you have any questions for me, I'll proceed in any way

23  you like.

24          THE COURT:   We can either hear from the prosecution

25  now or, Ms. Lenich, if you wish to speak now, you may.   You

1   can also speak later.  It's up to you.

2        THE DEFENDANT:  Okay.  I'll speak now if that's

3   okay.

4        THE COURT:  Sure.

5        THE DEFENDANT:  Thank you.

6        Your Honor, I have a hard time even believing that I

7   am in your courtroom today as a criminal defendant and it's

8   because of terrible decisions that I alone made and am

9   responsible for.  Since my arrest I have had to take a long

10   look at how I treated this situation and ended up in your

11   courtroom.  Fifteen months ago I was an assistant DA in

12   Brooklyn and that was more than just a job to me.  It really

13   was my life.  I dedicated myself to making the streets of

14   Brooklyn safer from gun traffickers, from violent gangs and

15   from drug dealers.

16        In 2015, when this all started, I was in a

17   completely destructive, unhealthy emotional professional and

18   personal relationship with someone who I was working on the

19   biggest case of my career with.   When that relationship went

20   from bad to completely disastrous, it had a negative effect on

21   that big case, I truly imploded.  I created the situation and

22   I felt like I couldn't talk to anyone and I dug myself deeper

23   and deeper into the hole.  I felt like everything around me

24   was closing in and I was suffocating and I couldn't breathe.

25   I felt isolated and completely alone and tried to manage an

1   ever increasing workload and what I perceived as a growing

2   threat to the biggest case.  I felt like everything around me

3   was crumbling and I didn't know what to do about it.

4   Obviously, now I know I could have and I should have sought

5   help from a variety of sources and instead I made the worst

6   decision possible and disrespected my position of trust.

7          I humiliated the office that I worked so hard for

8   and embarrassed family and friends. I listened in to calls

9   that I know right to hear.  I knew what I was doing was wrong.

10  I don't know how listening to those calls would help take me

11  out of the place that I was in.  In some irrational way I was

12  trying to maintain control over a truly out of control

13  situation that I had created and in fact I only made things

14  worse, worse for everyone.  I am still struggling through

15  weekly therapy and church to understand why I made and

16  continued to make those decisions.

17         And through my own self-destructive behavior, I lost

18  the very thing that I was trying to protect, my career.  I

19  embarrassed my family and friends, the office that I cared

20  about and the saddest thing was it ripped me from this cage

21  that I had built, this unbearable situation.  I had to take a

22  long look at myself and what I had become and try to right the

23  wrongs that I have created.

24         Your Honor, whatever your sentence today, please

25  know that I understand the harm that I caused and I'll be

28

1    thinking about it for the rest of my life.  I have been trying

2    and I will keep trying through the solace I find in church and

3    my work to support veterans and focus on helping others and

4    through weekly therapy, to continue this process, if allowed.

5          And I apologize to everyone who has been affected by

6    my actions.  First, to the victims and their families, I

7    deeply regret my behavior.  It is inexcusable.  I violated

8    their rights and I was wrong.  To the judges who signatures I

9    used, I'm sorry.  I can't apologize enough.  To the Kings

10    County DA's Office for causing any negativity to come to that

11    office.  My work there was my life and I believed every day

12    going to work made the streets of Brooklyn safer.

13          To the citizens of Brooklyn, they deserved better

14    from me, your Honor. To my family who is here, I apologize for

15    the shame and embarrassment and had the press waiting outside

16    their house looking for me for days and yet they stood by me

17    and this incredible network of friends and family that I

18    really am so fortunate to have.  To the Focus Forward people,

19    who I know are here today, they allowed me to be in their

20    tremendous program and to continue the growing process of

21    looking forward.  To Angela Coyle and Reverend Susan Copley

22    and the War Veterans Council, which has always been one of my

23    passions to continue to support veterans, and she trusted in

24    me and that was incredible.  She didn't know me before this.

25    It was truly remarkable.  To Reverend Susan Copley, who is

29

1   also here, she let me attend Christ Church and all the good

2   they do.

3          Your Honor, I just want you to know this:  I am so

4   humbly repentant for my actions, and I don't know if I deserve

5   a second chance, but I want you to know that I will never make

6   these terrible decisions again and I am truly sorry.

7          Thank you.

8          THE COURT:  Thank you.

9          We'll now hear from the prosecution.

10          MR. POLEMENI:  Thank you, your Honor.

11          One or two things to say.  Judge, for nearly 18

12   months Ms. Lenich lied to and manipulated everyone around her

13   and manipulated the Kings County District Attorneys Office.

14   She was given an immense amount of power and authority and she

15   abused it repeatedly.  Daily, she abused that power.  She

16   could have stopped at any time.  She didn't.  She made a

17   conscious decision for 18 months to forge documents, to forge

18   judges' signatures, to listen in on private personal telephone

19   conversations, to read private personal text messages, for 18

20   months, your Honor.

21          She manipulated her colleagues, junior assistants,

22   who looked up to her.  She was their supervisor.  She lied to

23   them repeatedly.  She lied to experienced, seasoned detectives

24   repeatedly.  She manipulated them.  And there is no doubt had

25   she not been caught she'd be doing it to this day.  She

1   committed a very serious crime and there is no doubt, your

2   Honor, and the government doesn't dispute that she has done

3   very good things, publicly, professionally and personally, but

4   she was given an immense amount of power and she abused that

5   power and she abused it for her personal gain.

6          She knew what she was doing.  It was not a mistake.

7   It was not an aberration, a one-time thing.  She knew what she

8   was doing and she knew what she was doing was a crime because

9   of all people in this courtroom Ms. Lenich, whose job was to

10  supervise wiretap investigations, whose job had to make her

11  realize, and no doubt she did, the incredibly intrusive

12  mechanism of a wiretap.  It is very effective for law

13  enforcement, but there's significant privacy interests at

14  risk, which require us, as federal prosecutors and state

15  prosecutors, to go to the highest levels of the department of

16  justice, as a federal prosecutor, and to the Kings County

17  District Attorneys Office, the highest levels there, to get

18  their approval, to say, you know what, this is worth it.

19         We then have to bring an application on the federal

20  level to your Honor or to any other judges, Title III Judges,

21  on the state level to Supreme Court Justices, and they have to

22  approve of that interception.  And we have to establish then,

23  judge, it's important.  We think that we need this

24  interception or these interceptions.  We understand that we

25  have to minimize because of the privacy interests that are at

1   stake.  We understand that we can only do this for 30 days

2   because of the privacy interests at stake.

3          No one knows that better than Ms. Lenich.  And

4   instead she took her knowledge of how the Kings County

5   District Attorneys Office wiretap investigations process

6   worked, she took her knowledge and she abused the system.  She

7   manipulated individuals to get what she wanted.  It was not a

8   mistake.  It was not a one-off aberration.  It was

9   intentional.  She did it daily for 18 months.

10          Now, Mr. Fodeman points to two factors that you can

11  take some solace in.  One being Ms. Lenich's actions did not

12  impact any pending investigations at the Brooklyn DA's Office.

13  The government doesn't know if that's true or not.  It may

14  very well be the case.  But the Kings County District

15  Attorneys Office had to review hundreds of cases that

16  Ms. Lenich worked on.  A state court judge demanded that they

17  do so.

18          While perhaps it may not have resulted or impacted

19  any pending investigations, in the sense that there's no

20  evidence that was tainted or improperly obtained.  That might

21  be the case.  That's not really what matters.  What matters is

22  the perception that everything is above board.  What matters

23  is the public's perception, the court's perception that's

24  what's going on in the prosecutor's office and with the law

25  enforcement agencies that those prosecutors work with

32

1    everything is done above board.

2          And when someone like Ms. Lenich, who is not a line

3    assistant, judge, who hasn't been in the office for a couple

4    of years, but a supervisor in the office for -- she is there

5    nor fifteen years and supervises all, not just some, all of

6    the district attorneys offices's wiretap investigations.

7    That's a problem.  And the district attorneys office will have

8    to overcome doubt for years.  They will have to restore their

9    credibility that what they are doing is above board.

10          Mr. Fodeman also takes solace in the claim that

11   these recordings that Ms. Lenich intercepted were never

12   disseminated.  That might be the case.  While the government

13   has some of the her computers and some of her cell phones, and

14   she turned some over as well, it's unclear whether there

15   exists other media out there.  It's a possibility, judge.  And

16   with all due respect to Mr. Fodeman, I'm not sure we should be

17   taking his client's word that there are none.

18          But even if there are none, again, that's not the

19   point.  The point is that these recordings of personal,

20   private communications exist and I think one of the victims

21   very artfully told this court she wakes up every day fearful

22   that private personal communications of hers will be

23   disseminated, via the internet, on FaceBook, somewhere, some

24   time her private communications might be out for the world to

25   see.  It could be instantaneous.  A click of a button.  That's

33

1  all it takes in this computer age.

2         Ms. Lenich committed a serious crime.  She should be

3  punished for her crime.  And this court should send a message

4  to people who, even if they are not in supervisory positions,

5  an attorney with all this authority, people who engage in this

6  conduct, particularly in this day and age, that you cannot

7  intercept communications.  You cannot hold people whose

8  communications you have intercepted hostage.  A strong message

9  has to be sent, your Honor, that this behavior cannot be

10  tolerated.

11         The government asks this court impose an

12  above-guideline sentence of 24 months, for those reasons and

13  for all the reasons we cited in our submission.  Thank you,

14  your Honor.

15         THE COURT:  Thank you, counsel.  I'll hear from

16  probation.

17         MS. McKEOWN:  Your Honor, the probation department

18  would rest on our sentencing recommendation.

19         THE COURT:  Again, just so the record is clear, your

20  recommendation was?

21         MS. McKEOWN:  Three years probation, to run

22  concurrently, a forty thousand dollar fine, due immediately

23  and payable within 90 days.

24         Special conditions of probation are as follows:  The

25  defendant shall refrain from the practice of law; the

34

1    defendant shall perform 200 hours of community service, in a

2    manner and at a rate approved by the United States Probation

3    Department, any time she is not employed or actively

4    participating in an educational, vocational or employment

5    program and the defendant shall comply with the fine payment

6    schedule.

7              THE COURT:  As I said before, I will let defense

8    counsel and the defendant respond to anything that they have

9    heard.

10             MR. FARRELL:  Yes, your Honor, thank you.  I hope

11   and intend to be brief.

12             THE COURT:   Take as much time as you need, counsel.

13             MR. FARRELL:  Tara said I can't believe she's here

14   as a criminal defendant.  Your Honor, I can't believe it

15   either.  This is almost Kafkaesque to me.  I've known of

16   Ms. Lenich for a long time.  We were both in the DA's office,

17   albeit in different eras.  But I've known of her and of her

18   reputation.  Had someone approached me say three years ago,

19   knowing that I am not adverse to a occasional friendly wager

20   and said, Gary, I bet you everything you have that in three

21   years on February 2, Tara Lenich is going to be before a

22   federal judge for sentencing.  I would have said, I'll take

23   that bet.  Even I can win this one.  If that happened, I would

24   be here wearing a barrel I guess.  But I would be here.  I

25   really am somewhat shocked myself because it's a woman whose

35

1    reputation I know.  I a denison of Kings County state court,

2    your Honor, and as I said a former Assistant DA and I kind of

3    kept tabs on Tara through my dear friend James Lee Burke, my

4    classmate, who was her supervisor and he would always kind of

5    tell me, Gary, I'm really lucky I have some women prosecutors

6    who are dynamite.  I think they color coordinate the DA's

7    Office by the parts of Brooklyn, and Tara was in the red zone

8    and my friend Jim would always say, he would affectionally

9    refer to them as the ladies of red, Tara, Kia Wright and

10   Christian Hoffman, who are here today to support their friend.

11   He would always brag about them, what talented lawyers they

12   were.  Tara was a very good trial lawyer.  But she was an

13   exceptional investigative lawyer.

14         And you read the letter from Marc Fliedner, a former

15   executive in the DA's office, who ran a very credible campaign

16   to be DA of Kings County.  He told me when I first reached out

17   to him, he goes, Gary, I'm happy, it's my honor to write this

18   letter.  She was singularly the best the best Assistant

19   District Attorney I ever had the pleasure of training and

20   working with.  Because she was a rock star.  She didn't wait

21   for cases to come, she went out and made the cases.  And I say

22   this respectfully and sincerely, Tara Lenich possessed the

23   work ethic of an Eastern District United States Attorney and I

24   do mean that sincerely.

25         There's a running joke in the lawyer's lounge here.

1    Hey, I got an e-mail from AUSA so and so at 4:00 in the

2    morning on Saturday and someone else will say I got one on

3    Sunday.  Do these guys ever sleep?  That's all said

4    respectfully for their work ethic that's renowned throughout

5    the city and that's the type of work ethic Tara Lenich

6    possess.

7            Respectfully, she also was involved in cases that

8    are like Eastern District cases.  She was not prosecuting

9    people on the corner for selling two vials.  She was making

10   big cases of drug traffickers and more importantly gun

11   traffickers.  The biggest cases that have come out of that

12   office in the last seven years have been Tara Lenich driven

13   cases.  She was fully dedicated, fully committed.  We're not

14   talking about a nine to fiver, your Honor.  She was all in,

15   all the time, working with confidential informants and, yes,

16   familiarizing herself with eavesdropping laws and using them

17   to the advantage of law enforcement to take hundreds and

18   hundreds of guns off the street and kilos and kilos of cocaine

19   and heroin.

20           And I would take some issue with the government

21   saying well we're not sure if there are any tainted

22   investigations.  Your Honor, respectfully, I'm pretty sure

23   elected District Attorney Eric Gonzalez has stated

24   unequivocally there is no evidence of taint or any

25   improprieties with any investigation that Tara Lenich was

1    involved in.

2           But all that is in the past, your Honor.  She's here

3    today, as she pointed out, as a federal felon, disgraced,

4    disbarred, no career to go back to.  Today was the last time

5    her voice will ever be heard in any courtroom and that's

6    saddens me.  But that's on her.  She stated, and my colleague

7    Moe Fodeman stated, she knew what she was doing.  The

8    government's right, she intentionally violated people's right

9    to privacy and that's a right we cherish here in this great

10   country of ours and I will also take some  -- I would

11   respectfully disagree that she did it for her enrichment, like

12   a stockbroker who trades and inside information.  He does that

13   for his personal gain.  I respectfully submit this was not

14   done for personal gain.

15          It's difficult for me to say as her lawyer what it

16   was done for.  We know the results, heartbreak, career ruined.

17   Again, I'll rely on Dr. Welner's report, as my colleague did,

18   to give some insight, some insight.  How do you explain the

19   unexplainable?  I think he did a commendable, professional job

20   of offering insight to a desperate, desperate woman in a very

21   volatile situation.

22          And, judge, everyone is different.  Mr. Fodeman is

23   right.  Some people can come back from a jail sentence or any

24   sentence and have their career.  A famous homemaker on TV

25   today telling us the greatest dip you can make for a superbowl

38

1  party.   She was sentenced, came back and is right back on TV

2  again.   An NFL football quarterback star can get involved in a

3  pit bull fighting ring and can come back and lead his team to

4  the playoffs.   That's a great thing.

5          But there's no coming back for Tara Lenich, not back

6  to the courtrooms.   That was her world for years and the

7  investigative wire rooms.   Those days are over.   She's got to

8  reinvent herself and to her credit she's on her way to do

9  that.   She's taking on-line courses.   She has a new passion,

10 not a new passion, she has always been a animal lover and dog

11 lover and she knows the need for these therapy dogs and she's

12 going to do that going forward.

13         I also draw attention to how did she comported

14 herself post-arrest here on pretrial supervision, going to the

15 Focus Forward Program, not just going, because maybe she had

16 to go, or we told her as her lawyers to go, she went.   She

17 became a leader, like she always does, judge, wherever she

18 goes, back to high school you saw and college and through the

19 DA's office.   That's how Tara is.   And she didn't sit around

20 feeling sorry for herself and binge watching The Crown or

21 Stranger Things, good shows that they are.   She was out there

22 helping veterans, helping people in the Christ Church.

23         And, judge, I don't know how much you know about

24 Westchester geography.   I know South Tarytown is not

25 Scarsdale.   That's a diverse community.   There are people

39

1   living on or below the poverty line.  She is not folding linen

2   napkins for banquets.  She's there passing out Ffood and

3   clothing that is needed.  She's helping kids that have DACA

4   issues.

5           She's doing what she can with Reverend Copley and

6   Angela Coyle and they are here today with a third party, Ivy

7   Turk, from Project Liberation.  Those are three great

8   organizations, three great things, that they all want a piece

9   of Tara in the best sense of that term.  They want her to work

10  with them.  And I submit that would be doing the community,

11  our community, a great  -- it would be a great things if she

12  did that.  Because she has the potential, your Honor, to help

13  people.  She is has a life-long track record to prove it.

14  Many defendants, I submit, most defendants that come before

15  you and your colleagues in this building, they are not wired

16  for that.  They are about themselves.  That's why they are

17  here.  They don't have the capacity to help the community in a

18  way that Tara Lenich does.

19          Even Focus Forward, not only did was a star there,

20  the Southern District reached out to borrow her to help a

21  woman they have who was sliding and Tara brought her back.

22  So, she has that going for her, your Honor.  Were she to go to

23  prison I think it is important to note she would not be Tara

24  Lenich the bank clerk who embezzled money or Tara Lenich the

25  molly dealer.  She would be Tara Lenich the former gang

40

1    prosecutor.

2         And I know you've read Joel Sickler's declaration

3    and his extensive experience in prison matters.  She would be

4    hundreds and hundreds of miles away from friends and family

5    and word about who she is would absolutely get out and there

6    would be isolation threats or worse.  So, that's a factor,

7    respectfully, that we would ask you to consider, your Honor.

8         I'm just about done.  I would say this, judge:  When

9    the prosecution noted about the victims' fears I would like to

10   do everything I can to try to assuage those fears.  There's no

11   secret cloud, there are no secret files.  She's not going to

12   do it.  She never did it.  She would never do it.

13        I would add, and I'm sure the court took note of

14   this, this was a victim whose statement was given to probation

15   by her renowned plaintiff's lawyer who has filed suit against

16   my client and who has amended that suit recently to include

17   the elected district attorney and other people.  So take note

18   of that, your Honor.  This was a victim that never cooperated

19   with the government, never once spoke to an FBI agent or

20   Assistant United States Attorney.

21        Judge, I'll never have a client like Tara Lenich

22   again.  I'm confident of that.  I'll never have someone who

23   has done so much for so many people and has touched so many

24   people in so many special ways.  I will never again represent

25   someone I hope who is not just a client but who has become a

41

1    friend and I am proud to say that.

2           So let me end by asking you to follow the

3    recommendation of the probation department that is so

4    respected in this courthouse, as it should be, to impose a

5    nonincarceratory sentence as we suggest or as probation

6    suggests.  I submit that would meet the ends of justice here,

7    would be sufficient to achieve the purpose of sentencing.

8    She's ready to work, judge.  She's ready to continue the

9    community service she's always done.  It has always been part

10   of her life.  She's ready, willing and able to help and thank

11   you for your patience in hearing all of us.

12           THE COURT:  Thank you.  Anything else, sir?

13           MR. FODEMAN:  Nothing.

14           THE COURT:  Anything else, Ms. Lenich?

15           THE DEFENDANT:  Nothing.

16           THE COURT:  Does the prosecution wish to say

17   anything in response?

18           MR. POLEMENI:  Just briefly.

19           I don't know where Mr. Farrell's point about the

20   victims in this case are coming from.  I assume he's not he's

21   not attempting to blame the victims for Tara Lenich  --

22           MR. FARRELL:  That's not a very correct response  --

23           THE COURT:  Whoa there.  Whoa. Whoa. Whoa.

24           I will listen to each side and I will let you have a

25   chance to respond.

42

1          MR. FARRELL:  I know.

2          THE COURT:  Don't do crossfire.

3          MR. FARRELL:  Got it, sorry.

4          THE COURT:  I'm old and slow.  So we're going to go

5     old and slow.  It's his turn and you'll have a chance to

6     respond and he will have a chance to respond.  I'm appointed

7     for life, for good behavior, and I just too old and boring to

8     behave other than boring.  Go right ahead.

9          MR. POLEMENI:  Judge, Ms. Lenich obviously has a lot

10    of family and friends who are here, but she had that when she

11    committed these crimes and a lot of people who walk into this

12    courtroom don't have that, don't have the support, and it cuts

13    both ways, judge.  People who have support, people who have

14    friends and family members behind them and don't commit

15    crimes, demonstrate that they often put their interests above

16    others and she had opportunities to resolve whatever was going

17    on professionally and personally.  She could have done that.

18    She could have spoken to people.  She could have quit her job

19    and gotten a new one.  She had those options available to her.

20          She's an educated woman who comes from a respectable

21    family with a respectable education and career.  She did not

22    choose to do any of those things.  Instead, she chose to

23    repeatedly commit serious crimes.

24          And there is a sense of why did she do all this?

25    And it really doesn't seem to be clear.  But I don't think

1   that helps Ms. Lenich.  In fact, judge, I think just the

2   opposite.  She had no good reason to commit these crimes, but

3   she did anyway.  And going forward the court should

4   respectfully consider that, that she can't articulate a good

5   reason for why these did these things or at least she had

6   conflicting reasons, sometimes out of desperation or sometimes

7   I don't know why I did it.

8           But the court, respectfully, should consider that

9   Ms. Lenich repeatedly put herself above herself others,

10  repeatedly lied to people, repeatedly manipulated the process

11  that she was entrusted with and, again, for those reasons and

12  for the reasons we submitted in our letters we ask the court

13  to impose an above-guidelines sentence.

14          THE COURT:  Now, I'll hear from defense counsel

15  again.

16          MR. FODEMAN:  No, thank you, your Honor.  And I

17  appreciate the opportunity.

18          THE COURT:  Anything else?

19          MR. POLEMENI:  No, your Honor.  Thank you.

20          THE COURT:  Anything else from Ms. Lenich?

21          THE DEFENDANT:  No, your Honor.

22          THE COURT:  Anything else from probation?

23          MS. McKEOWN:  No, your Honor.

24          THE COURT:  Thank you all.

25          Ms. Lenich, the court has this to say:  Perfect

44

1  justice in this case would involve a power that neither I nor

2  any judge nor any human being, for that matter, has in his or

3  her hands.  It is challenging and humbling to sit here as the

4  court and to pass sentence on a fellow human being.

5          This case impacts your family, many of whom who are

6  here today and the court appreciates their being here in

7  support of you.  This case impacts the victims of your crime.

8  Ultimately, this case impacts you because this case is

9  ultimately about you, about what you did that brought us here

10  today, which is a day of sadness and a day of tragedy.

11          On March 23, 2017, the United States of America

12  indicted the defendant on two counts of illegal interception

13  of communications in violation of 18 United States Code

14  Section 2511(a).  On April 3 of 2017, the defendant pled

15  guilty to the indictment; there is no written plea agreement

16  in this action, as has been noted.  The court now sentences

17  the defendant and sets forth its reasons for the defendant's

18  sentence using the rubric of 18 United States Code Section

19  3553(a) factors, pursuant to the requirements of 18 United

20  States Code Section 3553(c)(2).

21          Let me begin with the legal standard.  18 United

22  States Code Section 3553 outlines the procedures for imposing

23  a sentence in a criminal case.  If and when a district court

24  chooses to impose a sentence outside of the sentencing

25  guideline range, the court shall state in open court the

45

1   reasons for the imposition of the particular sentence, and the

2   specific reasons for the imposition of a sentence different

3   from that described in the guidelines.   18 USC Section

4   3553(c)(2).   The court must also state with specificity its

5   reasons for so departing in a statement of reasons form.

6           The sentencing court's written statement of reasons

7   shall be a simple, fact-specific statement explaining why the

8   guidelines range did not account for a specific factor or

9   factors under Section 3553(a).   United States vs. Davis,

10  8-CR-332, 2010 Westlaw, 1221709, at star one, the Eastern

11  District decision dated March 29, 2010 by my brother Judge

12  Jack Weinstein.   Section 3553(a) provides a set of seven

13  factors for this court to consider in determining what

14  sentence to impose on a criminal defendant.   This court now

15  addresses each in turn.

16          First, we'll begin with the nature and circumstances

17  of the offense and the history and characteristics of the

18  defendant.   The first Section 3553(a) factor requires this

19  court to evaluate the nature and circumstances of the offense

20  and the history and characteristics of the defendant.   18 USC

21  Section 3553(a)(1).   The defendant, as was noted, was born on

22  May 2, 1975 in Worcester, Massachusetts, to William Lenich and

23  Frances Lenich (nee Sheerin). The defendant and her younger

24  brother were raised in an above-average income household,

25  where their basic needs were always met.   The defendant

1  reported that her childhood was free of any abuse.  Similarly,

2  the defendant had good physical health for the majority of her

3  life with a few notable exceptions.  She has stated limited

4  mobility in her left knee, the result of surgery to repair an

5  injury she sustained while a passenger in a car that was

6  involved in a car accident during her third year of high

7  school in 1992.  In 2000 and 2004 the defendant contracted

8  lime disease from which she has fully since recovered.  And

9  her vehicle was rear ended in 2015 after which she suffered

10 back pain, muscle inflammation and swelling.  The defendant

11 has never had any substance abuse, alcohol or gambling issues,

12 nor is there any evidence that she has had serious emotional

13 or health problems.  There is, however, evidence to suggest

14 that the defendant maintains a close and loving relationships

15 with her parents and her brothers, all of whom are aware of

16 the defendant's crimes and are actively supporting her, as

17 we've seen here today, and that the defendant has a supportive

18 network of colleagues and friends, as we have also seen here

19 today.

20        The defendant had a distinguished academic and

21 professional history.  She graduated from Wilton High School

22 in Wilton, Connecticut, in 1993; she obtained her

23 undergraduate degree from Colby College in Waterville, Maine,

24 in 1997; she graduated with a juris doctorate degree from

25 Emory School of Law in 2003.  From July 5 of 2005 until

1    November 28 of 2016, the defendant worked as an Assistant

2    District Attorney for the Kings County District Attorneys

3    Office, the KCDA.

4          The KCDA is the government agency  -- and its ADAs

5    are the government agents  -- responsible for investigating

6    and prosecuting New York State and local criminal offenses in

7    Brooklyn, New York.  In order to investigate and to prosecute

8    such criminal offenses, ADAs have the authority to, inter

9    alia, apply to judges for orders and warrants in order to

10   search electronic media stored by telecommunication providers,

11   or to intercept oral or electronic communications transmitted

12   to and from particular telephones.  ADAs also gather evidence

13   by issuing subpoenas, in the name of sitting grand juries, for

14   stored records, including telecommunication providers, where

15   there is a good-faith basis to believe the information sought

16   by the subpoena provided is relevant to an ongoing

17   investigation..

18         In her capacity as an ADA, the defendant played an

19   integral role in numerous successful prosecutions, including

20   of defendants possessing large amounts of guns and drugs.

21   Beginning in 2014, however, a series of events occurred which

22   the defendant asserts were the impetus for her subsequent

23   crimes.  Specifically, a personal relationship between herself

24   and a married police detective with whom she worked came to a

25   volatile end, after which the detective reportedly subjected

48

1    defendant to harassment, including by sending threatening text

2    messages and engaging in unprofessional behavior related to

3    cases they were prosecuting together as has been adverted to

4    by the defendant today and in the addendum to the PSR at 1-2,

5    filed on ECF number 17.  The defendant was single at the time

6    and has never been married.  See paragraph 49 of the PSR.  The

7    detective subsequently allegedly began a relationship with

8    another KCDA employee and although defendant purportedly

9    discussed with her boss what she considered to be continued

10   harassment from the two of them, the KCDA allegedly took no

11   action.

12           Between June of 2015 and November of 2016, the

13   defendant forged, by physically cutting copies and signatures

14   of various New York State Supreme Court Justices and taped

15   them onto documents, 24 purportedly judicially approved

16   orders, authorizing the KCDA and other law informant agencies

17   to intercept and record oral and electronic communications

18   transmitted to and from the cell phones of the said detective

19   and the said other KCDA employee, according to PSR paragraphs

20   9 through 13.  The defendant submitted these fraudulent orders

21   to the service providers of the cell phones and

22   misappropriated the KCDA equipment and facilities to further

23   her scheme.  The defendant also forged search warrants

24   authorizing the seizure of text messages transmitted to and

25   from one or more of the cell phones.  To avoid detection of

1    these illegal activities, the defendant lied to her fellow

2    KCDA employees, telling them she was intercepting

3    communications as part of an extremely confidential law

4    enforcement investigations.  Between June of 2015 and November

5    27 of 2016, the defendant also created and submitted several

6    grand jury subpoenas to telecommunication providers seeking

7    subscriber information for some of the telephone numbers that

8    communicated with the cell phones.

9            And to be specific, this defendant created and

10   submitted eight forged judicial orders to intercept the oral

11   and electronic communications to and from cellular telephone

12   one on the following dates: June 8 of 2015, July 6 of 2015,

13   August 3 of 2015, September 2, of 2015, October 2 of 2015,

14   October 30 of 2015, December 23 of 2015 and December 23 of

15   2015.

16           This defendant also created another series of

17   similarly forged judicial orders which she transmitted to the

18   telecommunications company referred to as provider two,

19   servicing another cellular telephone line belonging to

20   victim's cellular telephone two.  In total this defendant

21   created and submitted 17 forged judicial orders to intercept

22   the oral and electronic communications transmitted to and from

23   cellular telephone two on the following dates:  August 20 of

24   2015, September 18 of 2015, October 16 of 2015, November 13 of

25   2015, December 11 of 2015, January 8 of 2016, February 5 of

50

1    2016, March 4 of 2016, April 1 of 2016, May 4 of 2016, June 3

2    of 2016, July 1 of 2016, August 3 of 2016, September 2 of

3    2016, September 30 of 2016, October 28 of 2016 and November 1

4    of 2016.

5            The defendant took the deliberate steps to prevent

6    her illegal eavesdropping scheme from discovery.   The

7    defendant lied to other Kings County District Attorney

8    colleagues.   Specifically, this defendant lied to them

9    stating she was conducting independent and highly confidential

10   law enforcement investigation.   The defendant instructed her

11   colleagues not to listen to, not to read and not to review any

12   of the telecommunications transmitted to and from the cellular

13   telephone one or the cellular telephone two providers.

14           The defendant also created and submitted grand jury

15   subpoenas to those third-party telecommunication providers.

16   Those grand jury subpoenas called for the production to the

17   grand jury of subscriber information for some of the telephone

18   numbers that communicated to cellular telephone one and

19   cellular telephone two during this period that the defendant

20   was illegally eavesdropping on them.

21           This conduct led to the defendant's indictment by

22   the United States government.   The defendant self-surrendered

23   to the Federal Bureau of Investigation Agents on March 27,

24   2017 and was released that same day on a five hundred thousand

25   dollar unsecured bond, according to the PSR at paragraph 16.

1          Now, we address the need for the sentence imposed.

2          The second 3553(a) factor instructs this court to

3   consider the need for the sentence imposed to reflect the

4   seriousness of the offense, to promote respect for the law and

5   to provide just punishment for the offense; to afford adequate

6   deterrence to criminal conduct; to protect the public from

7   further crimes of the defendant; and to provide the defendant

8   with needed educational or vocational training, medical care,

9   or other correctional treatment in the most effective manner,

10  under 18 USC Section 3553(a)(2).

11         The court's sentence punishes the defendant for

12  violating federal law and is crafted to deter her and others

13  from engaging in any similar criminal activity in the future.

14  The court takes into account the detrimental impact the

15  defendant's crimes had on public trust and law enforcement and

16  the criminal justice system, to the extent to which her crimes

17  invaded the victims' privacy, and the impact of the

18  defendant's crimes on the victims' reputations, careers, and

19  mental and emotional well-being.  The court also considers the

20  defendant's loving and supportive family and network of

21  friends, her years of public service to the community during

22  her tenure as an ADA, the difficult circumstances unique to

23  the defendant's specific crime, the punishment she has already

24  suffered in the form of her loss of the ability to practice

25  law, her chosen career, and the volunteer work and educational

1  programing work she has done since pleading guilty to the

2  instant offenses.

3          Next I address the kind of sentences available.  The

4  third 3553(a) factor requires this court to detail the kinds

5  of sentences available for the defendant under 18 USC Section

6  3553(a)(3).

7          The defendant pled guilty to two count of illegal

8  interception of communications, in violation of 18 USC Section

9  2511(1)(a), for which she faces a maximum term of imprisonment

10  of five years per count, pursuant to 18 USC Section 2511(4),

11  which may run either consecutively or concurrently, pursuant

12  to 18 USC Section 3584.  If a term of imprisonment is imposed,

13  this court may also impose a term of supervised release of not

14  more than three years, pursuant to 18 USC Section 3583(b)(2),

15  where multiple terms shall run concurrently, pursuant to 18

16  USC Section 3624(e).  Because each offense is a Class D

17  felony, the defendant may also be sentenced to a term of

18  probation of not less than one, nor more than five years,

19  under 18 USC Section 3561(c)(1), with one of the following

20  conditions unless extraordinary circumstances exist:  A fine,

21  restitution, or community service, under to 18 USC Section

22  3563(a)(2).  The defendant also faces a maximum fine of

23  $250,000 per count, under 18 USC Section 3571(b), and payment

24  of the mandatory special assessment of one hundred dollars per

25  count, which I mentioned earlier, pursuant to 18 USC Section

1    3013, which comes to $200 in this case.

2           I next address the kinds of sentence and sentencing

3    range established for the defendant's offenses.

4           The fourth 3553(a) factor requires the court to

5    discuss the kinds of sentence and the sentencing range

6    established for the applicable category of the offense

7    committed by the applicable category of defendant as set forth

8    in the guidelines under 18 USC Section 3553(a)(4)(A).

9           Guidelines Section 2H3.1(a)(1) applies to violations

10   of 18 USC Section 2511(1)(a) and sets a base offense level of

11   nine for each count, pursuant to the U.S. Sentencing

12   Commission Guidelines, Section 2H3.1(a)(1), the November 2016

13   USSG Guidelines, et sequentia.  Because the defendant abused a

14   position of public trust, and/or abused a special skill, in a

15   manner that significantly facilitated the commission and/or

16   concealment of the offense, the offense level is increased by

17   two levels, according to Section 3B1.3.  Accordingly, the

18   adjusted offense level for each count is eleven.

19          For purposes of determining a guidelines sentencing

20   range where there are multiple distinct offenses, or groups,

21   the court must determine the total combined offense level by

22   taking the adjusted offense level applicable to the group with

23   the highest offense level, under Section 3D1.4.  Because both

24   groups carry identical offense levels of eleven, the adjusted

25   offense level is eleven.  That offense level must be increased

1    by an amount that is determined by the number of units, where

2    the count with the highest offense level is one unit and each

3    count that is equally serious or from one to four levels less

4    serious counts as an additional unit, pursuant to Section

5    3D1.4(a).  Here, as was previously discussed, there are two

6    units because the defendant has pled guilty to two offenses

7    that are equally serious.  Accordingly, as was stated before,

8    the guidelines direct a two-level increase, which results in

9    an offense level of thirteen.  The guidelines permit a

10   two-level reduction, however, because the defendant has

11   clearly accepted responsibility for her crimes, as defined in

12   Section 3E1.1(a).  Accordingly, the defendant's total combined

13   adjusted offense level is eleven.  And, as we talked about

14   before, because the defendant has no prior arrests or

15   convictions, she has a criminal history score of zero and a

16   criminal history category of one.

17          Given a total offense level of eleven, and a

18   criminal history category one, the guidelines suggest a term

19   of imprisonment of between eight and fourteen months.  As an

20   alternative, the court may impose a term of imprisonment of

21   one month, followed by a term of supervised release with a

22   special condition requiring seven months of community

23   confinement or home detention, Section 5C1.1(c)(2).  As a

24   further alternative, this court may impose a sentence of

25   probation.  That includes a condition, or combination of

55

1    conditions that substitute intermittent confinement, community

2    confinement, or home detention for imprisonment, according to

3    the schedule in USSG Section 5C1.1(c).  The guidelines further

4    provide for a term of supervised release of one to three

5    years, under Section 5D1.2(a)(2), a fine between $4,000 and

6    $40,000, pursuant to Section 5E1.2(c)(3), and payment of the

7    costs of prosecution, pursuant to section 5E1.5.

8          The fifth 3553(a) factor addresses pertinent policy

9    statements of the sentencing commission.

10         The fifth 3553(a) factor, which requires the court

11   to evaluate any pertinent policy statements issued by the

12   sentencing commission, is in the view of this court not

13   applicable to this case.

14         The sixth 3553(a) factor requires the court to

15   consider the need to avoid unwarranted sentence disparities

16   among defendants with similar records who have been found

17   guilty of similar conduct.

18         As was stated earlier, the court has been thoroughly

19   advised by both prosecution and defense of the range of

20   sentences of many cases that have been considered and this

21   court holds that it is going to comply with that requirement.

22         Courts in this district, as well as other districts,

23   have imposed in some instances below-guidelines sentences for

24   crimes that similarly involve abuse of a position trust.  See

25   United States vs. Sanchez, 7-CR-246, Eastern District of New

1   York, September 15, 2008, by my sister Judge Ross, sentencing

2   the defendant who pled guilty to making false statements to

3   the department of justice regarding an ongoing personal

4   relationship with an inmate of a prison, where she was a

5   psychiatrist to probation.  Also see judgment in United States

6   vs. Johnson, 16-CR-52, Southern District of Mississippi,

7   September 14 of 2017, sentencing an ADA who accepted bribes to

8   provide favorable treatment for defendants in cases brought by

9   his office to probation.  The court is also mindful that the

10  vast majority of defendants nationwide who were sentenced

11  post-Booker and under USSG Section 2H3.1 received probationary

12  sentences.  See the National Center of Institutions and

13  Alternatives, Federal Sentence Statistical Analysis Report,

14  ECF, 18-22 and 3.  On the other hand, in a June 2016

15  sentencing in this district, the defendant, an attorney who

16  pled guilty to one count of forging the signature of a

17  bankruptcy judge, was sentenced by my brother Judge Spatt to

18  16 months in prison.  That was in United States vs. Stark,

19  14-CR-572, EDNY, 2016.  For the reasons stated in this

20  memorandum and order, and considering the other six 3553(a)

21  factors, the court's sentence avoids unwarranted sentence

22  disparities.

23          The final, and seventh 3553(a) factor, which

24  requires this court to consider is the need to provide

25  restitution to any victims of the offense, according to USC

1    Section 3553(a)(7), the court determines that this is not

2    applicable in this case.

3           As all sides have stated, this is a challenging

4    case, as are all cases involving criminal defendants, the

5    learned defense counsel, accomplished prosecution and

6    experienced probation service have disagreed on many elements

7    but you have all agreed on one thing, this case is a tragedy

8    and this court agrees with that fact.  However, the

9    protagonist created this tragedy.  The fatal flaw of the

10   protagonist led to this tragedy.  The protagonist in this case

11   is the defendant.  She has acknowledged that here today.  The

12   jealous rage of an Othello led to the tragic death of

13   Desdemona.  The vanity of a King Lear destroyed his kingdom

14   and led to the tragic death of Cordelia.  The delay and

15   equivocation of a Hamlet led to the tragic death of Ophelia.

16   The evil actions of McBeth led to the tragic death of King

17   Duncan and the demise of the Dusk family.  The protagonist

18   driven by a fatal and tragic flaw causes the tragedy.  True

19   tragedy does not end with that protagonist walking away from

20   the carnage which he or she created with the equivalent of

21   community service, or the self-serving I suffered or

22   self-important deterrent to the pre-tragic state of life.  In

23   the recent movie The Kingsmen when asked why he did not simply

24   let the creator of a truly tragic scene of destruction just

25   walk away unscathe, the hero of that film looked him in the

58

1    eye and shook his head and said, no.  He said, This ain't that

2    kind of movie Bro.

3              Counsel, let me put it this way:  This ain't that

4    kind of justice system.  This justice system requires this

5    court to apply the rule of law without fear or favor, equal

6    justice under the law in a system defined by the rule of law,

7    not by the personal demons of the men and the women empowered

8    to enforce the rule of law.  We are a government of laws and

9    not a government of men and women.

10             The prosecution argues lots of people come here who

11   don't have support, and they want you to take that into

12   account that you do have support.  The double-edged sword

13   argument.  Other people argue they don't have support and you

14   have to take that into account in imposing sentence, and the

15   3553(a) factors so state.

16             But everyone has a back story.  We're here today

17   because of the actions taken.  The background never justifies

18   crime, never justifies crime.  It's taken into account, but we

19   are responsible for our actions, whatever our background.

20   That is what is said in this courtroom and in every courtroom

21   in this judicial district and across the country.  For that

22   reason the defendant is hereby sentenced to twelve months of

23   incarceration on count one, twelve months of incarceration on

24   count two, to be served concurrently, at the same time, not

25   consecutively.  Twenty-four months, way too much for this

1    crime.  Time served, home confinement, way too little for this

2    crime, not because I expect you, Ms. Lenich, to somehow

3    magically get your law license back and wind up prosecuting

4    people again, but because every person in this courtroom I

5    suspect has at some point kind of wished to know what a love

6    interest or a love rival might be up to.  We live in a world

7    where you don't have to hear it from me, you all know, privacy

8    is really important.  The constitution protects it.  People in

9    our country, in this district and in every district, need to

10   know that the human beings who are given all this power, the

11   prosecutors, the defense counsel, the judges, the police, are

12   not off on their own personal agendas.  We are all human, but

13   we have to rein it in, whether we are from the hood of Bed

14   Stuy or the hood of Greenwich, we have to do it.

15          I have said this repeatedly to people who say you

16   have to understand.  I do understand.  I'm a boy born in Bed

17   Stuy, raised in the public housing projects of Harlem, have

18   four degrees from Harvard, spent 33 years practicing law on

19   Wall Street.  I get it.  I get it.  I understand the

20   pressures.  And I would be a liar if I said to you, oh boy, I

21   never wished I knew what this potential girlfriend or

22   boyfriend was up to, but you can't take your power in hand to

23   peak.  Thirty-five thousand to forty thousand police officers,

24   prosecutors across the country, judges, can I sit in my

25   chambers and get a phone call from assistant attorney that

60

1    rises and says I just got a TC warrant, judge, Did you really

2    sign it?  Because you are interested in what the person is up

3    to?  Really?  I'm going to have that conversation?  Who am I

4    talking to?

5            You know how important this system is.  You know

6    it's crucial.  Everyone here knows it's crucial.  Everyone

7    here knows that we are all human but we have to, whether we

8    are from the hood or from the other hood, be responsible for

9    our moral actions.  You understand that, Ms. Lenich, and I'm

10   sure you said the equivalent to many people as a prosecutor.

11   I was consumed by personal concerns doesn't cut it.  It

12   doesn't cut it.  We are responsible for our actions.  We are

13   informed by Freud but we are judged by Skinner.  What we do,

14   not who we are, not what is in our heads, because we engaged

15   in behavior that is dangerous.

16           As far as the victim impact statement, there's

17   another courtroom, in another part of this building, where

18   that's going to be determined.  I'm not determining that

19   today.  I'm not commenting on that today.

20           I am adopting the probation pretrial sentence

21   recommendations in their entirety.  I want to make that clear

22   that the punishment is twelve months on count one, twelve

23   months on count two of incarceration to be served

24   concurrently.  I'm recommending to the Bureau of Prisons that

25   the prison be as close as possible to New York and I'll hear

61

1  from both sides in a minute.  I just want to make that very

2  clear.

3          Now, I'll hear first from the prosecution and then

4  from defense counsel and then you can respond.

5          Anything else?

6          MR. POLEMENI:  Judge, are you going to impose

7  supervised release?

8          THE COURT:  No.  This is a defendant who has great

9  support and I don't want her stumbling over some minor

10  infraction that gets her back here.  When you complete your

11  service, ma'am, your family and your friends will be here and

12  they will be with you and they will be with you throughout.

13  So, no, we're not going to go down the supervised release.

14  Five days later, your tax returns.  You have to deal with

15  somebody else, not me.

16          MR. POLEMENI:  A monetary penalty?

17          THE COURT:  No.  Only the $200, which I have to

18  impose $100 per count.  No other financial penalties.

19          MR. POLEMENI:  May I ask the court to advise the

20  defendant of her right to appeal.

21          THE COURT:  You certainly have a right to appeal

22  this sentence, absolutely.

23          MR. POLEMENI:  Fourteen months from the execution of

24  court orders.

25          THE COURT:  As you say.

62

1          MR. POLEMENI:  Fourteen days.

2          THE COURT:  I know what you said and I'm sure if you

3    want to extend it to fourteen months learned defense counsel

4    will let you do that.  It might be jurisdictional and my

5    friends on the 17th floor we'll see what they will do on the

6    over side of the river.

7          Anything else?

8          MR. POLEMENI:  No, your Honor.

9          THE COURT:  Anything else from you?

10         MS. McKEOWN:  No, your Honor.

11         THE COURT:  Defense counsel.

12         MR. FODEMAN:  Yes, judge, just a couple of

13    administrative matters.

14         THE COURT:  Talk slowly.  It's been a long day and

15    our intrepid court reporter has not had anyone spell him his

16    activity.

17         MR. FODEMAN:  First, thank you, your Honor, for your

18    obvious consideration of this case.  On behalf of Ms. Lenich

19    we appreciate it.  We inundated you and your staff with a lot

20    of materials.

21         THE COURT:  You didn't inundate us.  All cases are

22    important.  That is important case.

23         MR. FODEMAN:  Thank you, your Honor.

24         With regard to the designation, I don't think I've

25    ever asked not to be close to home.  But this is unique

63

1    situation where we have a former law enforcement officer.  We

2    have engaged the assistance of someone who is familiar with

3    BOP procedure.

4            THE COURT:  I'll rephrase my comment.

5            Whatever you think is the right place, I will

6    recommend it now.  My recommending something to the BOP is

7    like showing up in the projects and asking for a pony when I

8    was about fourteen, my father said Bill, you're a good kid,

9    not as good as your brother Eric, but we live in the projects

10   on the fourth floor, you ain't getting a pony and I've never

11   gotten a pony.  I will ask BOP whatever you suggest as the

12   designation or set of designations.  For the obvious reasons,

13   maybe we don't want to have an extended discussion about what

14   that might be in this arena.  So if you want to submit it

15   under seal for my consideration as a recommendation, that's

16   fine, too.  But they will do what they do.

17           MR. FODEMAN:  We'll do that, your Honor.

18           THE COURT:  I think that's probably a little better.

19           MR. FODEMAN:  Agreed.  Thank you, your Honor.

20           The only other request  -- this is another thing

21   that I think is probably a first for me  -- I don't usually

22   ask for more time for my clients, generally not.

23           THE COURT:  You want one more day?

24           MR. FODEMAN:  That's where I was going.

25           THE COURT:  Okay.  You got it.  Twelve months and

64

1  one day.

2        MR. FODEMAN:   Thank you, your Honor.   Much

3  appreciated.

4        THE COURT:   To paraphrase the song Les Mis, One Day

5  More.   I get it.

6        MR. FODEMAN:   Thank you, your Honor, much

7  appreciated.

8        THE COURT:    Anything else?

9        MR. FODEMAN:   No, your Honor.   Thank you.

10        MR. POLEMENI:   A surrender date.

11        MR. FODEMAN:   Yes.

12        THE COURT:   What do you recommend and what do you

13  recommend?

14        MR. POLEMENI:   30 days.

15        THE COURT:    Why don't we pick a date certain that

16  is exact.

17        MR. FODEMAN:   I have some things scheduled, I know

18  that.

19        THE COURT:   That's why I said recommend a date

20  certain.   Take a look at your calendar.   Like I said, I'll be

21  here for a while.   Take a look at your calendar.

22        MR. FODEMAN:   Does March 14 work?

23        THE COURT:   Does that work for you?

24        MR. POLEMENI:   No objection.

25        THE COURT:   Everyone.   March 14 it shall be at the

65

1    appropriate place and the appropriate time.  You folks work

2    that out.

3               MR. FODEMAN:  Thank you, your Honor.

4               THE COURT:  Anything else?

5               MR. FODEMAN:  No.  Again, thank you.

6               THE COURT:  Thank you.  We are adjourned.

7                         ooooooo0ooooooo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25