UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
STEPHANIE ROSENFELD,

               Plaintiff,

      -against-

TARA LENICH; CITY OF NEW YORK;
LU-SHAWN M. THOMPSON, as
Administrator of Estate of
Kenneth P. Thompson; ERIC
GONZALEZ; WILLIAM SCHAEFER; BRIAN
DONAHUE; and JOHN/JANE DOES 1-10,

               Defendants.
-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**17-CV-7299 (NGG) (PK)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Stephanie Rosenfeld brings this action under the Electronic Communications

Privacy Act ("ECPA"), 18 U.S.C. §§ 2510 et seq. and 2701 et seq., 42 U.S.C. § 1983, and certain

state tort laws against Defendants Tara Lenich, the City of New York ("the City"), Lu-Shawn M.

Thompson (as administrator of the estate of Kenneth P. Thompson), Eric Gonzalez, William

Schaeffer, Brian Donohue,[1] and John/Jane Does 1-10. (Am. Compl. ("FAC") (Dkt. 11) ¶¶ 98-

133.)

Defendants the City, Thompson, Gonzalez, Schaeffer, and Donohue (the "City

Defendants") now move to dismiss the complaint[2] pursuant to Federal Rule of Civil Procedure

12(b)(6). (See Mot. to Dismiss (Dkt. 62); Mem. in Supp. of Mot. to Dismiss ("Mem.") (Dkt.

64).) For the reasons that follow, the City Defendants' motion is GRANTED in part and

DENIED in part.

---

[1] Schaeffer and Donohue's names appear to be misspelled in the case caption. The court adopts the spellings used
by City Defendants in the motion to dismiss.

[2] References herein to the "complaint" refer to Plaintiff's first amended complaint (Dkt. 11).

# I. BACKGROUND

## A. Facts

The following facts are drawn from Plaintiff's complaint and are assumed to be true for purposes of the motion to dismiss.

Plaintiff joined the Kings County District Attorney's Office ("KCDA") as an Assistant District Attorney ("ADA") in January 2006. (FAC ¶ 20.) She worked with Lenich in KCDA's "Red Zone Trial Bureau," a general practice bureau, from approximately 2007 until 2012, when Lenich transferred to the Special Investigations Bureau. (Id. ¶ 23.) Plaintiff was transferred to the KCDA School Advocacy Bureau in July 2016, where she remained until she left KCDA in May 2017. (Id. ¶ 24.)

From 2014 until his death on October 9, 2016, Thompson served as the District Attorney for Kings County, and Gonzalez served as the Deputy District Attorney. (Id. ¶¶ 8-9.) Since October 9, 2016, Gonzalez has served as the District Attorney. (Id. ¶ 9.) At all relevant times, Schaeffer was an Executive Bureau Chief and Donohue was an Assistant Deputy Chief Investigator, both within KCDA. (Id. ¶¶ 10-11.) John/Jane Does 1-5 are alleged to have been employees of KCDA with responsibility for setting and implementing KCDA policy with respect to overseeing wiretap operations. (Id. ¶ 12.) John/Jane Does 6-10 are alleged to have been employees of KCDA who used and/or disclosed Plaintiff's private communications knowing that they were unlawfully obtained. (Id. ¶ 13.)

From May 2015 through November 28, 2016, Lenich was the Deputy Bureau Chief in charge of Special Investigations at KCDA. (Id. ¶ 25.) Plaintiff alleges the following upon information and belief: Lenich reported to Schaeffer, but had the authority to report and make requests directly to the District Attorney (id. ¶¶ 26-27); Schaeffer, Thompson, and later Gonzalez were responsible for supervising Lenich and overseeing the investigations she was conducting

2

and overseeing (id. ¶ 28); Lenich supervised between two and six ADAs as well as the KCDA wire room staff, which included KCDA employees and members of the New York City Police Department (id. ¶¶ 29-30); Lenich had the authority to set KCDA policy with respect to the operation of a wiretap, the oversight of wiretaps, the documentation required when conducting wiretaps, and reporting requirements of individuals working in the wire room (id. ¶ 32); and Lenich had final decision-making authority within KCDA over whether to seek a wiretap, how a wiretap was set up, and the operation of a wiretap (id. ¶ 33).

Plaintiff alleges that in order to conduct a wiretap, ADAs at KCDA were required to file a wiretap application with a court, along with an affidavit demonstrating the requisite probable cause. (Id. ¶ 34.) Pursuant to KCDA policy, a supervisor, such as Lenich, was required to approve these wiretap applications. (Id. ¶ 35.) Plaintiff alleges upon information and belief that once an order authorizing a wiretap is signed and sealed by a court, it is given to Donohue, who is responsible for ensuring that the order has all necessary signatures and a raised judicial seal and for setting up the wiretap in the KCDA wire room. (Id. ¶¶ 36-37.) She also alleges upon information and belief that all KCDA wiretaps must be conducted out of the KCDA wire room (id. ¶ 38), and that KCDA policy did not permit wiretaps to be conducted using personal laptops (id. ¶ 39). Finally, she alleges upon information and belief that a wiretap order typically authorizes a minimum of two ADAs, as well as all supervisors above them, to review the intercepted communications. (Id. ¶ 40.) Only the individuals named in an authorizing order are permitted to review the communications intercepted pursuant to that order. (Id.)

Plaintiff further alleges upon information and belief that Lenich used KCDA equipment and facilities to intercept, record, and review the oral and electronic communications sent to and/or from Plaintiff's cell phone. (Id. ¶ 58.) Specifically, between approximately June 2015

and December 2015, Lenich intercepted and recorded communications sent to and from Plaintiff's private cell phone. (Id. ¶ 41.) To do so, Lenich forged the signature of New York State Supreme Court Justices on documents purporting to be judicial wiretap orders. (Id. ¶ 42.) Plaintiff alleges upon information and belief that Lenich showed these forged orders, none of which had raised judicial seals, to Donohue, who reviewed and accepted them. (Id. ¶¶ 43-44.) Plaintiff also alleges upon information and belief that Lenich and/or Donohue sent seven forged orders (or caused them to be sent) to Plaintiff's cell phone provider to allow for the interception and recording of the communications transmitted to and from Plaintiff's private cell phone. (Id. ¶¶ 45-46.) Lenich recorded and reviewed Plaintiff's private conversations with friends and family, none of whom consented to having those communications intercepted or recorded. (Id. ¶¶ 47-50.) In or about and between May 2015 and November 2016, Lenich also forged multiple search warrants authorizing the seizure of text messages sent to and from Plaintiff's cell phone. (Id. ¶ 51.) Plaintiff alleges upon information and belief that Lenich used the forged search warrants to obtain and review text messages sent to and from Plaintiff's cell phone. (Id. ¶ 52.)

Plaintiff also alleges upon information and belief that Lenich used information contained in Plaintiff's communications to harass and/or direct others to harass Plaintiff and her family and "alienate affections." (Id. ¶ 53.)

From August 2015 through November 2016, Lenich also used forged court orders and other documents to intercept and record oral and electronic communications from another cell phone not belonging to Plaintiff. (Id. ¶ 54.) The communications intercepted from this other phone included communications sent to and/or from Plaintiff. (Id. ¶ 55.) Plaintiff did not authorize the interception of such communications. (Id. ¶ 56.)

4

Upon information and belief, Plaintiff alleges that Defendants Thompson, Gonzalez, Schaeffer, and John/Jane Does 1-5 knew or should have known that Lenich was conducting an unlawful wiretapping scheme because Lenich submitted forged judicial orders to Donohue, these forged orders were stored in KCDA, she used KCDA equipment and facilities to conduct her operation, she claimed she was conducting a confidential law enforcement investigation that did not exist, and she needed the assistance of other KCDA employees to conduct this wiretapping operation. (Id. ¶ 63.) Plaintiff alleges upon information and belief that Lenich told other KCDA employees that the wiretapping operation against Plaintiff was part of a confidential law enforcement investigation, which was not true. (Id. ¶¶ 59-60.) Plaintiff alleges that Schaeffer, Thompson, and Gonzalez knew that Lenich was not conducting any law enforcement operation against Plaintiff and that they were responsible for knowing what investigations Lenich was conducting at all times. (Id. ¶¶ 61-62.)

Plaintiff also alleges upon information and belief that Lenich was the subject of multiple EEOC complaints concerning her allegedly erratic and aggressive behavior from fellow ADAs during this period, and that Lenich was ordered to undergo sensitivity training. (Id. ¶ 64.) Plaintiff alleges that these complaints and training alerted or should have alerted the Supervisory Defendants to monitor Lenich more closely. (Id. ¶ 65.) Plaintiff further alleges that the Supervisory Defendants' "deliberate indifference" to Lenich's misconduct violated Section 3-1.3 of the National Prosecution Standards, Third Edition, issued by the National District Attorneys Organization, which requires prosecutors who become aware that "evidence has been illegally obtained" to "take affirmative steps to investigate and remediate such problems." (Id. ¶ 67.) Plaintiff also alleges that their behavior violated Section 2.12(f) of the American Bar Association's Standards on Prosecutorial Investigations, which states that prosecutors need to

stay informed about the activities of personnel using electronic surveillance and ensure that required procedures are being followed. (Id.)

On or around November 28, 2016, KCDA filed a criminal complaint in Kings County Criminal Court charging Lenich with two counts of eavesdropping under Penal Law § 250.05 and two counts of criminal possession of a forged instrument in the second degree under Penal Law § 170.25. (Id. ¶ 68.) The complaint alleged that Lenich forged court orders authorizing eavesdropping and "requested and was provided computerized access to review" and did review communications over Plaintiff's cell phone. (Id. ¶¶ 69-70.) Plaintiff learned on November 28, 2016, that her communications had been unlawfully intercepted, but alleges upon information and belief that Donohue and Supervisory Defendants knew about the interceptions and the fact that they were stored on Lenich's laptop prior to November 28, 2016. (Id. ¶¶ 71-72.) Despite this alleged knowledge, they permitted Lenich continued access to Plaintiff's private communications. (Id. ¶ 73.)

Lenich's arrest was covered extensively in the media. (Id. ¶ 74.) Plaintiff's name and the fact that Lenich had wiretapped her phone was leaked to the media and her name appeared in stories for multiple days. (Id.) Reporters staked out Plaintiff's home and "accosted" her and her family. (Id.)

Neither Plaintiff nor any party to the intercepted communications consented to anyone from KCDA using or disclosing Plaintiff's private communications. (Id. ¶ 78.) Nonetheless, Plaintiff alleges upon information and belief that Schaeffer, Gonzalez, Donohue, and Does 1-10 received, used, reviewed, and disclosed to one another and to others copies of communications that they knew had been unlawfully intercepted from Plaintiff's phone. (Id. ¶¶ 75-77.)

On December 6, 2016, Plaintiff's counsel sent a letter to KCDA requesting that KCDA: (1) provide her with a copy of all intercepted communications; (2) provide her with copies of all documentation used by Lenich to obtain and record her private communications; (3) destroy copies of the intercepted communications in the possession of KCDA or maintain all other copies under seal; (4) identify all individuals to whom copies of Plaintiff's private communications had been provided; (5) reveal the results of KCDA's search of Lenich's home and the likelihood that Lenich maintained copies of Plaintiff's communications; and (6) provide Plaintiff's counsel with notice of any attempt to review or obtain Plaintiff's intercepted communications. (Id. ¶ 79.) In response, KCDA refused to identify the individuals who reviewed Plaintiff's communications, return her communications, or confirm that copies had been destroyed. (Id. ¶ 80.) Plaintiff alleges, upon information and belief, that Gonzalez disclosed or directed the disclosure of Plaintiff's communications to the United States Department of Justice ("DOJ"). (Id. ¶ 81.) Plaintiff also alleges that in or around January 2018, KCDA disclosed her communications to a Justice of the New York Supreme Court (Justice Chun) without Plaintiff's authorization. (Id. ¶ 83.) She alleges upon information and belief that the Supervisory Defendants authorized this disclosure, knowing that they had been illegally obtained. (Id. ¶ 83.) KCDA currently maintains copies of Plaintiff's communications. (Id. ¶ 82.)

On or about March 27, 2017, a federal grand jury indicted Lenich on two counts of illegal interception of communications in violation of 18 U.S.C. §§ 2511(1)(a), 2511(4)(a), and 3551, et seq. (Id. ¶ 84.) The indictment, attached to the complaint, alleged that Lenich "without lawful authorization, knowingly and intentionally intercepted, endeavored to intercept and procured another person to intercept and endeavor to intercept the wire, oral and electronic

communications" of Plaintiff. (Id. ¶ 85.) Lenich pleaded guilty to both counts of the indictment on April 3, 2017. (Id. ¶ 86.)

Plaintiff was forced to leave her job at KCDA in May 2017. (Id. ¶¶ 87, 89.) She felt she could no longer remain at KCDA because KCDA employees were gossiping about her, her supervisors looked at her differently, and defense attorneys and judges treated her differently. (Id. ¶ 88.) Plaintiff has made significant efforts, but has not been able to find new employment due to the extensive media coverage she received as a result of the unlawful wiretapping operation. (Id. ¶ 90.) She has been diagnosed with post-traumatic stress disorder. (Id. ¶ 91.) Plaintiff has been accosted by reporters in front of her home, including while she was with her children, has become afraid to walk in her neighborhood for fear that she is being followed or surveilled, and has had recurring dreams about being watched and followed, including by Lenich. (Id. ¶¶ 92-94.) In December 2017, Plaintiff submitted a Victim Impact Statement in connection with Lenich's sentencing in federal court. (Id. ¶ 95.) In it, she described her anxiety and the effect of media attention on her personal life, family, and career. (Id.)

Plaintiff served a written and sworn Notice of Claim upon Defendants within ninety days of Plaintiff's discovery of the unlawful wiretapping scheme. (Id. ¶ 96.)

### B. Procedural History

Plaintiff commenced this action on December 14, 2017. (See Compl. (Dkt. 1).) She filed an amended complaint on February 1, 2018. (See FAC.) The amended complaint asserts six causes of action. Plaintiff alleges first that all Defendants violated the ECPA, 18 U.S.C. §§ 2510 et seq. and 2701 et seq. (Id. ¶¶ 98-104.) She also brings § 1983 claims against Lenich and the City alleging a deprivation of her rights under the Fourth and Fourteenth Amendments. (Id. ¶¶ 105-108, 109-114.) Finally, Plaintiff asserts three state tort causes of action: negligent retention and supervision against the City and Thompson, Gonzalez, Schaeffer, and Does 1-5;

8

negligence against the City, Thompson, Gonzalez, Schaeffer, Does 1-5, and Donohue; and tortious interference with employment against the City and Lenich. (Id. ¶¶ 115-133.)

Lenich answered the amended complaint on February 15, 2018. (Answer (Dkt. 24).) City Defendants now move for the dismissal of all claims against them. (Mem.)

## II.    LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of a plaintiff's complaint. Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007). To survive a Rule 12(b)(6) motion, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Accordingly, for the purposes of deciding Defendants' motion, the court will "accept all factual allegations in the [complaint] as true" and "draw all reasonable inferences in [Plaintiff's] favor." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 429 (2d Cir. 2011) (citation and internal quotation marks omitted). The court is not, however, required to accept as true an allegation that amounts to a "legal conclusion couched as a factual allegation" or a "naked assertion devoid of further factual enhancement." See Iqbal, 556 U.S. at 678 (citation omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint falls short of this standard when its well-pleaded factual allegations are "merely consistent with" or suggest the "possibility" that a defendant is liable. Id. (internal citation and quotation marks omitted). A plaintiff must therefore plead sufficient factual content to "nudge[]" her claim "across the line from conceivable to plausible." Id. at 680 (quoting Twombly, 550 U.S. at 570).

A plaintiff may plead facts alleged "upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (citations and quotation marks omitted). Even "where the facts are peculiarly within the possession and control of the defendant," however, the complaint must nonetheless provide "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegality." Id. (alterations adopted) (quoting Twombly, 550 U.S. at 556).

## III. DISCUSSION

### A. ECPA Claim

Subject to certain exceptions, Title III of the ECPA makes it unlawful to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept" a wire, oral, or electronic communication, or to "disclose" or "use" "the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained in violation of [the ECPA]." 18 U.S.C. § 2511(1)(a), (c), (d). The ECPA defines "contents" as "any information concerning the substance, purport, or meaning of [the intercepted] communication." 18 U.S.C. § 2510(8). Individuals whose wire, oral, or electronic communications have been "intercepted, disclosed, or intentionally used in violation of [the ECPA]" may maintain a civil cause of action against any person or entity responsible for such conduct. Id. § 2520(a). Plaintiff also asserts a violation of Title II of the ECPA, commonly referred to as the Stored Communications Act, which makes it unlawful to "obtain[] . . . access to a wire or electronic communication while it is in electronic storage" by "intentionally access[ing] without authorization a facility through which an electronic communication service is provided." 18 U.S.C. § 2701. (See FAC ¶¶ 98-104; Pl. Opp'n at 8 n.7.)

Plaintiff alleges that the City Defendants violated the ECPA in several ways. First, she claims "[u]pon information and belief" that Schaeffer, Gonzalez, and Donohue all unlawfully disclosed her communications "to one another, as well as others." (FAC ¶ 77.) Second, she alleges upon information and belief that Gonzalez unlawfully "disclosed, or directed the disclosure of, Plaintiff's private communications" to the DOJ. (Id. ¶ 81.) Third, she alleges "[u]pon information and belief" that Thompson, Gonzalez, and Schaeffer authorized the disclosure of Plaintiff's private communications to a Justice of the New York Supreme Court (the "Supreme Court Justice"). (Id. ¶ 83.) Finally, she asserts that the City is responsible for the alleged misconduct by Schaeffer, Gonzalez, Donohue, Thompson, and Lenich under the doctrine of respondeat superior. (Pl. Opp'n at 9.) The court first discusses Plaintiff's claim against the individual City Defendants and then her claim against the City.

   1.  Individual City Defendants

Plaintiff alleges "[u]pon information and belief" that (1) Schaeffer, Gonzalez, and Donohue, and Does 1-10 "received, used, reviewed, and disclosed copies of telephonic and electronic communications that were unlawfully intercepted from Plaintiff's private cellular phone" (FAC ¶ 75); (2) Schaeffer, Gonzalez, Donohue, and Does 1-10 "knew Plaintiff's communications had been unlawfully obtained at the time they received, used, reviewed, and disclosed them because they knew Lenich had forged court orders to wiretap Plaintiff's cell phone (id. ¶ 76); and (3) Schaeffer, Gonzalez, Donohue, and Does 1-10 disclosed these communications "to one another, as well as others, without Plaintiff's permission" (id. ¶ 77). Plaintiff contends that these three paragraphs (id. ¶¶ 75-77), which she labels the "main

disclosure violations," are "sufficient to state a Wiretap Claim against all City Defendants"[3] (Pl. Opp'n at 9). The court disagrees.

Plaintiff describes the complaint as alleging that individual City Defendants had access to her communications, that they knew her communications had been unlawfully intercepted, and that "characterizations about the content of her communications ended up in newspaper articles and became a part of office and legal community gossip." (Id. at 10 (citing FAC ¶¶ 74, 95).) "These rumors arose," Plaintiff explains in her opposition brief, "because those who had access to Plaintiff's communications—the [individual City Defendants and Lenich] and other KCDAO employees (John Does)—illegally disclosed information about their contents." (Pl. Opp'n at 10.) However, this description of the complaint is overly optimistic. With respect to "access," Plaintiff points the court to paragraph 40 of the complaint, in which she merely asserts that "[u]pon information and belief, a [legal] wiretap order typically authorizes a minimum of two ADAs, as well as all of the supervisors above those ADAs in the chain of command, to review the intercepted communications." (FAC ¶ 40; see Pl. Opp'n at 10.)[4] As for "disclosure," the complaint alleges only that Plaintiff was publicly identified as the victim of Lenich's wiretapping scheme—not that any information regarding the contents of her intercepted communications was leaked.[5] The disclosure of her name, despite the harm it may have caused, is not actionable

---

[3] The court notes that, although Plaintiff uses the collective defined term, "City Defendants," in describing these allegations in her opposition brief (see Pl. Opp'n at 9), the complaint does not allege that Kenneth Thompson took part in these presumed disclosures.

[4] The court notes that Plaintiff also alleges upon information and belief that Donohue was responsible for physically setting up wiretaps at KCDA. (FAC ¶¶ 11, 36.) This allegation at least raises the possibility that Donohue might have had the ability to access the contents of intercepted communications, including those of Plaintiff. It is nonetheless insufficient to state a claim under the ECPA because, as explained infra, Plaintiff fails to plausibly allege the existence of a disclosure.

[5] Plaintiff cites paragraph 74 for her contention that the complaint contains allegations that "characterizations about the content of her communications ended up in newspaper articles." (Pl. Opp'n at 10.) Paragraph 74 reads:

> Lenich's arrest was covered extensively in the media. Plaintiff's name was leaked to the media, which reported that one of the phones that Lenich wiretapped belonged to Plaintiff. Plaintiff's

under the ECPA, which only protects the <u>content</u> of a communication and not the identity of a party to that communication. <u>See</u> 18 U.S.C.A. § 2510(8) (defining "contents" for the purposes of the ECPA as "any information concerning the substance, purport, or meaning of [the intercepted] communication"); S. Rep. No. 541, 99th Cong., 2d Sess. (1986), <u>reprinted in</u> 1986 U.S.C.C.A.N. 3555, 3567 (noting that the ECPA was amended to "exclude from the definition of the term 'contents,' the identity of the parties or the existence of the communication . . . thus distinguish[ing] between the substance, purport or meaning of the communication and the existence of the communication or transactional records about it"); <u>In re Zynga Privacy Litig.</u>, 750 F.3d 1098, 1106 (9th Cir. 2014) (holding that, for the purposes of the ECPA, Congress intended "contents" to refer only the message conveyed by the communication, and not to the record information generated in the course of the communication, such as the identities of the parties to the communication); <u>Gilday v. Dubois</u>, 124 F.3d 277, 296 n. 27 (1st Cir. 1997) (holding that a device that "captures electronic signals relating to the [personal identification number] of the caller, the number called, and the date, time and length of the call" does not capture the contents of communications and therefore "is not within the ambit of the [ECPA]"); <u>cf.</u> <u>In re Pharmatrak</u>, 329 F.3d 9, 18 (1st Cir. 2003) (personal information provided to an online pharmaceutical website, including users' names and addresses, constituted "contents" of a

---

name appeared in multiple news sources for days. Reporters staked out Plaintiff's private residence and accosted her and her family in an effort to obtain more information about the wiretapping operation.

(FAC ¶ 74.) Plaintiff also points to allegations in paragraph 95 to bolster her claim that the complaint alleged a leak of her private communications; however, the relevant portions of paragraph 95 largely speak to Plaintiff's subjective beliefs about what others were thinking after they learned she was Lenich's victim. (<u>See id.</u> ¶ 95.) She describes feeling "mortified and humiliated" because of press attention and that she "could no longer walk through the lobby of the office building without people staring at me side-eyed wondering did she or didn't she have an affair with the police officer." (<u>Id.</u> (cited in Pl. Opp'n at 10, 11).) She also states that "defense attorneys and judges tr[ied] to talk to [her] about what happened." (<u>Id.</u>) Neither of these paragraphs indicate that the contents of her communications leaked to the media or her colleagues.

communication under the ECPA because users had communicated with the website by entering this personal information into a form provided by the website for that purpose).

Without additional factual allegations suggesting that there was in fact an unlawful disclosure of Plaintiff's communications, Plaintiff's conclusory statement "[u]pon information and belief" that a group of Defendants "all disclosed" her communications "to one another and to others" (FAC ¶ 77) does not "[]cross the line from conceivable to plausible." See Iqbal, 556 U.S. at 680 (quoting Twombly, 550 U.S. at 570). As the Second Circuit explained in Citizens United v. Schneiderman, 882 F.3d 374 (2d Cir. 2018):

> A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory. Those magic words will only make otherwise unsupported claims plausible when 'the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.'

Id. at 384 (quoting Arista Records, LLC, 604 F.3d at 120). In Citizens United, the court held that the plaintiffs' allegation "[u]pon information and belief" that the defendant had published certain sensitive documents in the past (and thus might do so again), without additional facts, "d[id] no more than conjure the specter of a leak." Id. (alteration in original). The court reasoned that, if the disclosures had occurred, "[t]here is no reason [the plaintiffs] could not find at least one inadvertent publication without any help from subpoenas, depositions, or interrogatories," particularly because they were "alleging public disclosures, which, by their very nature, would be easy to discover if they occurred." Id. at 385 (emphasis in original). Here, similarly, Plaintiff alleges "[u]pon information and belief" that a wide group of Defendants disclosed the contents of her communications to each other and to others, resulting in media coverage and office gossip that caused her damage. (See FAC ¶¶ 75-77.) Yet she could not point to a single example of

that purported disclosure.[6] As in <u>Citizens United</u>, Plaintiff has presented the mere mention of the possibility of [disclosure]. That cannot be enough." <u>Citizens United</u>, 882 F.3d at 385.

Similarly, Plaintiff's allegation "[u]pon information and belief" that "Gonzalez disclosed, or directed the disclosure of," Plaintiff's communications to the DOJ, knowing that they had been obtained unlawfully,[7] is speculative. (<u>Id.</u> ¶ 81.) As noted above, Plaintiff may plead facts "upon information and belief" where "[1] the facts are peculiarly within the possession and control of the defendant or [2] where the belief is based on factual information that makes the inference of culpability plausible." <u>Arista Records, LLC</u>, 604 F.3d at 120. Here, however, she has not identified any barrier that would prevent her from, at a minimum, asking the DOJ whether it received copies of the contents of Plaintiff's communications, nor has she pleaded sufficient factual information to make "the inference of culpability plausible." <u>Id.</u>

The only other allegation relevant to this disclosure is Plaintiff's allegation that on March 27, 2017, a federal grand jury indicted Lenich on two counts of illegal interception of communications. (<u>Id.</u> ¶ 84.) However, this fact does not give rise to the inference that the <u>contents</u> of her communications were unlawfully disclosed to the DOJ at any point—or that Gonzalez was involved with that disclosure. Instead, the indictment of Lenich is entirely consistent with lawful conduct: either a disclosure to the DOJ of unprotected information about the wiretapping scheme—for example, Lenich's forged orders and record information concerning the date, time, and target of the unlawful wiretaps—or the disclosure of Plaintiff's communications pursuant to a valid grand jury subpoena—which would be shielded by the

---

[6] For example, Plaintiff does not point to a single news article that discusses the contents of her communications, nor does she cite any comments by coworkers indicating awareness of the contents of her communications. Her subjective fears that her coworkers were silently speculating about her private life (<u>see</u> FAC ¶ 95) do not suffice.

[7] Plaintiff labels this disclosure and the disclosure to the Supreme Court Justice, discussed <u>infra</u>, the "secondary disclosure violation." (Pl. Mem. at 9.)

ECPA's good faith exception (see 18 U.S.C. §2520(d)(1) (a "good faith reliance" on, among other things, a court warrant or order or a grand jury subpoena is a complete defense against any civil action under the ECPA or any other law)). Where, as here, there is a lawful, "'obvious alternative explanation' that is more likely, the plaintiff's cause of action is not plausible and must be dismissed." Holmes v. Air Line Pilots Ass'n, Int'l, 745 F. Supp. 2d 176, 193 (E.D.N.Y. 2010) (quoting Iqbal, 556 U.S. at 682); see also Arar v. Ashcroft, 585 F.3d 559, 617 (2d Cir. 2009) (en banc) (allegations "become implausible when the court's commonsense credits far more likely inferences from the available fact"). Standing alone, Plaintiff's assertion "[u]pon information and belief" that Gonzalez "disclosed, or directed the disclosure of Plaintiff's private communications" to the DOJ (FAC ¶ 83) is "obviously conclusory" and not accepted as true. Starr v. Sony BMG Music Entm't, 592 F.3d 314, 319 n. 2 (2d Cir. 2010); see Iqbal, 556 U.S. at 686.

Plaintiff also alleges that in January 2018 KCDA disclosed Plaintiff's communications to a Justice of the New York Supreme Court. (Id. ¶ 83.) She asserts "[u]pon information and belief" that Thompson, Gonzalez, Schaeffer, and Does 1-5 authorized this disclosure. (Id.) City Defendants counter that they are shielded by the ECPA's good faith defense because the disclosure was made pursuant to the court's order. (Mem. at 8 (citing 18 U.S.C. § 2520(d)(1).) Plaintiff concedes that the good faith defense "applies." (Pl. Opp'n at 19-20.)[8] The court thus finds that City Defendants are thus shielded from liability related to the alleged disclosure of Plaintiff's communications to the New York Supreme Court Justice.

---

[8] Plaintiff nonetheless explains in a footnote that "the [c]omplaint references this incident because any disclosure of the content of those communications to other prosecutors or employees in KCDAO prior to or not in accordance with the law." (Pl. Opp'n at 20 n.13 (emphasis in original).) The court agrees that well-pleaded allegations of unlawful disclosures prior to or not in accordance with this alleged court order could state a violation of the ECPA, but, as explained elsewhere, the complaint contains no such non-conclusory allegations.

Accordingly, the court grants City Defendants' motion to dismiss Plaintiff's ECPA claim with respect to Thompson, Gonzalez, Schaeffer, Donohue, and Does 1-10 and does not consider whether these individual Defendants are entitled to absolute or qualified immunity.

### 2. Vicarious Liability of the City

Plaintiff also asserts that the City is liable for Lenich's misconduct in unlawfully intercepting Plaintiff's communications under the doctrine of respondeat superior. (FAC ¶ 103.)[9] City Defendants counter that the City cannot be held liable for violations of the ECPA under the doctrine of respondeat superior because Lenich did not act within the scope of her employment in carrying out her unlawful wiretap scheme. (Mem. at 13-16.)

Under the New York common law doctrine of respondeat superior, "an employer may be vicariously liable for the tortious acts of its employees only if those acts were committed in furtherance of the employer's business and within the scope of employment." Sclafani v. PC Richard & Son, 668 F. Supp. 2d 423, 447 (E.D.N.Y. 2009) (quoting N.X. v. Cabrini Med. Ctr., 765 N.E.2d 844, 846-47 (N.Y. 2002)); see also Saretto v. Panos, 992 N.Y.S.2d 88, 90 (N.Y. App. Div. 2014); Giambruno v. Crazy Donkey Bar & Grill, 885 N.Y.S.2d 724, 728 (N.Y. App. Div. 2009). "The theory is that the employer should, as a required cost of doing business . . . compensate a party harmed by an employee who was acting not on his or her own behalf, but in the employer's service." Rausman v. Baugh, 682 N.Y.S.2d 42, 43 (N.Y. App. Div. 1998) (citing Adams v. New York City Transit Auth., 666 N.E.2d 216, 218 (N.Y. 1996)). Therefore, in order to state a respondeat superior claim, a plaintiff must plead facts that plausibly allege that the predicate torts were committed "within the scope of the employee's duties to the employer

---

[9] Because, as explained above, the court has dismissed the ECPA claim against the individual City Defendants, the court does not consider whether the City could be held vicariously liable for their alleged misconduct. (See FAC ¶ 103.)

and was thus in furtherance of the employer's interests." Doe v. Alsaud, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014); see also Tchatat v. City of New York, No. 14-CV-2385 (LGS), 2015 WL 5091197, at *17 (S.D.N.Y. Aug. 28, 2015) ("Respondeat superior applies to a tort committed by an employee in the course of the performance of his or her duties, even if such duties are carried out in an irregular fashion or with disregard of instructions.") (internal citation and quotation marks omitted), recons. granted in part by, 2015 WL 6159320 (S.D.N.Y. Oct. 20, 2015); Rausman, 682 N.Y.S.2d at 43. The same principle applies to intentional torts: the employee must have committed the intentional tort while acting within the scope of employment. See Sclafani 668 F. Supp. 2d at 447; see also Dykes v. McRoberts Protective Agency, Inc., 680 N.Y.S.2d 513, 514 (N.Y. App. Div. 1998); Quadrozzi v. Norcem, Inc., 509 N.Y.S.2d 835, 836-37 (N.Y. App. Div. 1986).

"[B]ecause the determination of whether a particular act was within the scope of the servant's employment is so heavily dependent on factual considerations, the question is ordinarily one for the jury." Haybeck v. Prodigy Servs. Co., 944 F. Supp. 326, 329 (S.D.N.Y. 1996) (quoting Riviello v. Waldron, 391 N.E.2d at 1281 (N.Y. 1979)); see Barua v. Barua, No. 14-CV-5107 (MKB), 2015 WL 4925028, at *6 (E.D.N.Y. Aug. 18, 2015) ("Whether an employee was acting within the scope of his employment is a fact-dependent inquiry typically left the jury." (citation omitted)). "However, where a court takes as true all the facts alleged by plaintiff and concludes that the conduct complained of cannot be considered as a matter of law within the scope of employment, then the court must dismiss the complaint for failure to state a claim." Haybeck v. Prodigy Servs. Co., 944 F. Supp. 326, 329 (S.D.N.Y. 1996).

"There is no single mechanical test to determine whether at a particular moment an employee is engaged in the employer's business." Rausman, 682 N.Y.S.2d at 43. Nonetheless, New York courts have identified a number of useful factors to consider, including:

> [1] connection between the time, place and occasion for the act; [2] the history of the relationship between employer and employee as spelled out in actual practice; [3] whether the act is one commonly done by such an employee; [4] the extent of departure from normal methods of performance; and [5] whether the specific act was one that the employer could reasonably have anticipated.

Riviello v. Waldron, 391 N.E.2d 1278, 1281 (N.Y. 1979). "While all five factors are considered, New York courts generally place greater emphasis on the fifth factor, namely, whether the acts involved . . . could reasonably have been anticipated by [the] employer." Mingo v. United States, 274 F. Supp. 2d 336, 346 (E.D.N.Y. 2003) (citation omitted).

Applying these factors and taking as true all factual allegations set forth in the complaint, the court cannot conclude at this stage that Plaintiff's unlawful acts were committed outside the scope of her employment.

With respect to the first factor—time, place, and occasion for the act—the complaint plausibly alleges that Lenich's employment as an ADA and access to KCDA equipment enabled her to commit the illegal acts at issue. See Adorno v. Corr. Servs. Corp., 312 F. Supp. 2d 505, 517 (S.D.N.Y. 2004) (finding connection between time, place and occasion for sexual assault and employment where facts showed that wrongdoer's status as an employee "enabled him to commit the alleged sexual assault"). The complaint alleges that Lenich forged judicial orders and grand jury subpoenas and misappropriated KCDA equipment to unlawfully intercept and seize Plaintiff's communications. (See FAC ¶¶ 38-58; Indictment (Dkt. 11-1) ¶¶ 6-14.) She also told other KCDA employees that these actions were part of a "confidential law enforcement investigation." (FAC ¶ 59.) In other words, Lenich's unlawful actions were made possible by

her status as a supervisory ADA: they took place in the KCDA office, using KCDA equipment, during working hours, and disguised as her lawful work. The court thus finds that Plaintiff has plausibly alleged a connection between the time, place, and occasion for Lenich's misconduct and her employment with KCDA.

As to past employment practices, the complaint also plausibly alleges that Lenich had authority at KCDA to open investigations and initiate and oversee wiretaps. (See FAC ¶¶ 30-33.) And while the complaint does not suggest that forging judicial orders to initiate wiretaps was a common practice at KCDA, ADAs such as Lenich did regularly initiate and monitor wiretaps. (See FAC ¶¶ 31-40.)

Finally, the court considers the extent of Lenich's departure from the normal methods of performing her job, and whether the act of unlawfully intercepting and accessing Plaintiff's communications was one that KCDA "could reasonably have anticipated." Riviello, 47 N.E.2d at 1282. As an initial matter, "for an employee to be regarded as acting within the scope of his employment, the employer need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected." Id. In other words, "it suffices that the tortious conduct be a natural incident of the employment." Id. Moreover, "where the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment." Id. (citing Sims v. Bergamo, 147 N.E.2d 1, 2-3 (N.Y. 1957) (reinstating judgment after trial on the grounds that assault of unruly patron by bartender was within scope of employment); De Wald v. Seidenberg, 79 N.E.2d 430, 431-32 (N.Y. 1948) (court could not say as a matter of law that assault of tenant by building superintendent during attempted enforcement of occupancy rules was outside the scope of his employment)). See also Holmes v. Gary Goldberg & Co., 838 N.Y.S.2d 105, 106 (N.Y. App.

Div. 2007) (reversing dismissal where it was "certainly foreseeable that an agent entrusted with significant sums of money might convert such funds to his [or her] own use").

Here, nothing on the face of the complaint suggests that forgery of judicial orders and subpoenas and unlawful wiretapping was not an egregious "departure from normal methods of performance" of an ADA's duties. Riviello, 47 N.E.2d at 1281. Indeed, the court sincerely hopes it was. Nonetheless, the court finds that, based on the allegations in the complaint, Lenich's misconduct was not clearly unforeseeable by her employer. The complaint sets forth the steps required to seek and obtain authority to conduct a wiretap. (FAC ¶¶ 34-40). The multiple levels of authorization required to conduct a wiretap—including judicial sign-off—exist precisely "[t]o safeguard the privacy of innocent persons." Gelbard v. United States, 408 U.S. 41, 47 (1972) (discussing the goal of Congress in passing the ECPA). Given the clear potential for an abuse of power inherent in the ability to intercept and review private communications, and Lenich's position of authority within KCDA, the court cannot conclude, as a matter of law, that Lenich's unlawful wiretapping scheme was not carried out within the scope of her employment. See Stewartson v. Gristede's Supermarket, Inc., 705 N.Y.S.2d 583, 584-85 (N.Y. App. Div. 2000) (jury could find that "apparently unprovoked attack" against customer by manager of grocery store was within scope of employment since it was "not clearly unforeseeable by his employer").[10]

The court thus denies the motion to dismiss Plaintiff's ECPA claim against the City.

---

[10] City Defendants also argue that Lenich was clearly acting outside the scope of her employment because she acted for "purely personal" reasons, and point the court to the transcript of Lenich's sentencing hearing, which they attached to their motion to dismiss. (See Mem. at 14.) The court declines to consider the transcript because it "is not integral to or otherwise incorporated in the complaint" (which was filed before the sentencing hearing was held), and because consideration of it may raise a material issue of fact that is inappropriate on a motion to dismiss—namely, Lenich's motivation in intercepting Plaintiff's communications. Nicosia v. Amazon.com, Inc., 834 F.3d 220, 231 (2d Cir. 2016); Fed. R. Civ. P. 12(d).

**B. 1983 Claim**

"[A] municipality cannot be held liable under § 1983 on a <u>respondeat superior</u> theory."

<u>Monell v. Department of Social Services</u>, 436 U.S. 658, 691 (1978). Instead, municipalities are

only liable under § 1983 for constitutional deprivations resulting from a governmental policy or

custom. <u>Id.</u> at 694; <u>see</u> <u>Lozman v. City of Riviera Beach</u>, 138 S. Ct. 1945, 1951 (2018) ("[I]n a §

1983 case[,] a city or other local governmental entity cannot be subject to liability at all unless

the harm was caused in the implementation of 'official municipal policy.'" (quoting <u>Monell</u>, 436

U.S. at 691)). A plaintiff may demonstrate that such a policy or custom exists by introducing

evidence of one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by
> government officials responsible for establishing the municipal policies that caused
> the particular deprivation in question; (3) a practice so consistent and widespread
> that, although not expressly authorized, constitutes a custom or usage of which a
> supervising policy-maker must have been aware; or (4) a failure by policy makers
> to provide adequate training or supervision to subordinates to such an extent that it
> amounts to deliberate indifference to the rights of those who come into contact with
> the municipal employees.

<u>Skates v. Incorporated Village of Freeport</u>, 265 F. Supp. 3d 222, 235 (E.D.N.Y. 2017) (quoting

<u>Jones v. Bay Shore Union, Free Sch. Dist.</u>, 170 F. Supp. 3d 420, 438 (E.D.N.Y. 2016)). A

plaintiff bringing a <u>Monell</u> claim also must establish a causal connection between the

municipality's official policy and the underlying constitutional violation. <u>See</u> <u>City of Canton v.</u>

<u>Harris</u>, 489 U.S. 378, 385 (1989).

Plaintiff asserts a § 1983 claim against the City under two theories: (1) the City is

responsible for Lenich's unlawful wiretapping scheme because she was an official with final

decision-making authority over wiretaps at KCDA, and (2) the City is responsible because

Lenich's supervisors failed to properly supervise her. (Pl. Opp'n at 21-24; <u>see</u> FAC ¶¶ 25-33.)

Defendants counter that Plaintiff has not plausibly alleged that (1) Lenich was a municipal

policymaker, (2) that any widespread custom or usage within KCDA caused Lenich's alleged violations or that any policymaking official was aware that Lenich was violating Plaintiff's constitutional rights, or (3) that any KCDA employee, including anyone at the policymaking level, was aware of Lenich's scheme—let alone that they tolerated or condoned it. (Mem. at 16-20.)

Where a plaintiff seeks to hold a municipality liable for a "decision by [a] municipal policymaker[]," Pembaur v. City of Cincinnati, 475 U.S. 469, 471 (1986), the plaintiff must show that the official had final policymaking power, see City of St. Louis v. Praprotnik, 485 U.S. 123 (1988) (explaining that "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability" (quoting Pembaur, 475 U.S. at 483)). An official has final authority if his decisions, at the time they are made, "may fairly be said to represent official policy." McMillian v. Monroe County, Alabama, 520 U.S. 781, 784 (1997) (quoting Monell, 436 U.S. at 694); see Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003). Moreover, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Pembaur, 475 U.S. at 481. That "a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." Id. at 482-83. "[T]he critical inquiry is not whether an official generally has final policymaking authority," but rather "whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." Roe v. City of Waterbury, 542 F.3d 31, 37 (2d Cir. 2008) (citing Jeffes v. Barnes, 208 F.3d 49, 58 (2d Cir. 2000)); see also Jeffes, 208 F.3d at 57 (explaining that a government

official must be a final policymaker with respect to the particular conduct challenged in the lawsuit).

Whether an official has final policymaking authority is a legal question, determined on the basis of state law, but "it involves a fact-intensive inquiry." Canner v. City of Long Beach, No. 12-CV-2611 (DRH), 2015 WL 4926014, at *7 (E.D.N.Y. Aug. 18, 2015); see Jeffes, 208 F.3d at 57-58 (holding that the burden is on the plaintiff to establish as a matter of law whether an official is a final policymaker). Plaintiff alleges that Lenich was the Deputy Bureau Chief in charge of Special Investigations at the Kings County DA (FAC ¶ 25); that she had the authority to report and make requests directly to the District Attorney (id. ¶ 27); and that she had supervisory authority over other ADAs and the KCDA wire room staff (id. ¶¶ 29-30). Plaintiff also alleges that Lenich had the authority to open a KCDA investigation (id. ¶ 31), and that she set KCDA policy with respect to the operation of a wiretap, the oversight of wiretaps, the documentation required to conduct wiretaps, and the reporting requirements of individuals working under her command in the wire room. (Id. ¶ 32.) Finally, Plaintiff alleges that Lenich had final decision-making authority over whether to seek a wiretap, how a wiretap was set up, and the operation of a wiretap. (Id. ¶ 33.) At this stage in the litigation, these allegations are sufficient to make out a claim that Lenich was a final policymaker.

The decisions that City Defendants cite in opposition, several of which discuss the issue at the summary judgment stage, do not compel dismissal. See Schwab v. Smalls, 435 F. App'x 37, 40 (2d Cir. 2011) (summary order) (affirming dismissal where plaintiff failed to allege that individual defendants had final policymaking authority in relevant area); Bliven v. Hunt, 579 F.3d 204, 214 (2d Cir. 2009) (dismissal appropriate where it was clear that judges only applied a policy concerning attorney compensation and did not set the policy); Anthony v. City of New

York, 339 F.3d 129, 139 (2d Cir. 2003) (on summary judgment, rejecting theory that police sergeant was final policymaker where plaintiff failed to provide state-law authority to that effect); Walker v. City of New York, 974 F.2d 293, 301 (2d Cir. 1992) (denying motion to dismiss and holding that municipal liability could lie for certain actions of KCDA); Conte v. Cty. of Nassau, No. 06-CV-4746 (JFB), 2010 WL 3924677, at *30 (E.D.N.Y. Sept. 30, 2010) (denying summary judgment in false arrest and malicious prosecution case because "[a]t this juncture," the court lacked complete information regarding the extent of ADAs' "supervisory capacities in general, and the extent to which these individual defendants exercised their supervisory authority in connection with the investigation and/or prosecution of [plaintiff]"); Peterson v. Tomaselli, 469 F. Supp. 2d 146, 169-70 (S.D.N.Y. 2007) (granting summary judgment for municipal defendants where plaintiff failed to offer evidence showing that individual defendant had a policymaking role). None of these cases mandate dismissal in a situation like the one here, where, at the motion to dismiss stage, the plaintiff has sufficiently alleged that the defendant had final policymaking authority in the relevant area.

The court thus declines to dismiss the Monell claim against the City. Since the Monell claim survives on this ground, the court need not consider whether Plaintiff sufficiently alleged her other purported basis for this claim—that the City's failure to properly supervise Lenich caused the alleged constitutional violations. See Canner, 2015 WL 4926014, at *7 (denying motion to dismiss Monell claim on one theory and declining to consider the plaintiff's other purported bases for the claim).

### C. State Law Claims

City Defendants also move to dismiss Plaintiff's claims for negligent retention and/or supervision, negligence, and tortious interference.

25

1. Negligent Retention/Supervision

Plaintiff asserts a claim for negligent retention/supervision against the City, Thompson, Gonzalez, Schaeffer, and Does 1-5. (FAC ¶¶ 115-20.)

To state a claim for negligent retention or supervision under New York law, a plaintiff must show: "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (internal quotation marks and citations omitted).

City Defendants focus on the second element, arguing that the complaint contains "no allegations whatsoever" that Lenich had a propensity to fabricate judicial orders and illegally wiretap her coworkers, "let alone that any [KCDA] official was on notice of any such propensity prior to [the commencement of her scheme]." (Mem. at 21.) Under New York law, an employer will be liable to an injured party for an employee's tort when the employer knew or should have known that the employee was unfit for the job. See Steinborn v. Himmel, 780 N.Y.S.2d 412, 415 (N.Y. App. Div. 2004) (dismissing negligent hiring and supervision claim where plaintiffs failed to "identify any information which could or should have been discovered during a screening process or during [the tortfeasor's] long tenure as a scout and scout leader which would have put defendants on notice that he had a propensity for sexual abuse"). The question for the court here is thus whether City Defendants knew about Lenich's propensity to engage in unlawful wiretaps or whether they "should have[] discovered" information about Lenich during her tenure that would have put them on notice of such a propensity.

As an initial matter, the court finds that Plaintiff's allegations relating to prior EEOC complaints against Lenich—none of which concerned unlawful interception of communications

26

(see FAC ¶¶ 64-65)—are insufficient to establish that City Defendants were on notice of her

propensity to wiretap Plaintiff. See, e.g., Doe v. Alsaud, 12 F. Supp. 3d 674, 681 (S.D.N.Y.

2014) ("The prior misconduct . . . must be of the same kind that caused the injury; general,

unrelated or lesser allegations of prior wrongdoing are insufficient."); Bowen v. Patrick, No. 11

CIV. 4799 (JMF) (GWG), 2012 WL 3743409, at *14 (S.D.N.Y. Aug. 29, 2012), report and

recommendation adopted, 2012 WL 4320537 (S.D.N.Y. Sept. 20, 2012) (allegation that "[a

doctor employee] stood idly by and watched an inmate with a severe and bleeding head injury be

maliciously beaten by a correction officer . . . does not show that [the doctor] was predisposed to

breaching any duty to provide medical care") (internal quotation marks omitted); Milosevic v.

O'Donnell, 934 N.Y.S.2d 375, 376 (N.Y. App. Div. 2011) (allegations of a "culture" of alcohol

use at company events insufficient to show that employer "was aware of the CFO's violent

propensities when intoxicated or of the possibility of an assault"); Naegele v. Archdiocese of

N.Y., 833 N.Y.S.2d 79, 80 (N.Y. App. Div. 2007) ("conclusory allegations" that "priests accept

money and things of value from their parishioners" were insufficient "to show that the

Archdiocese knew or should have known of [the priest's] propensity to commit the [fraud]

alleged"). As a result, they do not support her claim for negligent supervision or retention.

    Plaintiff's other allegations, however, fare slightly better. Plaintiff alleges that Lenich's

unlawful wiretapping scheme unfolded over eighteen months (FAC ¶¶ 41, 51, 54) and involved

the submission of at least seven forged judicial orders and multiple forged search warrants (id. ¶¶

46, 51). Plaintiff also alleges that (1) Lenich told other KCDA employees that she was

"conducting a confidential law enforcement investigation" into Plaintiff (id. ¶¶ 59, 63);

(2) Thompson, Gonzalez, and Schaeffer "were responsible for knowing what investigation

Lenich was conducting at all times" (id. ¶ 61); and (3) these same Defendants knew that Lenich

was not actually conducting a confidential investigation into Plaintiff, a fellow ADA, on behalf of KCDA (id. ¶ 62). The court thus finds that Plaintiff has plausibly alleged that Lenich's supervisors—Thompson, Gonzalez, Schaeffer, and Does 1-5—would have discovered at least some of Plaintiff's unlawful acts—and therefore learned that she was unfit for her position—but for their negligent supervision.[11] If a claim for negligent supervision means anything, it must mean that a claim lies where, as here, a plaintiff has sufficiently alleged that defendants would have discovered a tortfeasor's ongoing tortious conduct but for their negligence in carrying out their supervisory duties. See Steinborn, 780 N.Y.S.2d at 415 (explaining in the context of a negligent hiring claim that plaintiff must show, at a minimum, that "defendants should have known of [tortfeasor's] propensity [to commit the alleged acts] had they conducted an adequate hiring procedure"); Naegele, 833 N.Y.S.2d at 80 (reversing denial of motion to dismiss whether plaintiff failed to allege that defendant "knew or should have known" of tortfeasor's propensity to commit alleged acts). City Defendants' motion to dismiss Plaintiff's negligent retention and supervision claim is therefore denied.

## 2. Negligence

Plaintiff also asserts a claim of negligence against the City, Thompson, Gonzalez, Schaeffer, Does 1-5, and Donohue. (FAC ¶¶ 121-27.) She claims that Thompson, Gonzalez, Schaeffer, and Does 1-5 had a duty to ensure that proper protections, policies, and protocols were in place to prevent the unlawful interception of Plaintiff's private communications by Lenich or any other KCDA employee, but that they breached this duty by failing to implement such protections, policies, or protocols, thereby allowing Lenich to unlawfully wiretap Plaintiff's

---

[11] The court is not concerned that Plaintiff alleges these facts "on information and belief" since the exact contours of Thompson, Gonzalez, and Schaeffer's supervisory responsibilities with respect to Lenich are facts "peculiarly within the possession and control of the defendant." Arista Records, LLC, 604 F.3d at 120.

phone. (Id. ¶¶ 122-23.) Plaintiff also asserts that Donohue had a duty to review the forged

judicial orders submitted to him by Lenich to ensure that they were not forgeries. (Id. ¶ 124.)

She alleges that he breached this duty when he "failed to use reasonable care to notice that the

orders Lenich presented to him had forged signatures and lacked the required judicial seal." (Id.

¶ 125.) Finally, Lenich claims that the City is responsible for the misconduct of these individual

defendants under the doctrine of respondeat superior.

Under New York law, a plaintiff must establish three elements to prevail on

a negligence claim: (1) that the defendant owed plaintiff a duty of care; (2) that the defendant

breached that duty; and (3) that as a result of the breach, plaintiff suffered

damages. See Pasternack v. Lab. Corp. of Am., 892 F. Supp. 2d 540, 552 (S.D.N.Y. 2012)

(citing Farash v. Cont'l Airlines, Inc., 574 F. Supp. 2d 356, 367 (S.D.N.Y. 2008)).

### a. Thompson, Gonzalez, and Schaeffer

City Defendants seek to dismiss the negligence claim against Thompson, Gonzalez,

Schaeffer, and Does 1-5 exclusively on the ground that there was no breach. (Mem. at 24.) City

Defendants point out that the complaint alleged that there were certain policies in place for

approving and executing wiretaps (id.), and contend that "there was no reason for any KCDA[]

official to believe that the safeguards in place . . . were in any way deficient" (id.). The court

agrees with Plaintiff, however, that City Defendants' argument is "purely factual in nature" (Pl.

Opp'n at 26) and thus inappropriate for resolution on a motion to dismiss.

### b. Donohue

City Defendants also move to dismiss Plaintiff's negligence claim against Donohue on

the grounds that Donohue did not owe Plaintiff a duty, and that, in any case, the complaint fails

to allege a breach. (Mem. at 25.)

"The existence of a duty is an essential element of a negligence claim because, '[i]n the absence of a duty, as a matter of law, no liability can ensue.'" Farash, 574 F.Supp.2d at 367 (quoting McCarthy v. Olin Corp., 119 F.3d 148, 156 (2d Cir. 1997)). "A plaintiff must show more than a duty owed to a potentially limitless class of people, but rather a specific duty owed to the plaintiff." Gen. Star Indem. Co. v. Platinum Indem. Ltd., No. 00-CV-4960 (LMM), 2002 WL 31159106, at *3 (S.D.N.Y. Sept. 27, 2002) (citing Hamilton v. Beretta U.S.A. Corp., 750 N.E.2d 1055, 1060 (N.Y. 2001) ("The injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her.")).

The question for the court is thus whether Donohue owed Plaintiff a duty to exercise reasonable care in reviewing a wiretap order that purported to authorize the interception of Plaintiff's communications. The parties' briefing on this point is limited. City Defendants state that they are unaware of any caselaw "supporting the existence of any such duty owed by an employee of a prosecutor's office to a would-be victim of a supervisory ADA's fraudulent conduct." (Mem. at 25.) Plaintiff counters that Donohue owed Plaintiff a duty because she was a "foreseeable plaintiff"—that is, she "was within the zone of danger created by defendant's actions." (Id. (quoting Gonzalez v. City of New York, 17 N.Y.S.3d 12, 14 (N.Y. App. Div. 2015).)

"The court determines the duty of care owed by one member of society to another as a matter of law." Korean Air Lines Co. v. McLean, 118 F. Supp. 3d 471, 485 (E.D.N.Y. 2015); Palka v. Servicemaster Mgmt. Servs. Corp., 634 N.E.2d 189, 192 (N.Y. 1994) (the existence and extent of a defendant's duty to a given plaintiff "is usually a legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration"). The standard is a practical one:

> [W]henever one person is by circumstances placed in such a position with regard to another that everyone of ordinary sense . . . would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances[,] he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.

Havas v. Victory Paper Stock Co., 402 N.E.2d 1136, 1138 (N.Y. 1980) (citation omitted). New York courts "have been cautious . . . in extending liability to defendants for their failure to control the conduct of others" by limiting such liability to situations in which "the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." Hamilton, 750 N.E.2d at 1061. This cautious approach is necessary to guard against "the specter of limitless liability" and to constrain the class of possible plaintiffs. Id. The court's "analysis is fundamentally about apportioning risks and allocating the burden of loss, and it is the responsibility of courts . . . to limit the legal consequences of wrongs to a controllable degree and to protect against crushing exposure to liability." In re Sept. 11 Litig., 802 F.3d 314, 345 (2d Cir. 2015) (internal quotation marks and citations omitted). "[D]uty is not something derived or discerned from an algebraic formula. Rather, it coalesces from vectored forces including logic, science, weighty competing socioeconomic policies and sometimes contractual assumptions of responsibility." Palka v. Servicemaster Mgmt. Servs. Corp., 634 N.E.2d 189, 192 (1994) (listing the "balancing factors" used by courts to analyze the existence of a duty of care, which include "the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability").

Here, Plaintiff alleges that Donohue "was responsible for reviewing all judicial orders authorizing the [KCDA] to conduct wiretaps to ensure they contained proper signatures and seals, as well as physically setting up the wiretaps in a designated, controlled location." (FAC ¶

11; see id. ¶¶ 34-37.) In other words, "draw[ing] all reasonable inferences in [Plaintiff's] favor," L-7 Designs, Inc., 647 F.3d at 429 (citation and internal quotation marks omitted), Donohue was allegedly employed by KCDA as a sort of gatekeeper to ensure the legitimacy of wiretap orders. He was thus well-situated to prevent unauthorized wiretapping by ADAs of an individual such as Plaintiff. See Stanford v. Kuwait Airways Corp., 89 F.3d 117, 123-25 (2d Cir. 1996) (airline owed a duty of care to passengers of hijacked plane because airline was well situated to implement additional screening measures and knew that passengers would not need to pass through a second round of screening before boarding the next flight, which was hijacked); In re Sept. 11 Litig., 802 F.3d at 346 (airline did not owe a duty to owners of buildings destroyed in terror attack where airline was not "the first line of defense" for the hijacked flight). And it is reasonable to infer that Donohue understood that the consequences of his negligence could be the unauthorized wiretapping of an innocent party.

Additionally, there are strong policy-based considerations that counsel in favor of finding that Donohue owed a duty to Plaintiff under these circumstances, to the extent that the complaint's characterizations of his responsibilities are correct. The unlawful interception of private communications works a "grievous[] infringe[ment]" on fundamental privacy rights. S.E.C. v. Rajaratnam, 622 F.3d 159, 185 (2d Cir. 2010); see Gelbard, 408 U.S. at 48 (noting that "protection of privacy was an overriding congressional concern" in enacting the ECPA). The potential for such severe injuries weighs in favor of imposing a duty here. See Landon v. Kroll Lab. Specialists, Inc., 999 N.E.2d 1121, 1124 (2013) (affirming the denial of a motion to dismiss a claim and finding a duty of care where a drug testing purportedly failed to use reasonable care in "the testing of plaintiff's biological sample," which could have "profound, potentially life-altering, consequences").

Finally, finding a duty on the part of Donohue would not create a risk of "limitless liability to an indeterminate class of persons," Hamilton, 750 N.E.2d at 1060, since the potential plaintiffs are only those individuals whose communications would be unlawfully intercepted pursuant to a forged wiretap order which Donohue allegedly had a responsibility to review. See Eiseman v. State, 511 N.E.2d 1128, 1135 (N.Y. 1987) (in completing an inmate's medical records, physician "owed a duty of care to his patient and to persons he knew or reasonably should have known were relying on him for this service to his patient," but not to "community at large"); Lindor v. Palisades Collection, LLC, 30 Misc. 3d 754, 761-62 (N.Y. Sup. Ct. 2010) (finding that creditor and debt collector owed duty to innocent consumer to take reasonable steps in performing their work and in ensuring that they did not link an innocent consumer to debt owed by a different person, and noting that potential plaintiffs are a limited group—namely, only those individuals whose identifying information the defendants had erroneously connected to another party's judgment).

It is possible, of course, that discovery will reveal that Donohue's job and responsibilities, particularly as to how he fits into the process for approving and reviewing wiretap orders at KCDA, do not accord with Plaintiff's characterizations. However, at this stage, the court finds that the complaint plausibly alleges that Donohue owed a duty to Plaintiff to exercise reasonable care in reviewing wiretap orders to ensure that they bore the proper indicia of authorization.

Moreover, contrary to City Defendants' argument, Plaintiff has plausibly alleged a breach by Donohue of that duty. (See Mem. at 25.) In particular, Plaintiff alleges that Donohue reviewed and accepted her forged orders, despite the fact that they lacked a raised judicial seal. (FAC ¶¶ 43-44.) Plaintiff also attaches to her complaint the Indictment, which alleges that

Lenich accomplished her forgeries by cutting out the signatures of judges and taping them to the wiretap orders. (Indictment ¶ 7.) It is thus plausible to infer that, in the exercise of reasonable care, Donohue should have realized that Lenich was forging wiretap orders. Defendant counters that the absence of a raised judicial seal would not have put Donohue on notice of the forgery because there is no requirement in New York that wiretap orders bear a raised seal. (Mem. at 25 (citing N.Y.C.P.L. § 700.30).) Regardless of the legal requirements for eavesdropping orders in New York (see N.Y.C.P.L. § 700.30), Plaintiff alleged that Donohue was responsible for ensuring the presence of a raised judicial seal. (FAC ¶ 37.) Whether the absence of such a seal should have put him on notice of Lenich's violations is a question of fact.

The court thus denies the motion to dismiss Plaintiff's claim for negligence against City Defendants.[12]

3. Immunity

Defendants contend that City Defendants are entitled to immunity under New York State law in connection with Plaintiff's negligent retention and supervision and negligence claims because all of the alleged actions by City Defendants involved "the exercise of discretion or judgment in the performance of their official functions." (Mem. at 26.)

Under New York law, "[w]hether an action of a governmental employee or official is cloaked with any governmental immunity requires an analysis of the functions and duties of the actor's particular position and whether they inherently entail the exercise of some discretion and judgment." Kirchner v. Cty. of Niagara, 969 N.Y.S.2d 277, 283 (N.Y. App. Div. 2013). If a functional analysis shows that the employee's position is sufficiently discretionary, then the

---

[12] City Defendants do not address the City's liability for Plaintiff's negligence claims under the doctrine of respondeat superior, stating instead that because no viable claims of negligence exist, the City cannot be held vicariously liable. Since the court has, however, denied City Defendants' motion to dismiss the negligence claims against the individual City Defendants, it will also deny it with respect to the City.

municipal defendant must also show "that the discretion possessed by its employees was in fact exercised in relation to the conduct on which liability is predicated." Valdez, 960 N.E.2d 356. If the official action in question did indeed "involv[e] the exercise of discretion or expert judgment in policy matters," then governmental immunity will attach, "even if its exercise of such discretion was 'negligent' or constituted a 'misjudgment' or a 'mistake,' so long as the governmental entity actually exercised such discretion by considering all relevant information in making its judgment and by complying with its own established regulations and procedures." H.H. v. City of New York, No. 11-CV-4905 (NG), 2017 WL 3396434, at *11 (E.D.N.Y. Aug. 7, 2017) (quoting Pub. Adm'r, Bronx Cty. v. City of New York, 706 N.Y.S.2d 40, 41 (N.Y. App. Div. 2000); Mon v. City of New York, 579 N.E.2d 689, 692-93 (N.Y. 1991)). On the other hand, where "'there is no evidence that . . . the City in fact made any such decision or exercised any such discretion . . . and no indication that it made a judgment of any sort,'" the governmental entity does not enjoy immunity. Haddock v. City of New York, 75 N.Y.2d 478, 485 (1990).

The decision in Haddock is instructive. There, the plaintiff sued the City for negligent retention of an employee with a criminal record after he raped her. 75 N.Y.2d at 485. The Court of Appeals held that the City was not entitled to governmental immunity because there was no evidence that Parks Department officials tried to comply with the Department's procedures for employees with criminal records or that the City exercised judgment by making a decision to retain the employee in spite of his criminal record. Id.

Here, taking the well-pleaded allegations in the complaint at face value and drawing all reasonable inferences in favor of Plaintiff, none of the City Defendants appear to have exercised discretion in permitting Lenich to conduct her wiretapping scheme. Nor does the complaint show that any of the City Defendants, with knowledge of Lenich's wiretapping scheme, decided

to retain Lenich while choosing not to properly supervise her. The court thus finds that City Defendants are not at this stage entitled to a finding of immunity.

### 4. Tortious Interference

Plaintiff also asserts a claim against Lenich for tortious interference with employment, and seeks to hold the City liable under the doctrine of respondeat superior. (FAC ¶¶ 128-33.)

City Defendants construe Plaintiff's claim as one for tortious interference with contract. (See Mem. at 27-28.) Accordingly, they argue that Plaintiff's claim against the City necessarily fails because Plaintiff cannot simultaneously make out a claim for tortious interference with contract—which requires a showing that Lenich acted outside the scope of her authority—and satisfy the requirements for vicarious liability—which requires an opposite showing. See, e.g., Albert v. Loksen, 239 F.3d 256, 275 (2d Cir. 2001) ("[A] plaintiff may maintain an action for tortious interference against a co-employee [only] by showing that the co-employee acted outside the scope of his or her authority." (citation and internal quotation marks omitted)).

Plaintiff's opposition, however, indicates that the court should construe her claim as one for tortious interference with business relations. (See Pl. Opp'n at 28.) Because Plaintiff is the "master of the complaint," her "allegations, submissions, and underlying theories of liability and damages should be taken at face value." Poventud v. City of New York, 750 F.3d 121, 154 (2d Cir. 2014). The court will thus analyze her claim as one for tortious interference with business relations.[13]

---

[13] While tortious interference with employment claims are generally framed as claims for tortious interference with contract, Plaintiff's approach is not without precedent in the at-will employment context. See Chanicka v. JetBlue Airways Corp., 243 F. Supp. 3d 356, 360 (E.D.N.Y. 2017) (at-will employee was "in a 'non-binding relationship' with [her employer,] [so] her claim must be one for tortious interference with business relations rather than for interference with a contract, as there was no binding contract to be broken") (citing Lawrence v. Union of Orthodox Jewish Congregations of Am., 820 N.Y.S.2d 60, 60 (N.Y. App. Div. 2006)).

To state a claim for tortious interference with business relations, "four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008). The New York Court of Appeals has explained that "where a suit is based on interference with a nonbinding relationship, the plaintiff must show that defendant's conduct was not 'lawful' but 'more culpable,'" with the "general rule" being that "the defendant's conduct must amount to a crime or an independent tort." Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103 (N.Y. 2004).

Plaintiff contends that she has satisfied each of these elements. (Pl. Opp'n at 28.) She further argues that she is not required to show that Lenich acted outside the scope of her employment. (Id.) City Defendants neglect to address any of Plaintiff's arguments in their Reply, nor do they cite any decisions in the Second Circuit—or elsewhere—suggesting that a claim for tortious interference with business relations (as opposed to contract) requires a showing that the individual defendant was acting outside the scope of her employment.

The court finds that Plaintiff has adequately stated a claim against Lenich for tortious interference with business relations. And as discussed, supra, the court cannot conclude with certainty at this stage whether or not Plaintiff acted outside the scope of her employment in pursuing her unlawful wiretap scheme. Accordingly, the court denies City Defendants' motion to dismiss the tortious interference claim with respect to the City.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part City Defendants' motion to dismiss (Dkt. 62).

City Defendants' motion to dismiss Plaintiff's ECPA claim against Thompson, Gonzalez, Schaeffer, Donohue, and Does 1-10 is granted. The ECPA claim is therefore dismissed as to those Defendants.

The following claims survive City Defendants' motion to dismiss:

- Plaintiff's ECPA claim against the City;

- Plaintiff's § 1983 claim against the City;

- Plaintiff's negligent retention and supervision claim against the City, Thompson, Gonzalez, Schaeffer, and Does 1-5;

- Plaintiff's negligence claim against the City, Thompson, Gonzalez, Shaeffer, Does 1-5, and Donohue; and

- Plaintiff's claim for tortious interference with employment against the City.[14]

SO ORDERED.

/s Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge

Dated: Brooklyn, New York
March 1, 2019

---

[14] Plaintiff's claims as to Lenich also remain outstanding. Lenich has indicated that she intends to file a motion for judgment on the pleadings with respect to certain claims. (See Jan. 30, 2019 Min. Entry.)