UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
ROSENFELD, et al.,              : 18-cv-06720-NGG-PK
                Plaintiffs,     :
        - versus -             : U.S. Courthouse
                               : Brooklyn, New York
LENICH, et al.,                :
Defendants                     :
------------------------------X
ROSENFELD,                      : Docket#
                               : 17-cv-7299-NGG-PK
                Plaintiff,      :
        - versus -             :
                               :
LENICH, et al.,                :
                Defendant       :
------------------------------X
LEMIEUX,                        : Docket#
                               : 17-cv-7299-NGG-PK
                Plaintiff,      :
        - versus -             :
                               :
LENICH, et al.,                : March 27, 2019
                Defendant       : 10:07 AM
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR PROCEEDINGS
BEFORE THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**

**For Plaintiffs**
**S. Rosenfeld, D. Rosenfeld**
**V. Garcia:**
                              **Samuel Shapiro, Esq.**
                              **Richard D. Emery, Esq.**
                              Emery Celli Brinckerhoff
                              & Abady LLP
                              600 Fifth Avenue, 10th Floor
                              New York, NY 10020

**For Plaintiffs**
**Lemieux and Class:**        **Tadghe Dooley, Esq.**
                              **James I. Glasser, Esq.**
                              Wiggin and Dana LLP
                              437 Madison Ave., 35th Fl.
                              New York, New York 10022


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

APPEARANCES (CONTINUED)

**For City Defendants**:

                              **Glenn A. Jacobson, Esq.**
                              **James E. Kimmel, Esq.**
                              Abrams, Gorelick, Friedman
                              & Jacobson PC
                              One Battery Park Plaza
                              New York, NY 10004

**For City Defendants**
**and Lenich**:

                              **Joshua Lax, Esq.**
                              NYC Law Department
                              100 Church Street
                              New York, NY 10007

**Transcription Service**:    **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              laferrara44@gmail.com

Proceedings                                          3

1              THE CLERK:  The Honorable Magistrate Judge

2       Peggy Kuo presiding.

3              Civil Cause for a Scheduling Conference, docket

4       number 17-cv-7299, Rosenfeld v. Lenich.  Civil Cause for

5       a Scheduling Conference, docket number 18-cv-6720,

6       Rosenfeld, et al. v. Lenich, et al.  And Civil Cause for

7       a Scheduling Conference, docket number 18-cv-6721,

8       Lemieux v. Lenich, et al.

9              Counsel, please state your name for the record,

10      starting with the plaintiffs.

11             MR. SHAPIRO:  Good morning, your Honor.

12             Sam Shapiro, Emery Celli Brinckerhoff & Abady

13      for plaintiff Stephanie Rosenfeld, Danielle Rosenfeld and

14      Vincent Garcia.

15             MR. DOOLEY:  Good morning, your Honor.

16             Tadhg Dooley, Wiggin & Dana for plaintiff

17      Jarrett Lemieux, and plaintiffs Danielle Rosenfeld and

18      Garcia.

19             MR. EMERY:  Good morning.

20             Richard Emery, along with Sam Shapiro for the

21      same parties.

22             MR. GLASSER:  Good morning, your Honor.

23             Jim Glasser, Wiggin & Dana on behalf of Jarred

24      Lemieux, Mr. Garcia and Ms. Danielle Rosenfeld.

25             MR. JACOBSON:  Good morning, your Honor.

Proceedings                                           4

1          Glenn Jacobson in the Stephanie Rosenfeld case,

2   17-cv-7299, and I have what I will call the City

3   defendants and the Kings County DA defendants.

4          MR. KIMMEL:  James Kimmel with Mr. Jacobson's

5   office, same defendant, same case.

6          MR. LAX:  On behalf of the City defendants in

7   18-cv-6721 and 18-cv-6720, I am Joshua J. Lax, from the

8   Office of Corporation Counsel.

9          Good morning, your Honor.

10          MR. SORKOWITZ:  Good morning, your Honor.

11          For Tara Lenich, Jonathan Sorkowitz of Pierce

12   Bainbridge Beck Price & Hecht in all three of the matters

13   that we're here for.

14          THE COURT:  All right.  Good morning, everyone.

15   So it's a little bit confusing to me who is representing

16   whom because the -- I don't know if there have been

17   changes but let me try to get this straight.  Okay.

18          So, Mr. Shapiro, you represent Stephanie

19   Rosenfeld, Danielle Rosenfeld and Vincent Garcia.

20          MR. SHAPIRO:  Correct, your Honor.

21          THE COURT:  Not Jarrett Lemieux.

22          MR. SHAPIRO:  Correct.

23          THE COURT:  And Mr. Emery, you represent those

24   same people.

25          MR. EMERY:  Same.

Proceedings                                          5

1              THE COURT:  Okay.  And Mr. Dooley --

2              MR. DOOLEY:  Yes.

3              THE COURT:  -- you represent those same people

4    or the Lemieux plaintiff?

5              MR. DOOLEY:  Mr. Glasser and I represent Mr.

6    Lemieux, apart from Emery Celli, and all of us represent

7    the class plaintiffs, Danielle Rosenfeld and Mr. Garcia.

8              THE COURT:  I see.  Okay, got it.  And then Mr.

9    Jacobson and Mr. Kimmel, you're not City Law Department

10   employees.

11             MR. JACOBSON:  That's correct.

12             THE COURT:  Okay.  But you're co-counsel with

13   the City Law Department.

14             MR. JACOBSON:  Well, there was a conflict and

15   we've been brought in specifically in the Rosenfeld case.

16             THE COURT:  I see.

17             MR. JACOBSON:  Stephanie Rosenfeld case.

18             THE COURT:  Got it.  So you represent the --

19             MR. JACOBSON:  The City --

20             THE COURT:  -- defendants in that case.

21             MR. JACOBSON:  With the exception of Lenich.

22             THE COURT:  Got it.  The City defendants in the

23   Stephanie Rosenfeld.

24             MR. JACOBSON:  Yes.

25             THE COURT:  Okay.  Great,  Thank you for

Transcriptions Plus II, Inc.

Proceedings                                          6

1   clarifying that.

2              MR. JACOBSON:  You're welcome.  Thank you.

3              THE COURT:  So let me pull up the cases.  So

4   since our last conference, some things have happened.

5   Judge Garaufis has granted in part and denied in part,

6   the City defendants' motion to dismiss.  there are

7   several claims that have been dismissed but most of the

8   claims have survived the motion to dismiss and so that

9   case is ready to go full speed ahead.

10             In the 18-cv-6720 and 18-cv-6721 cases, there

11  are motions to dismiss which are pending; is that

12  correct?

13             MR. JACOBSON:  They're currently still being

14  briefed, your Honor.

15             THE COURT:  Right.  Okay.  So I see the

16  briefing schedule and there have been requests to change

17  that, so by April 15th, the whole bundled motion with any

18  responsive pleadings -- responsive filings will be filed.

19  And the last time we were here, I also asked the parties

20  to go ahead and do initial disclosures, so that we can

21  get moving.

22             So I think what makes sense now and I've

23  ordered the parties to confer and propose a discovery

24  plan is for the discovery to move forward on the

25  individual claims.  I don't know that we should be moving

Proceedings                                7

1  forward on the class claims yet, as far as discovery but

2  certainly in the interest of being efficient since the

3  17-cv-7299 case is ready to move forward, I think the

4  others can move forward at the same place.  All right?

5        So I see that the parties have -- whether they

6  agree with me or not, have actually complied with that

7  and so the three proposed discovery plans seem to be in

8  sync, all right?

9        So Mr. Shapiro, did you want to say anything

10  before I go through what the parties have agreed to?

11        MR. SHAPIRO:  Your Honor, I do think that we

12  are prepared to proceed with the class -- the case

13  discovery, as well.  I think the liability discovery with

14  respect to all three cases, is almost completely

15  overlapping and we've discussed this amongst ourselves

16  earlier this week and we went back and forth on some

17  proposals about the best way to handle this.  It is sort

18  of a complicated situation as your Honor appreciates, I

19  think.

20        What we would propose, and I'll just sort of

21  say this up-front is that the three cases be consolidated

22  for purposes of liability discovery.  As I said, we

23  believe the liability discovery is really the same in all

24  three cases.  We have sent over a proposed protective

25  order to all of the defendants that they are looking at

Proceedings                                                    8

1    and commenting on.

2           The concept is that everything -- every

3    document that would be produced for liability could be

4    used in all three cases.  I think that would ease the

5    burden on all parties to not have to reproduce the same

6    document in all three cases.  It would hopefully reduce

7    some of the confusion.

8           Damages discovery, however, would be done

9    separately in all three cases.  I think that could be

10   done parallel with liability discovery.  I don't think it

11   would need to be done sequentially.  They could all

12   happen parallel but because the damages issues are unique

13   across the three cases, particularly the individual

14   cases, and speaking for Stephanie Rosenfeld, the City Law

15   Department is conflicted out.  We don't want to be

16   producing damages documents, health records, things like

17   that, to the City Law Department in the Stephanie

18   Rosenfeld case.

19          So that would be our concept in broad brushes

20   and we have raised this with the defendants.  I'll let

21   them provide their view on that but that is the concept

22   that we have discussed and that we think might make some

23   sense here.

24          THE COURT:  Okay.  Thank you.  So let me just

25   ask you, you said consolidate for liability discovery.

Proceedings                                              9

1    You're not moving to consolidate the cases, just for

2    discovery.

3              MR. SHAPIRO:  No, your Honor.

4              THE COURT:  Okay.  So why don't I start with

5    Mr. Lax?  Do you have a view on --

6              MR. LAX:  Certainly, your Honor.  So, you know,

7    what we were -- what all of us walked away from our last

8    conferral with the plaintiffs' committee was that they

9    were seeking to actually do liability discovery first,

10   then damages.  So I just want to be clear, they're now

11   saying that we can do it all at the same time, they just

12   make clear like who can see what types of damages

13   discovery that -- because I just want to be clear that

14   that's what the current position is because they were

15   saying to bifurcate and we'll do liability first, then

16   damages.

17             THE COURT:  Right.  Well, what --

18             MR. JACOBSON:  Now I am understanding it to be

19   -- it's simultaneous, it's just the difference is they

20   don't want me privy to things perhaps about Stephanie

21   Rosenfeld because I -- she works at my agency and there

22   may be some personal information they produced to Mr.

23   Jacobson and Mr. Kimmel and then Lemieux, they would not

24   -- Mr. Kimmel and Mr. Jacobson wouldn't be privy to his

25   damages discovery.

```
                    Proceedings                      10
```

 1          THE COURT:  What I heard was that they want the
 2   discovery to be separate but parallel.
 3          MR. JACOBSON:  Okay.
 4          THE COURT:  Simultaneous; let's put it that
 5   way.
 6          MR. JACOBSON:  I think from my perspective, it
 7   should all move forward.  Liability discovery is not so
 8   significant.  The damages discovery could actually be a
 9   lot more significant.  So it needs to start now, however
10   that shapes out.
11          And if there's a discussion about me being
12   walled out from let's say treatment records from a
13   psychiatrist for Stephanie Rosenfeld, if that's what
14   exists, I am happy to be reasonable on that topic but we
15   just don't want it sequential.  We want it all happening
16   at the same time.
17          THE COURT:  So, Mr. Shapiro, do you have any
18   problem with that?
19          MR. SHAPIRO:  No, we don't have a problem with
20   that, your Honor.  It's true -- I understand Mr. Lax's
21   confusion.  We floated that, the concept of doing it
22   sequentially when we spoke earlier.  They raised some
23   concerns about that that we heard.  We thought about it.
24   I think we're fine doing it on parallel tracks.
25          I think the most -- I think the documents

1   should be relatively easy to segregate.  I think damages

2   documents will be different from liability documents.  I

3   think where it might be a little trickier is depositions.

4   Something that we talked about on our side of the table

5   is potentially just -- essentially doing depositions in

6   two parts.  So to the extent our client has any

7   information on liability, we would hold a deposition.

8   Everyone could be there, ask the questions they want.

9        And then a separate session on damages

10  discovery only where only Mr. Jacobson and his firm would

11  be there to ask the questions.

12       THE COURT:  All right.  Well, that sounds like

13  a good way to proceed.

14       MR. LAX:  Your Honor, I would want to just

15  think about that proposal because the issue for us is

16  that although Lemieux and Stephanie Rosenfeld have

17  separate actions, they are witnesses in each other's

18  cases.  And so to the extent that there may be some

19  credibility issue that develops from testimony, that type

20  of walling off may not -- may deprive us of something we

21  would otherwise be entitled to but that's something I can

22  confer with the plaintiff's counsel about and, you

23  know --

24       THE COURT:  Right.  I think that the concept of

25  having depositions in -- walled off depositions, let's

1    say, makes sense.  It's just where the walls will be

2    built.  And so I think you can work out those details.

3    If you think it's appropriate for you to be present at

4    any part of the deposition, you can certainly have a

5    discussion about that.

6              MR. LAX:  Okay.

7              THE COURT:  Okay?

8              MR. LAX:  All right.

9              THE COURT:  But the concept of having

10   depositions in that way, I think makes sense.  You just

11   have to work out the details.  All right.

12              And so for Mr. Jacobson and Mr. Kimmel, did you

13   want to add anything as far as the progress of discovery?

14              MR. JACOBSON:  No, we just weren't quite clear

15   about the delineation between the damages and the

16   liability discovery.  Obviously, with the claims that are

17   being made, for instance, receipt of authorizations

18   immediately for us to start gathering records, which

19   typically takes some time on the medical side, we need

20   those authorizations.  It's provided for, I believe, in

21   the proposed discovery plan and once we receive them,

22   we'll start to gather the records and proceed.

23              THE COURT:  Okay, great.

24              MR. JACOBSON:  Thank you.

25              THE COURT:  And then the other part of it is as

Proceedings                                    13

1  to the class discovery.  So Mr. Shapiro, you've proposed

2  that there be class discovery proceeding immediately as

3  well.

4           MR. SHAPIRO:  Correct, your Honor.

5           THE COURT:  Okay.  So let me find out from the

6  defendant what your views are.

7           MR. JACOBSON:  Are view, or I should say the

8  City defendants view, Mr. -- we've actually been ignoring

9  you, I believe.

10           THE COURT:  Oh, sorry.  You're sitting together

11  and so I didn't give you a chance in to weigh in on

12  discovery.

13           MR. SORKOWITZ:  Don't worry, your Honor.  I

14  don't have a problem standing up and saying something if

15  need be.

16           THE COURT:  Okay, good.  Thank you.

17           MR. LAX:  I apologize to you, Mr. Sorkowitz.

18           From the City defendants' perspective, I mean

19  the only real -- class discovery, this is not -- it's

20  sort of an unusual class action because it's really just

21  a series of individual claims, really the "class"

22  discovery is going to follow from the same discovery, at

23  least for me from the Lemieux case in terms of liability

24  and then the damages are being alleged, is that people

25  were incidentally, unlawfully intercepted.

Proceedings                                    14

1      And so I expect at some point this morning,

2  we're going to talk about the electronic information that

3  was intercepted by Lenich and how that is going to be

4  handled going forward.  That is really the bulk of what

5  the discovery is because in identifying who was a

6  legitimate class member, and who may not be a legitimate

7  class member, that information, I think is really the big

8  bulk of what it is that's going to -- so everything, I

9  think overlaps with the Lemieux case, at least from my

10  perspective.

11      THE COURT:  All right.

12      Mr. Sorkowitz?

13      MR. SORKOWITZ:  Yes. Your Honor, the --

14  proceeding with class discovery is just fine.  In our

15  view, the major issue is going to be the varying

16  expectations of privacy among the counter parties to

17  these calls and, you know, that will be the focus of the

18  discovery that we want to take here.

19      You know, I think there's been some back and

20  forth on whether various things fall into a liability or

21  a damages bucket in the individual cases.  With respect

22  to the class case, I think they travel together for that

23  reason.

24      The individuals who were on the other end of

25  these calls, you know, may have been in a public place,

Proceedings                                      15

1   may have been a commercial call, et cetera, et cetera.

2   I'm sure you're familiar with these issues.

3            So, that will be the focus of the discovery

4   that we expect to take and it will be necessary to

5   proceed with that.

6            THE COURT:  Okay.  And Mr. Jacobson, Mr.

7   Kimmel?

8            MR. JACOBSON:  We agree with that, your Honor.

9            THE COURT:  You agree.  Okay.  Great.  So I

10  just wanted to make sure that everybody was on the same

11  page with what I've identified as different buckets

12  potentially of discovery.  So it sounds like everything

13  can go forward; liability, damages, and class discovery

14  and then you'll work out the details as to who needs to

15  be walled off from what part of it, okay?  So that's

16  great.

17           Let's now turn to the discovery plans that have

18  been proposed.  And I see a footnote here --

19           MR. JACOBSON:  Yes, your Honor, that --

20           THE COURT:  -- where the City defendants object

21  to discovery proceeding.

22           MR. JACOBSON:  I failed --  I looked for it but

23  then I didn't see it and I failed to omit it from this

24  round.  So I apologize.

25           THE COURT:  Okay.  So you don't object.

Proceedings                                    16

1            MR. JACOBSON:  Yeah, we're --

2            THE COURT:  That's great.  Okay.  So I will

3    cross that out.  And let me start with the oldest case,

4    so that I can -- and it looked from my review as if the

5    dates are all the same.

6            So you've had your 26(f) conference and you've

7    -- well, in the latter cases, the initial disclosures

8    have been exchanged but in the first filed case, the

9    Stephanie Rosenfeld case, it says your 26(a)(1)

10   disclosures won't be exchanged until April 3rd.  Why is

11   that different?

12           MR. SHAPIRO:  We have -- plaintiff has given

13   initial disclosures already in that case.  I believe the

14   request was from the defendant because they are

15   relatively new to the case, and so we consented to that.

16           THE COURT:  Okay.  But I guess I am not sure,

17   Mr. Lax or Mr. Jacobson, you could tell me why that date

18   is different from the ones in the latter two cases.

19           MR. LAX:  Yes, your Honor.  You may remember

20   that we did things sort of out of sync in the one that I

21   was one, counsel of record in the Stephanie Rosenfeld

22   case.  So there was discovery produced in the Stephanie

23   Rosenfeld case but we never actually had a discovery

24   schedule and so there was actually no formal initial

25   disclosure served in that case.

Proceedings                                    17

1          And then when we were here for Lemieux's case

2     in the class action, your Honor directed everyone to

3     serve in those cases, I think by the 28th, initial

4     disclosures.  So that's why it happened in those two

5     cases but the gentlemen in the Stephanie Rosenfeld case

6     were not present and they were not subject to that order

7     and so that's why it's sort of all over the place.

8          THE COURT:  Okay.  But it's basically going to

9     be the same discovery.

10         MR. JACOBSON:  Yes, your Honor, I would believe

11    so.

12         THE COURT:  Okay.  Good.  So now I am glad

13    everybody is here and we can all be on the same page and

14    get caught up.

15         So let's move onto the medical authorizations.

16         MR. SHAPIRO:  Your Honor, I -- so our position

17    on that is that we understand that at least in the

18    Stephanie Rosenfeld case, speaking about that exclusively

19    now, psychological records are relevant.  We intend to

20    seek emotional damages here.

21         We would object to providing authorizations for

22    a blanket release of her psych. records.  We will -- what

23    we would propose is that -- well, I don't have the psych

24    records now myself, but that we retrieve them and we take

25    a look at them and produce all the relevant material.

Proceedings                                    18

1          THE COURT:  Well, that -- okay.  I will hear

2    from defendants first before I interject.

3          MR. JACOBSON:  Your Honor, I've been doing this

4    sort of practice with physical and psychological injuries

5    for most of my career.  Typically, in my experience, what

6    happens is we are given HIPAA authorizations.  If someone

7    is making a claim, putting their psychological or

8    physical condition into question, we're entitled to

9    obtain all the records.  They don't get to filter what

10   they want us to see and what they don't want us to see.

11         And in addition, if the claim is that someone

12   is now undergoing psychiatric or mental health treatment

13   as a result of some sort of an event or an injury, but

14   they were seeking that treatment before and this is just

15   further treatment and possibly an exacerbation of a pre-

16   existing condition, we should be entitled to see all the

17   records without any question.

18         So our position is, we're entitled to HIPAA

19   authorizations.  We're entitled to know what healthcare

20   or mental healthcare treatment she has sought for this

21   and in the past, and that we be able to obtain the

22   records, review them and use them accordingly.

23         And just as an aside, obviously if there are

24   going to be settlement discussions at some point, we need

25   to know what the claim is for her psychological injuries

Proceedings                                    19

1   because that's going to be an element of the damages that

2   they're seeking, how could I possibly write a report to

3   my principals without giving them a breakdown and an

4   analysis of what the injuries are?

5            THE COURT:  Okay.

6            MR. SHAPIRO:  Just to be clear, we're not

7   suggesting that they're not entitled to psychological

8   records.  That's not the question.  What he's asking for

9   now it sounds like is for every record of every

10  psychological visit she's ever had for all time.  That's

11  a --

12           THE COURT:  Well, I don't know that it's a time

13  issue.  I think there might be some time limit you can

14  put around it but in terms of whatever falls within that

15  time, you shouldn't get to pick and choose what is

16  related to this case and what is not related to this case

17  because the mind and body is all interconnected, right?

18  So if --

19           MR. SHAPIRO:  Well, I do think that if --

20           THE COURT:  If she started seeing a

21  psychiatrist the day after this came to light and she is

22  suffering, then everything should come in or should be

23  produced at that point.

24           MR. SHAPIRO:  And I don't know, to the extent

25  she was -- if she was seeing a psychiatrist before this

Proceedings                                    20

1   event, I don't know, we will find that out but I would

2   certainly request if we're going to be ordered to provide

3   HIPAAs that there be a time frame on this, that it not be

4   allowed to go back forever.

5          THE COURT:  All right.  Yes.  I mean, you

6   should talk about a time frame but you shouldn't get to

7   pick and choose, which is what you said when you stood up

8   earlier, right?  So please work out a time frame for how

9   many --

10         MR. JACOBSON:  Yes, your Honor.

11         THE COURT:  -- what time period you're seeking

12  the authorizations and get that done.  It says here on

13  the Lemieux and class cases, that it's not applicable.

14  So in the -- you're only seeking -- you're only claiming

15  psychological, medical nongarden-variety injuries for

16  Stephanie Rosenfeld, right?  Everybody else is just

17  garden variety.

18         MR. SHAPIRO:  Certainly not the class, we're

19  not -- the class we are not seeking.

20         THE COURT:  How about Lemieux and --

21         MR. DOOLEY:  Yeah, similar emotional distress

22  damages in Lemieux.  There's no damages claim and -- for

23  the class, except for the statutory damages.

24         THE COURT:  So it's garden variety.

25         MR. DOOLEY:  The only thing that -- garden

Proceedings                          21

1   variety.  Excuse me.

2            THE COURT:  Okay.

3            MR. DOOLEY:  And, your Honor, the only thing I

4   would note with what Mr. Shapiro was saying earlier is

5   not so much that the plaintiffs are interested in picking

6   and choosing but simply in seeing it first and that may

7   not be as unreasonable an --

8            THE COURT:  Well, you can always see it because

9   it's your own clients, so just get the authorization from

10  your clients to see the records and then the defendants

11  will have an opportunity to get the same records from the

12  same providers.

13           MR. DOOLEY:  Yes, your Honor.

14           THE COURT:  They shouldn't have to pass through

15  your hands to get to them, in other words.  So you're

16  always free to get your own client's records.

17           MR. DOOLEY:  I recognize that.

18           THE COURT:  Yes.

19           MR. DOOLEY:  In some instances, there may be an

20  interest in seeing them first, so that the client can

21  make a determination as to how to proceed without

22  withholding anything from the other side.

23           THE COURT:  I appreciate that your client may

24  have an interest in it, but that doesn't mean they're

25  entitled to it.

Proceedings                                    22

1          MR. DOOLEY:  Just wanted to raise the issue.

2          THE COURT:  Okay.  Thank you.

3          So let's look at the 160.50 arrest records,

4   releases; that has been done for everyone.  Okay?  There

5   are no John Doe --

6          MR. SHAPIRO:  Your Honor, sorry.  On the

7   160.50, so I think -- and we spoke about this a little

8   earlier.  You had previously ordered -- granted an order,

9   I believe this is how it was done, and Josh, correct me

10  if I am wrong, but the Court had granted an order

11  allowing the unsealing of the Kings County District

12  Attorney's files with respect to Tara Lenich.  That was

13  done in the context of the Stephanie Rosenfeld case.

14          What we had discussed earlier this week was

15  that the order just be expanded, so that it include the

16  other two cases.  I think that still, as a housekeeping

17  matter, would need to occur.

18          THE COURT:  So what does the Court need to do?

19          MR. SHAPIRO:  Expand the unsealing order that

20  the Court entered in Stephanie Rosenfeld --

21          THE COURT:  Oh.

22          MR. SHAPIRO:  -- and allow those unsealed

23  records to be used in the class case and the Lemieux

24  case.

25          THE COURT:  Okay.  So Mr. Sorkowitz, since it's

Proceedings                          23

1   your client's records, do you need me to sign something

2   in particular to unseal the records for all three cases?

3           MR. SORKOWITZ:  I know that previously we had

4   filed a paper authorizing the release of those records, I

5   believe to the City in the Stephanie Rosenfeld case.

6           Josh, you're indicating that's not correct

7   or --

8           MR. LAX:  There was -- it was very simple.  All

9   that happened was that I believe there was a motion, a

10  consent motion made.  I think there might have even been

11  a proposed order submitted and there was an affidavit

12  from Lenich because there was some issue with where she

13  was in prison and getting her to notarize the actual

14  release, so it was like a (indiscernible).

15          To cut all this out -- I mean, to cut through

16  it, either we can all just consent to the order that was

17  entered in the Stephanie Rosenfeld case being expanded to

18  apply to everything.

19          The other thing is that I learned today, Ms.

20  Lenich has actually been released from prison already.

21  So the easiest thing to do is just to have her sign a

22  release and give it to all the parties.  That might be

23  the other thing -- way to handle it, which I was not

24  aware of until this morning.  So --

25          THE COURT:  Okay.  So Mr. Sorkowitz, what's the

Proceedings                                    24

1    best way to proceed for your client?

2              MR. SORKOWITZ:  It shouldn't be an issue, your

3    Honor, to get those executed.  I mean, I will confer with

4    my client and with counsel but I don't anticipate this

5    being a hangup.

6              THE COURT:  Okay.  Great.  And let me just get

7    clarification, is it pronounced [Len-ick] or [Len-itch]?

8              MR. SORKOWITZ:  [Len-itch].

9              THE COURT:  [Len-itch], okay.  So the arrest

10   records and that's the only one at issue, is for Ms.

11   Lenich's arrest record, okay?

12             MR. SORKOWITZ:  I believe so.

13             MR. SHAPIRO:  At the moment.  Yeah, I believe

14   so, your Honor.

15             THE COURT:  Okay.  We have the identification

16   of John and Jane Doe defendants in the Stephanie

17   Rosenfeld case, having a date of June 10th.  Are there

18   John Doe defendants here?

19             MR. SORKOWITZ:  There are in the Rosenfeld

20   case.  I'm not sure whether we will actually be

21   identifying anyone but we just wanted to build in a

22   little time and see the initial discovery and then make a

23   determination, your Honor.

24             THE COURT:  And there is a proposed stipulation

25   of confidentiality.  Is that something that, I guess the

Proceedings                                    25

1    parties are still reviewing and if you agree to it, and

2    you want the Court to so order it, please file it on the

3    docket, okay?

4              MR. SORKOWITZ:  Yes, your Honor.

5              THE COURT:  And you have talked about ESI but

6    it sounds like that's something we may need to talk about

7    today.  Mr. Shapiro?

8              MR. JACOBSON:  Your Honor?

9              THE COURT:  Oh, yes.

10             MR. JACOBSON:  May I?  I'm sorry.

11             THE COURT:  Yes, go ahead.

12             MR. JACOBSON:  Just with respect to the John

13   Doe defendants, as a practical matter, that may present

14   or throw a monkey wrench into this because we don't know

15   who they believe they may be  bringing in.  There may be

16   people that I might be defending.  There may be other

17   counsel that has to be brought in.

18             So maybe the time frame that we have here is a

19   little bit too broad.  If they seem to know who they are,

20   and rather than do that and have to come back to you and

21   say this -- none of this is good, maybe we should do the

22   adjustments while we're here today.

23             THE COURT:  All right.  So do you have a sense,

24   Mr. Shapiro, of who those --

25             MR. SHAPIRO:  No, I don't believe I ever said

Proceedings                                        26

1    that.

2              THE COURT:  -- defendants may be?

3              MR. SHAPIRO:  I said we needed to see discovery

4    and the date for discovery was going to be -- discovery

5    requests is April 10th, meaning we're not going to get

6    responsive documents until the middle of May and that was

7    the reasoning behind this time frame.

8              THE COURT:  All right.  So -- Mr. Emery, did

9    you want to say something?

10             MR. EMERY:  No, I just wanted to check -- I was

11   wondering whether the claims against the individuals,

12   John Does, were dismissed by Judge Garaufis and --

13             MR. SHAPIRO:  I don't think they all were and

14   there's also a question of -- I think our position would

15   be we would like to see the discovery on this.  There's -

16   - the claims that were dismissed were claims against

17   individual City defendants under the Wiretap Act.

18             MR. EMERY:  That's true (indiscernible) --

19             MR. SHAPIRO:  There are other individuals --

20             MR. EMERY:  State claimants.

21             THE COURT:  Hold on.  I'm sorry.  Mr. Emery, if

22   you're not speaking, please don't speak, all right?

23             MR. SHAPIRO:  There are other individual

24   defendants who are still remaining in the case with state

25   law claims against them.  There could be John Does who

Proceedings                                    27

1   also have state law claims against them.  I don't know.

2   To be perfectly honest, I don't totally anticipate it but

3   I don't want to waive our right to identify these folks

4   after receiving discovery.

5          THE COURT:  All right.  So it seems that that

6   is a matter that should be resolved as quickly as

7   possible.  So if you -- once you get your discovery

8   responses and you're in a position to identify those

9   people, reach out to the defendants -- defense counsel

10  immediately, so that they can determine whether they need

11  to bring in new counsel or other things.

12         MR. SHAPIRO:  Absolutely.

13         THE COURT:  All right.  So that we're not

14  waiting necessarily until June to move forward because we

15  may lose time, all right?  So that's a good suggestion,

16  Mr. Jacobson.

17         So for ESI, what do we need to talk about

18  today, if anything?

19         MR. SHAPIRO:  We had sent a proposed ESI

20  procedure to the defendants.  We haven't received

21  comments yet on it, so I -- they have our proposal.  I

22  don't know exactly what their position is.

23         THE COURT:  Okay.  So do we need to discuss

24  this or --

25         MR. LAX:  No, your Honor, I -- this is Mr. Lax.

Proceedings                                            28

1   So I think I do recall receiving it.  I think it got lost

2   in the shuffle a little bit because it was received in

3   the Lemieux and class case, so I don't even know if

4   they've seen it yet.

5             It's something we just need to go back to and

6   confirm.  I don't think there's any disagreements at the

7   moment that are ripe for the Court.

8             THE COURT:  Okay, good.  So please do keep

9   talking about it.  It may get complicated and so I want

10  to make sure that everyone is on top of that, okay?

11            So let's look at the settlement proposals.  You

12  are planning to make a settlement demand by May 31st.

13  And then there will be a settlement offer by June 28th

14  and you're thinking that you might be able to sit down

15  and have a settlement conference by July 10th.

16            So let me ask the parties first, because I like

17  to give everybody the opportunity to take advantage of

18  our wonderful mediation program.  We do have professional

19  mediators on staff -- not on staff, sorry -- who are on a

20  panel, who have volunteered to do a mediation session at

21  a reduced rate, $600 for the first session.  There are

22  several parties here, so dividing it should make it very

23  cost effective.  And if you want to continue with the

24  mediator for subsequent sessions, you can and you can

25  work out the rate or if things don't work out after that,

Proceedings                                        29

1  you can come to the Court and ask for a settlement

2  conference.

3          Do you think it would be useful for you to try

4  that first or do you think that you should be coming

5  directly to me for a settlement conference.  Mr. Shapiro,

6  let me start with you.

7          MR. SHAPIRO:  We're open to the idea of

8  mediation, your Honor.

9          THE COURT:  Okay.  Yes, Mr. Sorkowitz?

10         MR. SORKOWITZ:  Your Honor, if I may, one of

11 the issues that we've put forward in our motion to strike

12 the class allegations that's currently being brief is a

13 conflict on the part of class counsel that, because of

14 the class case's interaction with the individual cases,

15 that may affect negotiations.  We're okay to exchange

16 offers on this schedule but as far as a mediation goes,

17 we would like a resolution for that motion before

18 proceeding to mediation.

19         THE COURT:  Okay.  So that's your motion to

20 strike the class.

21         MR. JACOBSON:  Correct, your Honor, and we

22 haven't -- you know, earlier I didn't seek to stay class

23 discovery in the interest of that because it seemed like

24 your Honor wanted to do them together but as far as going

25 into a mediation, the relationships between the parties

Proceedings                                    30

1   and cases, we would like some kind of statement from the

2   Court on that before proceeding to a mediation,

3   respectfully.

4           THE COURT:  Okay.  Because you think that if we

5   don't know if there's going to be a class, it's hard to

6   settle.

7           MR. JACOBSON:  Well --

8           THE COURT:  You might be settling just

9   individually if there's no class left.

10          MR. JACOBSON:  Actually, your Honor, the issue

11  is Daniel Rosenfeld and Vincent Garcia -- that's

12  certainly a part of it but the named plaintiffs and their

13  counsel are either relatives or also representing the

14  plaintiffs in the individual actions.

15          THE COURT:  I see.

16          MR. JACOBSON:  So how do you balance those two

17  settlements?  It's not clear.  That's why we think

18  there's a conflict.  That will be briefed and decided,

19  which is fine but as far as a mediation sessions, we're

20  open to the idea but timing-wise, don't think it should

21  take place until there's a resolution on that.

22          THE COURT:  Okay.  I hear you.

23          Mr. Lax, do you have a position?

24          MR. LAX:  I don't have authority to agree to

25  the mediation program, because it involves money that

Proceedings                                    31

1   would have to come from the comptroller.  I know I would

2   be happy to come before your Honor and discuss these

3   issues.  You've already learned a lot, I think, in the

4   course of the three cases.  So we're happy to come here.

5          I would have to find out what our interest in

6   mediation would be and report back at another time.

7          THE COURT:  Okay.  Great.

8          MR. SORKOWITZ:  And obviously, the dog wagging

9   the -- the tail wagging the dog on this issue, we'll have

10  to speak with the City as well and get authority for

11  that.

12         THE COURT:  Okay.  Right.

13         MR. SORKOWITZ:  Thank you.

14         THE COURT:  But I think the timing issue is

15  still one that's a little bit open.  So I guess from the

16  plaintiffs' perspective, you would be seeking in addition

17  to the individuals, also a class settlement, right?

18         MR. SHAPIRO:  Yes, your Honor.  Yes.

19         THE COURT:  Because I've seen cases where

20  there's a settlement with the individuals and they say

21  forget the class, we'll just settle on the individuals

22  but if you're sitting down for settlement discussion, you

23  would be seeking to have a class settlement, as well as

24  the individuals.

25         MR. SHAPIRO:  Yes, we're certainly willing to

Proceedings                                    32

1   mediate and discuss settlement on behalf of the class and

2   on behalf Jarrett Lemieux and/or Stephanie Rosenfeld and

3   Jarrett Lemieux.

4           THE COURT:  But my question was more would you

5   be willing to sit down and talk just settling the

6   individuals not the class or it's all bound up together?

7           MR. SHAPIRO:  Oh, yes.  I think we would be

8   willing to do that, your Honor.

9           THE COURT:  All right.  So that will effect

10  whether it makes sense to go forward with a settlement

11  conference early on.  So what I would propose is that I

12  keep that date open.  Just looking at the dates also, I

13  think it's probably too soon after the settlement offer

14  has been made because it's only about two weeks after

15  that.  So it may be too soon.  Everybody needs time to

16  really look at the settlement demand and offer.

17          So I will not schedule a settlement conference

18  for July 10th but I will ask the parties to get back to

19  me with a joint proposal, either agreeing to mediation or

20  not and then proposing a new date for when everybody can

21  sit down and talk.

22          I know, Mr. Sorkowitz, you've made your desire

23  to sit down and have a settlement discussion contingent

24  on a decision in the class -- your motion to strike the

25  class but please see if it makes sense to try to talk in

Proceedings                              33

1   advance.

2           MR. SORKOWITZ:  I'm happy to talk to my client

3   about it, your Honor.  And, you know, when a decision

4   will come down on that is unpredictable, so --

5           THE COURT:  Yes.

6           MR. SORKOWITZ:  -- you know, I would love to be

7   able to make a more definitive statement but --

8           THE COURT:  I understand.  So but it may be

9   that there's a moment early in the litigation before all

10  the legal issues have been sorted out, when people in the

11  -- in an atmosphere of uncertainty where there might be

12  very good reasons to settle, all right?  And if the

13  plaintiffs are also willing to talk individually, then

14  the issue of the class may become less of a concern for

15  you.

16          So we just need to figure out what people are

17  willing to sit down and talk about and then what the

18  timing of that should be.  I think July 10th is probably

19  too soon, given the offer and demand; later in July maybe

20  fine.  I mean, I am not saying you have to wait until the

21  fall, sometime in the summer may be fine but I would

22  think that you need a little bit more than two weeks to

23  think about an offer before sitting down and having a

24  long discussion, okay?

25          So let's see if the parties can send me that

Proceedings                                    34

1    proposal in about two weeks?  I'm just loading up my

2    calendar.  April 10th.  So, April 10th the parties should

3    let me know about mediation and settlement conference.

4              All right, let's keep moving.  The motion to

5    join new parties, it says here within 30 days of the

6    Court's deposition -- disposition of the Rule 12 motions,

7    subject to the applicable statute of limitations, okay.

8              And you're doing your initial request and

9    interrogatories April 10th, fact discovery to be

10   concluded by December 20th.

11             Now I see here you're thinking that there may

12   be expert discovery on the issue of policies and

13   practices regarding wiretapping.  And for the Stephanie

14   Rosenfeld case, also a psychiatrist and economist.

15             What is the economist's role?

16             MR. JACOBSON:  Your Honor, I just had that put

17   in as a matter of protection for us.  There are certain

18   claims that are made that she was unable to work.  They

19   may have a claim that she has wage loss.  I mean, I don't

20   know exactly where they're going to be going with that

21   but out of an abundance of caution, I just put in that we

22   may need an economist.

23             THE COURT:  Okay.  Thank you.

24             MR. SORKOWITZ:  Your Honor, if I may, this is

25   frankly off the top of my head, hearing what Mr. Jacobson

Proceedings                                          35

1    had to say but it does occur to me that I believe Jarrett

2    Lemieux is also making allegations that he's had adverse

3    consequences at work.  It's not clear to me exactly what

4    dollar figure he is going to assert for that.

5              So I can't say right now what kind of expert

6    we're going to have on it but it just makes sense to put

7    on the record that it may also be necessary in that case.

8              THE COURT:  Okay.  So but regardless of that,

9    you'll adhere to the same schedule, which is that there

10   will be a case-in-chief expert report due January 31st,

11   rebuttal expert due February 28th, deposition of experts

12   to be completed by April 3rd, in 2020.  And you'll

13   certify everything is done by April 6th and if there's

14   going to be a summary judgment motion, you need to make

15   your pre-motion conference request to Judge Garaufis by

16   April 17th.  And if there's no motion, then you'll be

17   ready for your joint pre-trial order by May 15th.

18             All right, great.  So I see that for -- this

19   must be an error because you have a class action motion

20   in both the Lemieux and the class case.  The Lemieux case

21   is not a class action.  So there shouldn't be dates for

22   the Rule 23 class certification.  I will cross that out.

23   Right?

24             But in the class action case, within 30 days --

25   within 90 days of the disposition of the Rule 12 motions.

Proceedings                                        36

1   All right.  So I guess we'll see once the decision comes

2   out and then you'll just jump on that schedule.

3           So I think this looks good and I'll enter these

4   orders in all three cases.  They're running

5   simultaneously and coordinated, so I appreciate that.

6           So action items; if the parties have their

7   confidentiality stipulation, please submit it for my

8   ordering.  Please work out your ESI issues and if you

9   need anything from the Court in terms of so ordering,

10  please submit that as well.

11          By April 10th, you'll submit a letter letting

12  me know about mediation and a new settlement conference

13  date.  And talk to each other about what that settlement

14  conference is likely to encompass.

15          Once I schedule a settlement conference, I will

16  also require settlement statements to be submitted, about

17  ten days in advance, so that I can get a preview of what

18  the settlement conference is likely to entail and then I

19  will call each of you ex parte to discuss your settlement

20  statements, so that I have an idea of where we can go.

21  And it's also very useful because sometimes they're

22  missing pieces and that gives people an opportunity to

23  fix them before the conference itself.

24          Beyond that, I think the parties will just be

25  going forward on discovery and I won't require another

Proceedings                                    37

1   conference unless the parties request it.  I may ask for

2   a status report on the progress of discovery but I will

3   do that after I hear from you in terms of any settlement,

4   okay?

5            Is there anything else from the plaintiffs?

6            MR. SHAPIRO:  Nothing from us, your Honor.

7            THE COURT:  All right.  Great.  And for the

8   defendants?

9            MR. LAX:  Yeah, there's two issues, your Honor.

10  So firstly, your Honor may remember back in the summer or

11  fall time, there was a discussion about the unsealing or

12  the disclosure from the sealed files of the DA's Office

13  of the actual interceptions themselves.  That's the voice

14  recordings from the phone calls and the text messages

15  from the -- I guess there were two different plants.

16           From my perspective, and the cases I'm

17  representing, I believe that we're at the point where

18  that information, those materials, are going to have to

19  be unsealed and the parties are going to have to have

20  access to them for a couple of different reasons.

21           One is, they're relevant to damages.  Two is

22  that the metadata so far only includes phone numbers.

23  That doesn't give us much in the way of what the

24  interceptions entail and that's important for the class

25  action discovery.

Proceedings                                        38

1          There may be other things in there that pertain

2     to issues that we don't even know about but it would seem

3     to me that this case can't proceed properly unless the

4     parties have access, subject to whatever protective

5     orders, to the recordings and text messages and things of

6     that nature, themselves.

7               Connected to that, there's no dispute that we

8     need to unseal the metadata that was not already unsealed

9     in the Stephanie Rosenfeld case and that any metadata

10    that was in the Stephanie Rosenfeld case, also needs to

11    be incorporated into the other two cases because that's

12    evidence of the interceptions themselves.

13              And I think that part of it we'll deal with

14    under whatever protective order we file with the Court in

15    the two new matters.  But the parties have begun talking

16    about this issue.  It's clear at this stage, that I don't

17    think we have a meeting of the minds on what the

18    appropriate scope is.  I mean, it's basically we're

19    saying everything and they're saying nothing.  And so

20    that is already a live issue that's coming up in the

21    case.

22              The other --

23              THE CLERK:  Sir, do not touch the mic.

24              MR. LAX:  Oh, sorry.

25              THE CLERK:  Yeah.

Proceedings                                    39

1          MR. LAX:  I'm used to gesticulating and I

2     apologize.

3          THE COURT:  You could gesticulate all you want,

4     just don't brush against the microphone.

5          MR. LAX:  Excuse me, your Honor.

6          So that is something that is something that --

7     I mean, one part of it is the confidentiality order which

8     I think the procedures under the confidentiality order,

9     everyone will agree to.  It's just what is the ultimate -

10    - what will the parties have access to in doing discovery

11    in this case.

12         And I think at least from my perspective, we

13    can't properly prepare for a settlement conference or a

14    response to a demand without that information and I

15    frankly don't think the plaintiffs' side would be doing

16    their client a service if they don't actually have a

17    listen or take a read for their folks in making a demand

18    because that -- the value is going to depend a lot, I

19    think on what was the level of intrusion, what are the

20    sorts of things that they internally may have

21    experienced, knowing that it could have been intercepted,

22    and things of that nature.

23         THE COURT:  All right.  So let me just try to

24    understand as far as the metadata.

25         MR. LAX:  Yes.

Proceedings                                    40

1          THE COURT:  To the extent that there was
2    metadata shared, produced, unsealed, and produced in the
3    Stephanie Rosenfeld case, has that been shared as far as
4    the other two cases?
5          MR. LAX:  Actually, both Mr. Shapiro and I have
6    been keeping them under lock and key because we didn't
7    think we were able to actually disseminate it, so while I
8    gave all the files to Mr. Jacobson, and Mr. Kimmel's
9    office, that is still sitting in a safe place contained
10   because I didn't think I was able to under the order from
11   Stephanie Rosenfeld and I don't think the Emery
12   contingent has shared with the Wiggin & Dana contingent,
13   the metadata from the first case.
14         THE COURT:  All right.  Is there any reason it
15   can't be or shouldn't be shared?
16         MR. LAX:  I don't believe so, your Honor.
17         THE COURT:  All right.  So then share the
18   metadata.
19         MR. LAX:  Okay.
20         THE COURT:  All right.  Now the content creates
21   -- presents a different issue and this has been the
22   difficulty in this case, which is that the allegation is
23   that there were certain damages from the mere
24   interception and it's not clear whether -- to what extent
25   specific communications have, in fact, been listened to,

Proceedings                                      41

1    shared, disseminated.  And there have been issues raised

2    as to the further damage that could be done by having

3    this content disseminated, even among the lawyers, let's

4    say and their clients.

5           So let me hear from you, Mr. Shapiro, in terms

6    of what you think should be done in terms of the content.

7    I am not going to do a one-sided discovery and so, what's

8    -- if one side wants it, the other side will get it.  And

9    so either it's all or nothing, okay?  Either nobody looks

10   at it and you move forward in a complete, black box, as

11   far as what the content is or what the specifics of the

12   content are or both sides share everything, okay?

13          MR. SHAPIRO:  Understood, your Honor.  I am not

14   going to repeat my one-sided argument.  Our position is

15   that this content should not be disclosed at all.  I

16   haven't heard from the other side, a reason why it's

17   really relevant.  I don't understand the point on

18   damages.  My client doesn't know what was intercepted.

19   She has no idea.  I mean, she can -- to the extent she

20   can recall maybe conversations she had, they're certainly

21   entitled to ask her about that at her deposition but she

22   doesn't have any advantage over them.

23          The damage was from learning the interception,

24   the concern and as we have stated before, there's

25   continuing damage from her not knowing what is happening

Proceedings                                     42

1   but without a one-sided disclosure and I know that ship

2   has sailed, there is no basis, we feel, to disclose to

3   everyone in this case.

4           THE COURT:  Okay.  So the damages that or the

5   distress that you're claiming is from the knowledge that

6   there was interception.  It may be that she's worried

7   about very sensitive information being intercepted and it

8   may also be that, I guess it, once you look at the

9   content, it could be that, oh, there was nothing to worry

10  about, that it wasn't very sensitive information

11  disseminated but it doesn't really matter because she

12  suffered from not knowing.

13          MR. SHAPIRO:  That's correct, your Honor, and I

14  think the crux of it, not all of it but a big part of the

15  damage for her is the notion that someone was listening

16  to her conversation and that feeling, that paranoid

17  feeling that persisted even when she discovered this and

18  persisted for a long time following that, that has

19  nothing to do with the content, it has to do with the

20  fact that they were being intercepted.

21          THE COURT:  Okay.  Got it.

22          MR. SORKOWITZ:  Your Honor, if I may?

23          THE COURT:  Yes.

24          MR. SORKOWITZ:  From my client's perspective,

25  one component of the claims or at least the allegations

Proceedings                                         43

1   about her conduct is that she supposedly shared

2   information that she learned from the tapes with others

3   in the office.  She contests that.  She doesn't believe

4   that's true.  That's not to omit culpability for what she

5   did do but she is adamant that she did not share

6   information she learned solely on the tapes with others

7   in the office.

8            We should be able to test those allegations and

9   we need the content of the communications in order to do

10  that.  If I am going to ask in a deposition well, did you

11  hear -- you know, what was shared, I want to be able to

12  compare that to the tapes to know if that's something

13  that my client heard or didn't hear on the tapes to test,

14  you know, that allegation.

15           THE COURT:  Well, Mr. Emery again --

16           MR. EMERY:  I'm sorry.

17           THE COURT:  -- I can hear even if you think I

18  can't hear you, so please don't interrupt.

19           Mr. Sorkowitz, so let me try to understand

20  this.

21           MR. SORKOWITZ:  Uh-hum.

22           THE COURT:  You're saying that their maybe

23  times when you want to question somebody on the content

24  to test whether the source of that content was your

25  client.

Transcriptions Plus II, Inc.

```
                    Proceedings                    44
```

 1           MR. SORKOWITZ:  Well, what I want to question

 2     on is the rumors that or the scuttlebutt in the office

 3     that is supposedly sourced from the tapes and then be

 4     able to compare them to the tapes, to evaluate whether

 5     that's the real source of it.

 6           THE COURT:  All right.  So you want to compare

 7     the rumors with the tapes, so then you can say well, the

 8     tapes don't actually say that, so these rumors are just -

 9     -

10           MR. SORKOWITZ:  Potentially.

11           THE COURT:  -- rumors and it didn't emanate

12     from your client.

13           MR. SORKOWITZ:  That's --

14           THE COURT:  Is that right?

15           MR. SORKOWITZ:  -- potentially what I would

16     like to argue but I haven't heard the tapes, so I don't

17     know if that's right or wrong, but --

18           THE COURT:  Right, but couldn't it --

19           MR. SORKOWITZ:  That's the idea here is that

20     there's evidence that may bear on this question.

21           THE COURT:  Right, but couldn't it also be

22     irrelevant to the sense -- in the sense that if they're

23     rumors, your client could have -- the allegation just

24     could be that your client made up the rumors without

25     having them based in actually what she heard on the

Proceedings                                45

1   tapes.

2          MR. SORKOWITZ:  Well, but the -- that wouldn't

3   constitute a disclosure of information she heard on the

4   tapes.

5          THE COURT:  I see.  Okay.  And that also

6   wouldn't tie into your client if the rumors were just

7   made up by other people, right?

8          MR. SORKOWITZ:  I would hope not.

9          THE COURT:  Okay.  All right.  Mr. Jacobson?

10          MR. JACOBSON:  Yes, your Honor.  I think that

11   plaintiffs' counsel here has given sort of a broad-

12   brushed but limited perspective of their potential claim

13   and I just looked very quickly as the sixth claim in

14   which it indicates that the private communications were

15   disclosed to members of the Kings County DA's Office and

16   disclosed to other members of the Kings County DA's

17   Office.

18          Well, with that claim, we should be entitled to

19   see what those disclosures allegedly were.  How can I

20   possibly meet with my clients and speak with them about

21   what's being alleged, they did or did not do in order to

22   mount a defense of them, if I don't have the information.

23          I mean, we're in discovery and this discovery,

24   I would believe, especially with materials as sensitive

25   as this, will be subject to very strict protection by way

Proceedings                                           46

1   of an order and its dissemination will have sanctions, I

2   would -- that's inappropriate.

3            But the idea that we can't take the steps

4   necessary to look at the materials that are the

5   underpinning of all of these claims against my clients,

6   and have to proceed with discovery and possibly

7   settlement negotiations and/or a trial without knowing

8   what's in these things, I understand one element of the

9   case has to do with statutory breaches and statutory

10  damages but there are other allegations here that don't

11  go to that and go to negligence and go to tortious

12  interference and things of that nature and I should be

13  entitled to discovery of what's in that material, what

14  the content of the text messages are, and on top of it,

15  they may dovetail with materials that we gather from the

16  psychiatrist, as a perfect example.

17           So, you know, again this is discovery.  We

18  should be entitled to it, subject to strict protective

19  order and be allowed to do what we need to do to mount a

20  defense in the case.

21           THE COURT:  Okay.  Yes, Mr. Shapiro?

22           MR. SHAPIRO:  I'm not quite sure I

23  understanding the testing disclosure argument.  I don't -

24  - I certainly don't understand why the contents are

25  critical to taking discovery about whether any

Proceedings                                             47

1   disclosures occurred.

2           Certainly at depositions, everyone is entitled

3   to ask whether Lenich disclosed, what did Lenich tell

4   you.  Maybe the answer is nothing, maybe it's something.

5   Those are certainly questions that you can ask.  I don't

6   understand exactly what you would be testing based on the

7   contents.

8           In addition, with respect to Mr. Jacobson, as

9   he surely knows, Judge Garaufis dismissed the claims

10  about disclosures in the Stephanie Rosenfeld case.  So I

11  don't quite know -- to the extent there are not claims

12  anymore under the Wiretap Act against individuals in that

13  case.  I don't know whether those claims will survive in

14  the other cases either.

15          But in any event, I just don't see the argument

16  that it is necessary, it is critical to under -- to see

17  the content in order to test whether there has been

18  disclosures.  Those questions can be asked at deposition.

19  These are very sensitive materials that should not have

20  been intercepted in the first place and there's really,

21  without a really critical basis to allowing them to be

22  disclosed further, I don't think that that's in the --

23  it's certainly something our client strongly objects to

24  here.

25          THE COURT:  All right.  Well, I mean, I think

Proceedings                                        48

1  the thing that seems just thinking it through, and I

2  maybe asking for further briefing on this issue, the

3  testing it seems to me, I am a little surprised, I guess

4  at the positions of the parties because it seems based on

5  your -- on the plaintiffs' claims, the plaintiffs are the

6  ones who would want the content because if they were to

7  say well, there's this rumor of X floating around and the

8  only way anybody could have come up with that is because

9  they had access to the information in the wiretaps, then

10 that would create a clear link to whoever heard it,

11 created the rumor.

12        But that's not what you want and yet, the

13 defendants are the ones who are asking for it, seeming to

14 disprove that point, but I don't know how you would

15 disprove it by knowing the content.  So, you know, I

16 would like to give the parties an opportunity to kind of

17 think through their positions, and give me some further

18 briefing with some more details as to the specific

19 arguments that you're -- the specific points you're

20 trying to prove or disprove and the arguments as to why

21 the content would be necessary for that, okay?

22        Yes?

23        MR. JACOBSON:  Your Honor, just to clarify

24 something, all of those claims were not dismissed by the

25 judge's order and decision.  In fact, while they were

Proceedings                                    49

1   dismissed as to the individual defendants, the City --

2   the judge specifically found that there City could be

3   held liable under respondeat superior.  So I just wanted

4   the record to be clear about that.

5            THE COURT:  Yes.

6            MR. JACOBSON:  That is still out there and I

7   have to defend that particular claim.

8            THE COURT:  Yes, I am aware of that.

9            MR. SORKOWITZ:  And that claim, just to be

10  clear also, is about Lenich's interceptions and that's

11  what they would be liable for.

12           THE COURT:  Right, so Judge Garaufis was very

13  clear and so, you know, whatever he said is what controls

14  in this case, and so we'll go back to that.  But I am

15  still curious about this particular issue about the

16  content because I think the parties really do need to sit

17  down and think through what they need to prove their

18  cases and what might not be necessary and whether, for

19  example, the plaintiffs are really willing to go forward

20  with a black box in this case.  Okay?

21           Because if everything is sealed, it's a black

22  box.  You're not going to be able to talk about it and

23  speculate because nobody had a chance to look at it and

24  so if that's your claim -- if that's your position, then

25  you need to look at whether your claims and your damages

Proceedings                                    50

1   are -- whether you can do what you're trying to do, okay?

2   And the same thing for the City or the flip side of it

3   is, do you really need this to disprove if the plaintiff

4   doesn't have it, do you need it to disprove something

5   because if they can't prove something, you don't need to

6   disprove it, okay?

7            So try to work that out.  I would suggest that

8   you think it through and then have a discussion to see if

9   you actually agree on this issue or not because if you

10  agree, that makes my job easier.  But if you still

11  disagree and you want to file something, I would like to

12  get something filed in late April -- well, I will just

13  give you a month.  So April 20- -- or perhaps we should

14  do it sooner, let's say April 19th, all right?  So by

15  April 19th, you'll give me briefing on this issue, so

16  that either you're going forward with full knowledge or

17  with zero knowledge, okay?

18           All right.  Anything else?  All right.  Thank

19  you everybody.

20           IN UNISON:  Thank you, your Honor.

21               (Matter concluded)

22                    -o0o-

23

24

25

51

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **11th** day of **April**, 2019.

*Linda Ferrara*
Linda Ferrara

AAERT CET 656
Transcriptions Plus II, Inc.