```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3   --------------------------------------X
                                          :
 4   STEPHANIE ROSENFELD,                 :
                                          :   17-CV-07299 (NGG)
 5                      Plaintiff,        :
                                          :
 6              v.                        :
                                          :   225 Cadman Plaza East
 7   TARA LENICH,                         :   Brooklyn, New York
                                          :
 8                      Defendant.        :   May 22, 2019
     --------------------------------------X
 9                                        :
     ROSENFELD, et al.,                   :
10                                        :   18-CV-06720 (NGG)
                        Plaintiffs,       :
11                                        :
                v.                        :
12                                        :
     LENICH, et al.,                      :
13                                        :
                        Defendants.       :
14   --------------------------------------X
                                          :
15   LEMIEUX,                             :
                                          :   18-CV-06721 (NGG)
16                      Plaintiff,        :
                                          :
17              v.                        :
                                          :
18   LENICH, et al.,                      :
                                          :
19                      Defendants.       :
     --------------------------------------X
20
            TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
21               BEFORE THE HONORABLE PEGGY KUO
                 UNITED STATES MAGISTRATE JUDGE
22

23
                    (Appearances on next page)
24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

```
1                                                          2

2

3    APPEARANCES:

4
     For the Plaintiffs:      JAMES I. GLASSER, ESQ.
5                             Wiggin and Dana LLP
                              437 Madison Avenue, 35th Floor
6                             New York, New York  10022

7                             JESSICA CLARKE, ESQ.
                              SAMUEL SHAPIRO, ESQ.
8                             RICHARD D. EMERY, ESQ.
                              Emery Celli Brinckerhoff & Abady LLP
9                             600 Fifth Avenue, 10th Floor
                              New York, New York 10020
10
     For the Defendants:      JOSHUA J. LAX,
11                            NYC Law Department
                              100 Church Street, Room 3-154
12                            New York, New York 10007

13                            JONATHAN A. SORKOWITZ, ESQ.
                              Pierce Bainbridge Beck Price & Hecht
14                            277 Park Avenue, 45th Floor
                              New York, New York 10172
15
                              JAMES E. KIMMEL, ESQ.
16                            Abrams, Gorelick, Friedman &
                               Jacobson, PC
17                            115 Broadway, 11th Floor
                              New York, New York 10006
18

19
     Court Transcriber:       MARY GRECO
20                            TypeWrite Word Processing Service
                              211 N. Milton Road
21                            Saratoga Springs, New York 12866

22

23

24

25
```

3

1  (Proceedings began at 12:02 p.m.)

2         THE CLERK:  The Honorable Magistrate Judge Peggy Kuo

3  presiding.  Civil Cause for a Status Conference, Docket No.

4  17-CV-7299, <u>Rosenfeld v. Lenich</u>; 18-CV-6720, <u>Rosenfeld, et</u>

5  <u>al., v. Lenich, et al.</u>; and 18-CV-6721, <u>Lemieux v. Lenich, et</u>

6  <u>al</u>.

7         Counsel, please say your name for the record

8  starting with the plaintiffs.

9         MR. GLASSER:  Good afternoon, Your Honor.  Jim

10  Glasser on behalf of Jarrett Lemieux, also representing

11  Danielle Rosenfeld and Stephanie Rosenfeld and Vincent Garcia

12  [inaudible].

13         MS. CLARKE:  Jessica Clarke with Emery Celli

14  representing plaintiff Stephanie Rosenfeld and also the class

15  plaintiffs as well.

16         MR. SHAPIRO:  Good afternoon, Your Honor.  Sam

17  Shapiro from Emery Celli Brinckerhoff & Abady representing

18  Stephanie Rosenfeld and the class plaintiffs.

19         MR. EMERY:  Richard Emery representing Stephanie

20  Rosenfeld and the class plaintiffs.

21         MR. LAX:  On behalf of the City defendants and the

22  case with Docket No. 18-CV-6720 and 6721, I am Joshua Lax of

23  the Office of Corporation Counsel.  Good morning, Your Honor.

24         MR. KIMMEL:  James Kimmel of Abrams Gorelick

25  Friedman & Jacobson on behalf of the City defendants in the

4

1    Stephanie Rosenfeld case only.

2            MR. SORKOWITZ:   Jonathan Sorkowitz of the Pierce

3    Bainbridge firm for Tara Lenich in all three cases.   Good day,

4    Your Honor.

5            THE COURT:   All right.   Good afternoon, everyone.

6    So we're here to talk about the issue of whether the content

7    of the communications should be unsealed and be part of

8    discovery.   I've read your pleadings.   I guess I'll start by

9    saying that I am persuaded by the plaintiff's arguments that

10   there may be harm to the plaintiffs and in revealing these

11   intercepted communications which everybody agrees should not

12   have been intercepted in the first place.   And so for you as

13   representing those parties to be concerned about their welfare

14   and the harm that could befall them should the communications

15   be revealed to all the parties and lawyers in this case is a

16   fairly compelling argument.   However, I also think that there

17   should be fairness to both sides.   So my starting point is to

18   say we -- I'm inclined to say let's not look at the

19   communications.   No one will look at the communications.   But

20   in order for that to happen it also means that some of your

21   claims and your damages claims, both the liability and the

22   damages claims, may need to be limited.   All right?   Because

23   if you make a claim about something that is in the

24   communication and the defendants can't see it and therefore

25   defend against it, then that's not fair.   Right?   So let's see

5

1  how this is going to play out and see if there's a way to

2  delineate what you will be allowed to argue or not argue.  And

3  I think that this may end up taking a form of a stipulation.

4  And if you go to trial most likely would have to have some

5  stipulation so the jury is not left wondering why aren't we

6  talking about the contents of the communications and some

7  stipulation that everybody agreed not to look at them.  Okay?

8           So if that sounds like a good starting point, let's

9  try to dip in and see what this means for the trial.  And if

10  you can come to an agreement on the greater details, then

11  that's something that I'll leave up to the parties to talk

12  about.  All right?

13           So I see some discussion on the plaintiff's side.

14  Mr. Glasser, are you going to be speaking for the --

15           MR. GLASSER:  I was, Your Honor.  I was going to be

16  making the argument but you've short circuited our argument

17  for which I'm grateful.  But I think it might be useful, given

18  Your Honor's planned course, for us to take just a couple of

19  minutes and talk amongst ourselves if that's okay with Your

20  Honor.

21           THE COURT:  Yes, that's fine.

22           MR. GLASSER:  Thank you.

23           THE COURT:  Okay.  And the same will be true for

24  defendants because I know that part of your arguments were

25  that there were certain things that you would be precluded

6

1    from --would be stymied in being able to defend and so I will

2    hear your arguments on those specific points.  All right?  So

3    let's take a ten minute break.

4              MR. GLASSER:  Five or ten minutes would be great.

5              THE COURT:  Five, ten minute break.  Okay.

6              MR. GLASSER:  Thank you.

7              THE COURT:  I'll just stay here.  If you're going to

8    talk softly, that's fine.  If you want, I have two rooms so

9    you can each take a room outside the court.

10             MR. GLASSER:  Thank you.

11   (Off the record at 12:07 p.m.)

12   (Back on the record at 12:15 p.m.)

13             THE COURT:  Let's see what a trial that doesn't have

14   communications involved, the contents of communications would

15   look like.  So many of the claims that the plaintiffs have put

16   forward have to do with harm and their fears that certain

17   private communications were disclosed to strangers.  If the

18   communications are unknown to both parties, then that argument

19   would take the form of, I don't want to say speculation, but

20   somebody would -- one of the plaintiffs would then be put in

21   the position of saying something like I don't know exactly

22   what was intercepted but because they were personal in nature,

23   the mere fact that somebody may have access to them is causing

24   me harm.  Maybe, Mr. Lax, you can tell me how that would play

25   out.

7

1          MR. LAX:  The problem is we do not concede anything

2     about what is the contents of the communication.  There's a

3     lot of vague references in the readings to what is supposedly

4     in there and what is leaked.  To date the plaintiffs have not

5     given us any specificity.  And the problem is the words Your

6     Honor has is speculation.  That is the core of the problem

7     which is we look down the road at this case makes it in front

8     of a jury.  They would be, and I point at the plaintiff's side

9     for the record, they would be doing their clients a disservice

10    if they didn't try and push the envelope and try and get the

11    jury to think about these as a personal matter and a personal

12    thing depending on what their claims are.  And everyone has

13    put in the possibility that a jury is going to go out and

14    speculate even if you just say it's personal because they're

15    like oh, maybe that involved this, maybe it involved that.

16    And then that's all happening in the jury room and whoever's

17    left as the defendants at that point in the case, they don't

18    have any way to rebut that and that's not fair.  And so

19    characterizing it in any way, I guess to answer the Court's

20    problem, is we are we see the genesis of the problem because

21    it could be that there's a couple of things in there that are

22    very personal and it could be that there's things in there

23    that are very mundane overall.  And the only people that know

24    what's in there in any complete way are Stephanie Rosenfeld

25    and Jarrett Lemieux, and perhaps Tara Lenich, depending on

8

1  what she owns up to actually having reviewed.  And so, you

2  know, and so I think from our discussion, and I will say that

3  actually Mr. Kimmel and I are in a different position, but

4  also Ms. Lenich is in a very different position than our

5  clients, but I think we all agree that like the plaintiff's

6  side has been trying to pin as much harm on our clients as

7  possible in the ultimate day of reckoning.  Because of that,

8  any characterization at all is going to probably enure to

9  their benefit.  And if we're left completely without any

10  ammunition to rebut it it's highly unfair to the folks we

11  represent.

12         THE COURT:  But can I just ask so again, we're just

13  trying to play out these hypothetical situations.

14         MR. LAX:  Yes.

15         THE COURT:  If a plaintiff says I had a personal

16  conversation with somebody and that is within the timeframe of

17  when the wiretaps occurred, okay, would it matter for you to

18  defend your case to say you see the communication didn't

19  actually involve the personal call, it was just calling to,

20  you know, a call to the babysitter to make a scheduling

21  arrangement?  Does that actually matter or --

22         MR. LAX:  It might.  I mean you know --

23         THE COURT:  How so?

24         MR. LAX:  Because in the allegations, and I speak

25  only because I'm involved with the new case where there's

9

1  individual claims, or claims for an individual harms, I mean

2  his complaint talks about basically -- makes it sound like all

3  of this was crushing -- like his life basically ended.  I mean

4  he says -- I will say he continues to work as a police

5  officer, yet he feels that his personal security and trust is

6  completely ruined, he claims his career is ruined.

7             THE COURT:  But couldn't that also be -- just the

8  mere fact that somebody listened in on your personal phone

9  calls could create that harm in and of itself.  Right?

10             MR. LAX:  But --

11             THE COURT:  So you wouldn't then be able to rebut it

12  by saying well, I mean the phone calls themselves were of the

13  nature of scheduling or something mundane and therefore your

14  fears are unfounded but --

15             MR. LAX:  Or the degree of it.

16             THE COURT:  Right.  But --

17             MR. LAX:  Because THERE'S the number that gets

18  affixed to it and that's also part of what we're defending

19  against.  Right?  It's, you know --

20             THE COURT:  Yes.  I agree.  And that's why we're

21  having this discussion to see how that would play out because

22  at the moment he doesn't know what was intercepted, right?

23  And he wouldn't be allowed under the rules that we are trying

24  to set up to say yes, I know there was a specific conversation

25  where I was talking with somebody and it was of a personal

1   nature.  If that were to happen, then I would say, for the
2   rules of fairness, would say you would definitely be able to
3   get that recording so that you could defend against it to say
4   you're claiming that you had a personal discussion on this day
5   with this person.  In fact, it was scheduling.  Right?  And so
6   I'm just trying to figure out if there's a way to be more
7   surgical and precise in terms of the things that you would
8   need to rebut but it would also require the plaintiffs to be
9   more mindful of the fraud allegations that they're bringing.
10  So if there allegations are based on in general anyone who has
11  their phones tapped is going to suffer harm because that
12  shouldn't happen, you know, that might be an okay argument
13  that you can argue without knowing what contents are.  But if
14  there are specific things about specific harms because of
15  specific communications, then you would at a limited level be
16  able to get access to those so you could defend.  That's what
17  I'm trying to envision here.
18              MR. LAX:  I mean there's an allegation, and I tried
19  to wrap my head around this because it sort of leads in
20  circles, there's an allegation at least for Lemieux, and I
21  think it exists in a variation in the Rosenfeld case from what
22  I recall, which is they say that there is something negative
23  about their character that developed and they don't say
24  specifically what it is other than something about a love
25  triangle, that developed about their character based not on

1  the mere fact that this was revealed but actually the fact

2  that there was contents of the communication that were

3  revealed.  You know, and so the fact that there saying the

4  adverse consequences for their career, for their personal

5  relationships, whatever it is, flowed not from the actual mere

6  fact that there was a scheme that took place, but actually

7  because of contents coming out into the public domain which

8  again, no one has ever said what that is.  Our discussion was

9  actually that you kind of have to just take that if you're

10  going to limit the, or excise the contents of the

11  communications, all of the things that are said to flow from

12  the content of the communications have to go out.  And then

13  what does that mean for the damages claim?  That means that it

14  affects what kind of punitive damages they concede because

15  punitive juries are typically instructed to flow from the

16  compensatory, that creates a complication.  So in terms of the

17  surgery of it, we thought that the only way to do this in an

18  efficient way is actually to take out actually the broad

19  strokes of it which is what we have in front of us because

20  we're dealing with the pleadings at this stage.

21          THE COURT:  Right.  So that may be -- what I now

22  turn to the plaintiffs to ask is more detail on the harms that

23  they're seeking and if that claim or those claims for damages

24  then triggers the need for the defendant to get access to

25  those communications to defend, then that might be the

1   appropriate thing.  In other words, we would start with a

2   black box but to the extent that there are things that

3   plaintiffs are claiming, it might trigger opening the black

4   box for a limited purpose rather than starting at the point

5   where everything is up for grabs.  Okay?  So then let me hear

6   from the plaintiffs about what you're claiming and what things

7   -- so for example, what things might trigger the need for

8   defense to see the communications to defend themselves.  So

9   the complaint was a little -- the complaints are little bit

10  vague on what the harms were.  If the harms are more specific

11  than just a general form of having your privacy infringed

12  upon, then let's talk about that.

13          MR. GLASSER:  Yeah.  So I'm happy to address some of

14  that, Your Honor.  In all honesty, in terms of this issue

15  being raised, we have to think about it and wrestle with it a

16  little more then perhaps I'm ready to at the moment.  But I

17  will respond to a couple of things that my colleague, Mr. Lax,

18  said to the court.  With respect to Mr. Lemieux in terms of

19  general injury, how it's affected him, how it's affected his

20  career as an illustrative example, I don't think anyone in

21  this room debates or disputes the fact that they were both, or

22  frankly all the plaintiffs including the potential cross

23  plaintiffs, were all the victims of an illegal wiretap that

24  went on for a year and a half.  Mr. Lemieux, focusing on him

25  for a moment, when the wiretap was disclosed and when news of

1  this broke, Mr. Lemieux was taken from his job, his gun and

2  badge was taken, and he was put on a desk.  He was removed

3  from an elite task force, the firearms task force, that's a

4  joint task force as I understand it between federal and state

5  authorities that has all source of opportunities associated

6  with that elite task force.

7            THE COURT:  Okay.  So the --

8            MR. GLASSER:  And he was unceremoniously removed

9  from that detail.

10            THE COURT:  Okay.  So can I just --

11            MR. GLASSER:  Sure.

12            THE COURT:  -- pause you there?  So are you saying

13  it's because somebody knew the contents of those

14  communications and based on what those communications revealed

15  they had these job consequences for him?

16            MR. GLASSER:  You know, we believe that to be the

17  case.  We're in a discovery phase.  We believe that to be the

18  case.  And quite frankly, you know, we hope to take the

19  deposition of various people.  There were news accounts.  Your

20  Honor may recall this was headline news in the Post and the

21  Daily News with some details that were provided in some way.

22  Whether that came from a disclosure from whoever may have been

23  reviewing those illegally recorded conversations, you know,

24  frankly is the subject -- hopefully we're going to flesh out

25  in the time to come.

14

1       THE COURT:  All right.  So my recollection of the

2  news reports, and I put no stock in them other than that --

3       MR. GLASSER:  Nor do I.

4       THE COURT:  -- the news said something is that there

5  was some romantic liaison involving Mr. Lemieux.  Right?  And

6  so if you're speculating that that is what led to him being

7  removed from the task force, then you would have to take a

8  deposition, and let's say you did find somebody who said yeah,

9  you're not supposed to have affairs of this nature and that's

10  why he was removed, if that's the case then you would have to

11  trace back that person's knowledge to the wiretap.  Now, if

12  that's the case, then it would only be fair for the defendants

13  to look at those wiretaps to see if in fact that's the case

14  because if it turns out that the wiretaps didn't involve

15  anything about an alleged affair, then it's not possible that

16  whoever read the communications conveyed the information such

17  that he was removed from the task force.  So that would be a

18  defense.

19       MR. GLASSER:  I'm not --

20       THE COURT:  But the only way you could defend it is

21  to actually look at those communications to say there is

22  nothing in there about that.  Right?

23       MR. GLASSER:  I'm not sure that I 100 percent agree

24  with Your Honor.

25       THE COURT:  Well, it doesn't have to be 100 percent.

15

1   But I think that a reasonable person would say if that's the

2   direction you're going then the only way the defendants can

3   say his removable from the task force had nothing to do, at

4   least the communications with the wiretaps, then if they don't

5   know what's in the communications then they can't defend.  And

6   that wouldn't be fair.

7           MR. GLASSER:  Oh, they can examine and cross examine

8   whoever it is is the relater and --

9           THE COURT:  But you still could -- if the person

10  said I have nothing to do with those, I never read the

11  communications, it was job performance let's say, you know, or

12  some other reason, you're still going to make the argument

13  that it was the wiretaps.  And if you're going to make that

14  argument, then the defendants get to make the argument we've

15  looked at the wiretaps and there's nothing in there about an

16  affair.  So --

17          MR. GLASSER:  Well, let's talk about that for a

18  moment.  Assuming, and I --

19          THE COURT:  Again, this is all hypothetical.  Right.

20          MR. GLASSER:  Thank you, Your Honor.  But assuming

21  that's the case and assuming we go down that road, I hope

22  we're not considering opening up a broad swath of recordings.

23  And the plaintiff would have to identify a particular

24  recording or a particular day in order to receive that.  They

25  can't just wholesale review recordings over an 18-month period

1    of time.

2            THE COURT:  Well, if this were the trigger let's

3    say, then the defendants should be able to go through the

4    wiretaps of the time that your client -- let's put it this

5    way.  If your client is saying -- well, there are two things,

6    right?  Your client is either going to say I did have an

7    affair and this is the time period where I had some

8    communications about it or your client's going to say I never

9    had an affair, this is all made up.  Right?  And so if it's

10   the first one, then it may be more targeted because then he

11   would know when certain things were happening or

12   communications were happening.  If it were the second one and

13   he denies it wholesale, then I think the defendants should be

14   able to look more broadly to say well, you know, that's not

15   true.

16           MR. GLASSER:  Yeah.  The problem with going down

17   this road, especially today --

18           THE COURT:  Yeah.  I -- that's --

19           MR. GLASSER:  -- it makes sense to retreat.  But

20   quite frankly, there's certain suppositions that are being

21   made that he was benched because of an alleged affair rather

22   than the fact of the interception for a long period of time

23   until, you know, whatever was done with those tapes till some

24   determinations were made.  And I don't know.  We allege that

25   they were listened to improperly.  Again, Your Honor, I've

1  looked not exhaustively perhaps, but I have not found a single

2  case that allows the disclosure of illegally intercepted

3  conversations.

4          THE COURT:  I'm happy to make new law here, okay?

5  Because I haven't found -- because the cases that you're

6  talking about are more in the nature of criminal and more in

7  the nature of should they be used.  It seems there should be

8  very limited reasons for why they would be disclosed.  The

9  fact that the plaintiffs themselves have brought a lawsuit may

10  be one of those triggers.  Okay?  So that's why I'm sort of

11  putting the burden on the plaintiffs to say I get your point

12  about privacy and harm and so I'm willing to put everything in

13  a black box.  But if you start triggering the need to look in

14  the black box then we might have to go look in the black box.

15  Right?  And so if you're willing to say we're just going to

16  keep everything locked up and nobody's going to look at it,

17  that's an okay starting point.  But you can't then start

18  talking about what's inside the box and not allow other people

19  to look in the box.  So that's your dilemma.  Right?

20          MR. GLASSER:  I understand.  I understand what Your

21  Honor's saying, but I don't think you have to go that far

22  quite frankly.  I mean you've got inferences that can be

23  drawn.  Let's just take Mr. Lemieux's removal from the task

24  force on the day that the fact of the wiretap was disclosed.

25          THE COURT:  Right.  And just for clarification, what

18

1   is your theory on that?

2           MR. GLASSER:  My theory is as a result of the

3   disclosure and the fact that there was something going on he

4   was in some way associated with the legal conduct by Tara and

5   nobody really knew at that point what was going on.  My theory

6   is that the police department took action with respect to him

7   to put him on the bench and that's where he sat for months and

8   months until he was restored.

9           THE COURT:  Okay.  And so --

10          MR. GLASSER:  Not to the task force.

11          THE COURT:  Okay.  So let's say that you depose

12  somebody from the police force who says it has nothing to do

13  with the wiretaps.  Coincidentally, he was just doing a

14  terrible job.  Okay.  So how are you going to --

15          MR. GLASSER:  I don't think it's possible.

16          THE COURT:  Okay.  But assuming that happens --

17          MR. GLASSER:  All right?  And I'd like to discover -

18  -

19          THE COURT:  But assuming that happens.

20          MR. GLASSER:  Yeah.

21          THE COURT:  How would you then proceed to disprove

22  that that person's testimony, which is that this had nothing

23  to do with the wiretaps, how would you go about disproving

24  that?

25          MR. GLASSER:  Yeah.  Well obviously, Your Honor, we

1  would have to develop other evidence and more than one person.

2  And you know, frankly, I would ask a jury to draw a reasonable

3  inference from the timing and the temporal nature of a fellow

4  who was on a trajectory for many years --

5          THE COURT:  But if no one knows and we're going to

6  proceed to trial on the premise that everyone has agreed that

7  it's going to stay a black box, how you going to prove that

8  there's any link between the substance of the wiretaps and

9  your client's removal?

10         MR. GLASSER:  I don't need the substance, Your

11  Honor, to make the argument.

12         THE COURT:  You're just going to make the argument

13  because of the timing and it's suspicious, therefore it's

14  enough?

15         MR. GLASSER:  And again, I need to develop --

16         THE COURT:  Really?

17         MR. GLASSER:  -- evidence through depositions of

18  what the reason he was put on the bench.

19         THE COURT:  But I'm just sort of giving your hardest

20  case, right, where --

21         MR. GLASSER:  Look, I don't think it's a different

22  inference to make.  And after all --

23         THE COURT:  It is because it's not -- you know, the

24  parties could say the timing is enough but then if somebody

25  says that's not the reason and you're just going to say that

20

1   person's lying, right, then the --

2           MR. GLASSER:  Your Honor, but we're not there, Your

3   Honor.  We don't have that evidence.

4           THE COURT:  Well, but this is what I'm -- I'm trying

5   to create a roadmap so that everybody understands, and maybe

6   it's a landmine, right, that everybody understands what will

7   potentially trigger having to open the black box, right?

8           MR. GLASSER:  And I appreciate --

9           THE COURT:  Because you want the black box.  That's

10  what you told me in your pleadings.

11          MR. GLASSER:  Yes.

12          THE COURT:  And I'm willing to start there.  But

13  depending on how the case proceeds, you may not end up there.

14          MR. GLASSER:  Yes.

15          THE COURT:  And I just want to be clear about how

16  these things are going to go forward because it's not fair to

17  the defense, right?  And I also, I'd rather start with the

18  black box then with full disclosure which is kind of what

19  everybody has -- you've staked our your positions and that's

20  kind of how it's panned out.  I'd rather start with the black

21  box.  But then it puts a burden on the plaintiffs to tread

22  carefully because if you start making arguments about what's

23  in the black box, then you're going to start poking holes in

24  creating the need to look in the box.  Now, it may not be a

25  wholesale look at everything, but it might be look at this

21

1   particular part, look at this particular part.  But you know,

2   and I know, I appreciate you're not ready to make this be that

3   clear which is why I proposed that maybe the parties need to

4   sit down and start hashing out some stipulations.  But you

5   can't start talking about the -- you still need to have a

6   theory as to what it is that your client was afraid was

7   revealed in the communications and if it's -- again, taking

8   the news reports for what they are giving them no value but

9   just speculating, if it's because he had an affair, then you

10  would need -- and somebody says no it wasn't, then the

11  defendants may have a right to go in to say there was nothing

12  in there about the affair.  Maybe the affair was because

13  somebody wrote an anonymous letter, the information about the

14  affair came from an anonymous letter, not the communications.

15  Right?

16          MR. GLASSER:  I understand.

17          THE COURT:  So that's the other possibility is yes,

18  it was the affair, but that's not where I got the information.

19  And if that's the case, then the defendants can go in to say

20  there's not a shred of information in here about the affair,

21  so the harm came from a different source, not from the

22  wiretaps.  See?

23          MR. GLASSER:  I understand where Your Honor's going

24  with it.

25          THE COURT:  Yes.

1          MR. GLASSER:  I don't obviously necessary agree that

2  that's appropriate under the circumstances.

3          THE COURT:  I know.  And you don't have to agree

4  with me.  You don't have to agree with me.  I just want to lay

5  out what I'm thinking and give everybody --

6          MR. GLASSER:  Very helpful frankly.

7          THE COURT:  -- yeah, the opportunity to argue.

8          MR. GLASSER:  Just to understand how you're thinking

9  about this is helpful to us I must tell you.

10          THE COURT:  Okay.  So Mr. Lax, what --

11          MR. LAX:  If I could just ask a clarifying

12  question --

13          THE COURT:  Sure.

14          MR. LAX:  -- and direct this towards the plaintiff's

15  side because I'm a little confused.  Lemieux is saying -- is

16  Lemieux basically admitting that he had an affair and it's in

17  the recordings and that's the only way we would have known?

18  Or is he denying that he had an affair and it's based on a

19  mistaken belief about what was in the recording?

20          THE COURT:  That's part of the -- one of the

21  questions that I asked.

22          MR. LAX:  Yeah.  And so if it's the latter, then

23  we're back in well what's the black box gonna be.  If he's

24  saying that I had an affair, the then we get into well, what

25  are all the different ways that people know you're having an

23

1  affair beyond listening to your recordings?  The case becomes

2  different I think.

3          THE COURT:  Right.  So that's why I'm putting so

4  much of an emphasis on the plaintiffs to really clarify their

5  points and their theories and where they're going.  Yes, Mr.

6  Emery?

7          MR. EMERY:  Thank you.  It seems to me, unless I'm

8  missing something, that there are a couple of other factors

9  here that we haven't taken into account.  First of all, Lenich

10 could very well have provided this information that caused the

11 damages in the individual cases and that in the end we'll just

12 find out in discovery.  But I guess it's the most likely

13 scenario.  She was the so-called jealous party here.  Whether

14 it was true or not, she was the one tapping because she was

15 worried about her own relationship with Lemieux and wanted to

16 find out everything about him apparently.

17         THE COURT:  And if that's the case, then the --

18         MR. EMERY:  The contents mean nothing.

19         THE COURT:  Well, but then the City shouldn't be

20 liable if it's all Lenich working on her own.

21         MR. EMERY:  Well, that depends on whether it's --

22 there are a number of other issues about whether they provided

23 a basis on which she could go do these illegal things through

24 their policies and also whether as a matter of respondeat

25 superior they are no matter what, because she says herself,

1   this was part of her law enforcement activity, she says at

2   sentencing this was part of her law enforcement duties to look

3   at Lemieux whether she was doing it for the right reasons or

4   the wrong reasons, she was pretending --

5           THE COURT:  Right.  But then your arguments --

6           MR. EMERY:  -- that this was official.

7           THE COURT:  Right.  Then your arguments about people

8   spreading news, everybody looking at the wiretaps and the

9   communications and having conversations at the water cooler,

10  those things need to be set aside if you're saying that the

11  City, you know, wasn't looking --

12          MR. EMERY:  And Your Honor --

13          THE COURT:  -- at the communications because you

14  don't care about the contents.

15          MR. EMERY:  I think you're right about that to the

16  following extent.  Judge Garaufis has already ruled that in

17  the Rosenfeld case, which I assume is going to follow, and the

18  Lemieux case and then the class case in several respects, that

19  the individuals who were responsible arguably -- who we allege

20  were responsible for disclosure are not liable.  He already

21  threw out those claims.  Now, we preserved them in the Lemieux

22  case and we've preserved them in the class case, but that's

23  essentially for appeal because if he hues to that line in both

24  of the other cases, those claims are no longer in the case

25  anyway on disclosure.  So I think we have that bridge to cross

1   depending on how he rules in those matters.

2         I also want to make the point very simply that none

3   of this applies to the class case.  The only way the black box

4   gets opened it seems to me under your own reasoning I think,

5   unless I'm missing something, is in the individual cases but

6   not in the class case.  So I think we should try and put that

7   aside.  The point here in the class case, it's our position

8   that this is a statute which is designed and was intentionally

9   created by Congress as a deterrent with a draconian liquidated

10  damage claim of 10,000 or $100 per day, whichever is more, as

11  with respect to both the -- with respect to damages for both

12  the person who made the call and the person who received the

13  call.  There is no discretion in between.  It says "may" but

14  the "may" relates to either one of those two damage amounts

15  set in the statute.  Our position at this point, and I

16  understand they disagree with this, but our position at this

17  point is it's all or nothing.  Either there's liability and we

18  get $10,000 per class member and per person who initiated the

19  call and the one who received the call, vice versa, or it's

20  nothing if they're not liable.  So I want to be clear about

21  that for the record here --

22         THE COURT:  All right.  So --

23         MR. EMERY:  -- in the class case.  In the individual

24  case, we have compensatory damage.

25         THE COURT:  Yes.

1           MR. EMERY:  That's different.  And everything you're

2     saying today it seems to me, Your Honor, relates to the

3     individual cases with respect to opening the black box.  I

4     agree with Your Honor completely that we can open the door,

5     like you can in any trial, to otherwise inadmissible evidence

6     by making claims or examining witnesses in trial that would

7     open the door and allow otherwise inadmissible evidence in.

8     But we are so far away from that point at this point that we -

9     - and we all agree that that's an evidentiary possibility, but

10    you can be sure we're going to be very, very careful not to

11    open the door.  So I think that's an issue that we have to

12    think about for another day.

13          THE COURT:  Okay.  So let me see if I understood

14    what you just said.  So for the class, members of the class,

15    you are only seeking statutory damages --

16          MR. EMERY:  That's correct.

17          THE COURT:  -- not compensatory.  All right.  And

18    for the compensatory damages, you've characterized this is a

19    trial issue but by the time we get to trial it's going to be

20    too late.  So I think it makes more sense to be looking at

21    this as we proceed through discovery and other things.  And it

22    also seems that there is insufficient clarity provided in the

23    complaint as to what your theories are.  So you know, clearly

24    the complaint is sufficient to move forward but as we try to

25    thrash out some of these discovery issues it will become

1   important as to what your theory is, clarifying things as Mr.

2   Lax brought up, was there an affair or wasn't there?  And if

3   so, you know, is your theory that someone knew about it or

4   didn't know about it or did it come from the communications or

5   not.  So and those are things that are within your control and

6   knowledge.  And so it's not too soon to start laying that out

7   so that everyone has sufficient time if you end up opening the

8   box to get everything lined up so that we're not caught on the

9   eve of trial before Judge Garaufis where he says well hold on

10  a second, nobody's looked at this and now you're asking for a

11  four month delay to look at it?  That's not good.

12          MR. EMERY:  Fair enough.  But I would urge Your

13  Honor to not confine our thinking to the binary question that

14  you have identified as one of the ways the box may be opened

15  by thinking did they have an affair or didn't they?  That's

16  not the issue.  The issue is whether Lenich thought they were

17  going to have -- thought they were having an affair and how

18  she behaved in the context of her fears, paranoia, suspicion

19  and the like.

20          THE COURT:  Well, but the factual -- so I appreciate

21  that in the modern world we have this complicated category.

22  Right?  So to say did he have an affair or did he not have an

23  affair may be something that can't be answered.  But -- can't

24  be answered --

25          MR. EMERY:  Or shouldn't be answered.

1          THE COURT:  -- to great satisfaction.  However,

2    there are factual issues, right?  So if someone is saying this

3    was all made up, there was absolutely nothing going on,

4    therefore there would be nothing in the communications to

5    that, and if Lenich, if you're saying Lenich is making it up

6    or she was concerned about it and even after she heard the

7    communications there was no evidence but nevertheless she

8    spread these rumors, that's a very different point from she

9    actually got the information through the communications and

10   then presented it to people or however it is that she

11   convinced them that this was the case.

12          MR. EMERY:  Well at this stage I think we're talking

13   very hypothetically.

14          THE COURT:  Yes.

15          MR. EMERY:  And we don't know where this is going to

16   go exactly in that respect.  But I would say this to be very

17   clear.  Whether they were having an affair or not in my view

18   is absolutely irrelevant to this under any scenario.  The

19   question is how the rumors got started they were having an

20   affair.

21          THE COURT:  Well, okay, so let --

22          MR. EMERY:  And we've given up on disclosure

23   essentially because all the individuals have been dismissed.

24   And in the other cases presumably they will be.  So we're not

25   going to be pursuing the individual disclosure issues in all

29

 1    likelihood.  We'll see.  But I don't think so.  So the issue
 2    is going to be what did Lenich do and why did she do it and
 3    how did she go about -- what she actually learned from the
 4    tapes is irrelevant.  She was --
 5                THE COURT:  Well, let me --
 6                MR. EMERY:  -- [inaudible] caused these people harm
 7    in the context of her listening to their --
 8                THE COURT:  Okay.  But there are two scenarios and I
 9    know you're saying it's not -- the world's not binary but
10    certain specific factual points may be.  Right?  So she either
11    thought there was an affair and that may be the motive, right,
12    but when she listened to the communications she'll either
13    confirm that there was something that she can use to convince
14    other people that there was an affair, whatever it is, or
15    there was nothing but she nevertheless continued to spread the
16    rumors.  And so it does put what's in the communications at
17    issue then in that case.
18                MR. EMERY:  I disagree, Your Honor, respectfully
19    because it seems to me that regardless of what's in the
20    communications, it's her behavior that counts.
21                THE COURT:  Okay.  So then let me focus on the issue
22    of damages.  Right?  So if a person is having an affair versus
23    a person -- if a person is not having an affair and vicious
24    rumors are being spread, it may be damages of a different
25    level from somebody who is actually having an affair and gets

1   found out.  And so it will matter and it may come to the point

2   where you have to make the argument because the jury is going

3   to be sitting there going okay, one's worse than the other and

4   for us to put a dollar amount on it we've got to know.  So I

5   think at some point you're going to have to be clear about it.

6   Your client's going to be deposed and so he's going to answer

7   it.  He may say it's complicated.  But then there's going to

8   be some discussion about what the details are.  So I

9   appreciate you're trying to protect your clients but at some

10  point because the suit has been brought alleging specific

11  things, the cat's going to come out of the bag on that.

12          MR. EMERY:  Well, let me just -- I respectfully

13  disagree and President Clinton comes to mind here.  But put

14  that aside for a minute.  The definition of -- what is the

15  definition of is is?  Who knows exactly what went on?  It's

16  not even there.  But my point is -- maybe that's a bad

17  reference.  But I respectfully disagree with the underlying

18  premise of what you're saying that a jury is going to react to

19  whether they did or did not have an affair as a matter of

20  damages in the context of a wiretap case.  I think the issue

21  is how did their lives suffer as a result of a violation of a

22  wiretap statute and not whether or not they were having an

23  affair.  This is a matter of respectful disagreement.

24          THE COURT:  Well, and you can disagree but I have to

25  make decisions, right?  So I think that we've hashed out some

1   of the difficulties here.  Oh yes, sorry, Mr. --

2           MR. SORKOWITZ:  Your Honor, if I may, just two small

3   points.

4           THE COURT:  -- Sorkowitz, yes.

5           MR. SORKOWITZ:  It doesn't look like we're going to

6   figure out every detail of this today.

7           THE COURT:  Correct.

8           MR. SORKOWITZ:  But I just want to flag a couple of

9   points here.  Number one, with respect to Ms. Lenich's

10  disclosure or nondisclosure of the content of the

11  communications, we don't deny and we couldn't deny that she is

12  responsible for tapping these phones.  However, she does deny

13  spreading rumors based on the content of the communications.

14  So it will indeed become relevant whether information that was

15  circulated did or didn't come from there as Your Honor got

16  into the whole colloquy with the City.  It should function the

17  same way in principle.

18          Second, I want to point to the matter of psychiatric

19  testimony and the damages that are being raised there by I

20  believe both individual plaintiffs.  It's hard for me to

21  envision, and we'll all have to think these issues through,

22  but it's hard for me to envision how any treating psychologist

23  or expert or what have you could testify that this condition

24  was caused only by the fact of the wiretaps and maybe I talked

25  to the patient about the content of it, but my testimony is

1  not based on that.  And here's the quantum that's based on the

2  fact of it and here's the quantum that's based on the content

3  of it.  It seems to me that's going to be impracticable to

4  disentangle those things but we're willing to think it through

5  further.

6          THE COURT:  Yes.  And -- oh, go ahead.

7          MR. SORKOWITZ:  Yeah.  The only other thing I was

8  going to raise is an issue of logistics which is we haven't

9  gotten deep into whether parts of the tapes could or couldn't

10  be disclosed.  I believe Your Honor made a reference to

11  possible time frames if we're talking about an affair that

12  happened at certain times.  I honestly don't know the answer

13  to this.  But logistically how could that be effectuated such

14  that nobody has a one-sided disclosure of what they're weeding

15  out using my point.  If someone has to look at the tapes and

16  say yes, this is relevant to this issue but the rest of the

17  tapes aren't, then some lawyer who's making those decisions is

18  going to have seen the rest of it.  So I honestly don't know

19  even which way that cuts but it does occur to me as something

20  that will have to be resolved if we're going to make a

21  stipulation.

22          THE COURT:  Yes.  Okay.  And I appreciate that you

23  may not be able to stipulate to everything from the beginning

24  and the case evolves as more facts come to light.  And so

25  whatever you come up with is going to be a living document.

33

1    Okay?  But I do want the parties to think really hard about

2    what your theories are.  And a lot of this -- I keep coming

3    back to the plaintiffs because a lot of this is within your

4    control.  If you agree not to argue certain things, then

5    you're fine.  If you argue certain things, you may be opening

6    the box.  So if the damages are -- well I mean again, it's

7    hard for me to speculate because I don't know the facts.  And

8    I think that if you talk to your clients you will have a

9    better idea of what actually happened.  If your clients are

10   going to say when I found out that my phone was tapped during

11   that period it really upset me because I know that during that

12   period I had certain things that were going on in my life and

13   so I don't care if those were the things that were actually

14   captured in the communication, my fear that they were captured

15   is the basis of my compensatory damages.  Right?  So that may

16   be the thing that you argue.  But if you are arguing that in

17   fact they were captured or in fact the communication was

18   disclosed in some way, then the defendants would have the

19   right to disprove that to say no, that communication that

20   you're afraid was  actually -- we never had it.  Your fears

21   are unfounded and therefore you don't get compensatory

22   damages.  So it's going to require a lot of hard work and

23   diligence and vigilance by the parties as you move forward,

24   but I wanted to give you a roadmap to say that at any -- and I

25   guess it's a way of saying that I will start with the black

```
 1   box but at any given point when the black box is opened I will
 2   permit defense to raise that and say we can't defend this
 3   unless we see either a portion of the communications, the
 4   communications of this person or that time frame or whatever,
 5   or actually it opens everything because we have to look at
 6   everything to disprove a negative or something like that.
 7   Okay?  And if you can have the -- when that point comes up and
 8   you can talk about it, maybe that's a moment where the
 9   plaintiffs can retreat and say oh actually we don't need that.
10   If the consequence is going to be that you get the
11   communications, then we don't need to make that argument.
12   We'll make an alternative argument and then you're going to be
13   bound by that.  Okay?  Yes, Mr. Lax?
14             MR. LAX:  Your Honor, I think maybe in terms of
15   benchmarking this kind of discussion it's useful to remember
16   that I think at the end of July we're supposed to have a
17   settlement conference.  So theoretically if we're going to do
18   that, plaintiffs have to make up their mind about what they're
19   doing because like no one can really do a settlement
20   conference without some of these complicated types of damages
21   claims if it's still amorphous at that point.  I mean it's
22   going to be very difficult for me to talk to my folks.  I'm
23   sure the other members of my table would share that sentiment.
24   So it's something that has to probably be worked out pretty
25   quickly.  It sort of shocks me that there's still talk that
```

35

1  they don't know whether they're going with some of this

2  because this was November 2016 that it got revealed, the big

3  reveal occurred then.  And I can tell you, as you may

4  remember, Stephanie Rosenfeld is back to being a prosecutor.

5  I believe Mr. Lemieux is still in the police department.  Like

6  I would think at this point they kind of know where they're

7  going.  So you know, I point all those things out and maybe we

8  should do this sooner rather than later.

9            THE COURT:  Yes, yes.  I agree.  And I also think

10  that even though theories are not carved in stone that you

11  need to at least have made a sketch of where you're headed

12  because you can't just leave everything open ended.  It's not

13  going to be helpful for settlement purposes in any event.

14            MR. GLASSER:  That's fair, Your Honor.  And I think

15  Your Honor has been very clear that at the moment under the

16  status quo we are prohibited from using what's in the black

17  box.  Right?  And so to the extent we want to pursue damages

18  theories that rely on what's in the black box, we can't do

19  that right now without opening the black box.  I think Your

20  Honor has been very clear about that.  I don't really see what

21  additional information the City or Ms. Lenich would need in

22  order to have a settlement conference.  I just don't really

23  get what exactly they want from us.

24            THE COURT:  Okay.  Well, I think Mr. Lax made that

25  pretty clear.  They need a clearer vision of your theory of

36

1   your case because they can't assess their risk of losing until

2   they hear what your best arguments are going to be.  And your

3   arguments or maybe the range of your arguments because -- and

4   I don't want to keep harping on this issue, you know, but you

5   do need to be clear with your clients as to what they would

6   testify to.  So let's forget about whether there was an affair

7   or not.  You need to be clear as to what your clients would

8   testify to under oath if confronted with the logical

9   questions.  And based on that, because there will be some

10  credibility risks by both sides, then if you're clear on where

11  you're headed and where you -- what evidence you have, then it

12  will allow the defense to assess the risks.  In other words,

13  if you've got a case that you set forth as your strongest case

14  and they have a chance to evaluate it, they might say yeah,

15  that's a pretty strong case so, you know, we have to go this

16  way.  Or they'll say we have to go this way or they'll say

17  we've got all kinds of evidence to disprove that so we're

18  going to assess the risk a different way.  But until they know

19  what it is that you're building, they don't know if it's going

20  to stand up.

21           MR. GLASSER:  Your Honor, and I guess from our

22  conversation what we're really talking about is compensatory

23  damages in the individual cases and what our theory of

24  compensatory damages is.

25           THE COURT:  But there's also some liability if

37

1   there's a question of what the -- I mean the --

2          MR. GLASSER:  We don't see that, Your Honor, how the

3   content relates to liability.

4          THE COURT:  Yes.  I mean in the sense -- okay.  So

5   in the sense that it's undisputed that the wiretap was

6   illegal, okay, right.  But in terms of -- and maybe you're

7   putting it in the damages bucket.  Did Mr. Lemieux have job

8   consequences because of what happened?  You're still going to

9   have to draw a factual link and --

10         MR. GLASSER:  A predicate for our compensatory

11  damages.  No, I -- understood.

12         THE COURT:  And for that you would also need to

13  sketch out what that is, what your theory of that is again so

14  that the defense can look at it to see how strong it is.

15         MR. GLASSER:  Fair enough.  That's helpful, Your

16  Honor.

17         THE COURT:  It's hard to assess the strength of an

18  edifice if you have no idea what that it's looking like.  Yes?

19         MR. EMERY:  Can I just say one more thing briefly?

20         THE COURT:  Go ahead, Mr. Emery.

21         MR. EMERY:  Sorry.  Both Lemieux and Rosenfeld were

22  going on about their lives in the way they were previously

23  going about their lives.  Then all of a sudden this happened.

24  And then all of a sudden other things happened to them.  They

25  had nothing to do until this was revealed in November of which

38

1    every year it was.  I've now forgotten.  With whatever Lenich

2    was doing.  And under the circumstances that she was allowed

3    to do it with her authority and power.  All of a sudden their

4    lives were thrown into upheaval.  Our case is only about what

5    happened with respect to the things that you're talking about

6    after that.  And who they were before that and what they did

7    before that seems to me at least is totally irrelevant.  The

8    question is causation.  The question is whether there was

9    causation of these wiretaps for all the changes in their life

10   which we are prepared to prove.

11         THE COURT:  Okay.  So thank you for that.  I think

12   that does clarify things because we're talking about what

13   people call the delta, right?  The difference between where

14   they were and where they ended up.

15         Now, if they were having an affair, okay, then it

16   may be that their delta is at a different place because they

17   were nervous about being found out or that they were stressed

18   about this happening.  So if you're saying they were just

19   going about their lives and everything was happy and there was

20   no stress, now suddenly this happens and the stress is up

21   here, it may be that if they were having an affair their

22   stress level is a little bit higher if it's an affair that

23   they didn't want people to find out about and they're taking

24   steps to hide it.  So now the delta is smaller.  So in fact

25   what was happening does play a role.  And I know -- and there

1  may be rulings that Judge Garaufis has at trial to say maybe

2  this is too much for the jury to handle and it's, you know,

3  too salacious, but for purposes at this early stage I think

4  those are going to be important questions.  And so you need to

5  be clear, as factually clear as possible, as to what was

6  happening because otherwise you don't know what the delta is.

7           MR. EMERY:  You put it very well.  I think it's

8  fascinating the way you're evaluating this as the delta.

9  Strictly damage, I mean it's really only about damages then.

10 And for purposes of settlement, it seems to me that this is

11 exactly the kind of case where knowing one or the other really

12 doesn't matter that much because in settlement issues it's

13 sometimes very advantageous, I'm sure you know, not to know

14 all the details and --

15          THE COURT:  Well, but if you're asking for --

16          MR. EMERY:  -- so that both sides compromise.

17          THE COURT:  Right.  But if you're asking for $1

18 million because they were happy and there was no stress, that

19 might be a different picture from you asking for $1 million

20 when they were stressed because that might be worth less.

21          MR. EMERY:  I respectfully disagree, but I get your

22 point.

23          THE COURT:  Well, I --

24          MR. EMERY:  I get your point.

25          THE COURT:  You've been disagreeing with me a lot,

40

1   Mr. Emery.

2           MR. EMERY:  Yes.

3           THE COURT:  And yet here we are.  Right?

4           MR. EMERY:  Yes.

5           THE COURT:  And again, I have to make decisions.  So

6   I think that -- and I've done a lot of settlement conferences

7   so I know that you can settle things in the absence of perfect

8   information but you often cannot settle in the absence of

9   basic information.  Okay?  And so I think again, you're doing

10  your jobs as advocates to try to protect your clients.  But I

11  think there's going to -- number one, the settlement

12  conference is a confidential situation so whatever you

13  disclose there is not going to the outside world and is not

14  going to be used in litigation.  And so you really should be

15  thinking very hard about what information you can provide that

16  will lead to a settlement of this case.  And it may be that

17  it's information that you want to show the other side to prove

18  how strong your case is so that they give you more money.  But

19  it may be that the defendants come to me and ask for me to

20  require that you give more information so they can look at,

21  you know, there are risks.  And sometimes settlement

22  conferences get canceled because very crucial evidence is not

23  disclosed.  It may be that the defendant say you know what, if

24  we don't have that information we can't sit down and have a

25  settlement conference until we depose that particular witness

1   and that will cause delay.  So I think parties should be

2   talking to each other, number one, about discovery and how

3   this is going to go forward.  Number two, about what is

4   necessary, what discovery is necessary to get to a settlement

5   conference because that's coming up faster than you would

6   think.  And I do require the settlement statements and I will

7   look at them carefully and I may come back to you and ask for

8   more information for me even if you don't want to share with

9   the other side.  All right?  So I think -- and I know people

10  will be working hard to get to that point.  But I think saying

11  well they don't need that is not necessarily conducive to an

12  actual settlement because I can't force parties to settle.

13  That's one thing a judge is not deciding.  And so if the other

14  side says we actually need it before we can give you a good

15  settlement amount then we're not going to be successful that

16  day.  And like I said, sometimes settlement conferences get

17  canceled because there's crucial information that's not

18  available.  So there may be information that's not available

19  but if there is information that is available through your

20  clients, through your best estimate of what they're going to

21  testify under oath, then I think it behooves the parties and

22  it's helpful to the process if you share that information.

23          MR. EMERY:  I think that your particular point is

24  very helpful that the settlement conferences are -- to remind

25  us that the settlement conferences or confidential and the

42

1  information that we reveal in that in the context of that is

2  not going to be part of the trial unless somebody contradicts

3  what they say.

4            THE COURT:  Yes.

5            MR. EMERY:  But the point is that that's very

6  helpful and I think that can move the ball forward.

7            THE COURT:  Okay.  And so your clients will all need

8  to be present at the conference.  And so I'll go through all

9  of that information again.  I've got my spiel for the

10 settlement conferences that covers all that stuff.

11           But so for today here's what I'm going to do.  I'm

12 going to grant the plaintiff's request not to reveal the

13 communications subject to the -- and give, grant leave to the

14 defendants to reargue this or bring up the points as specific

15 things come to light, as we progress, so that they say we need

16 to open all or some of the communications for this purpose

17 because we need to defend against an argument that's being

18 made.  Okay?  So we're just going to tread carefully and I

19 think people should be -- to the extent that the parties can

20 work these things out amongst themselves, that's best.  Then

21 you don't need me to make a decision.  But I will allow

22 plaintiffs at any given point to bring it up.

23           Now, if we go along and it turns out that I'm

24 being -- there are several points coming up at every turn,

25 this is causing an issue, then we'll have to revisit whether

43

1   this is the right approach.  But I will trust the parties

2   since you now know how I'm framing, how I'm thinking about

3   this issue and how I want the parties to frame this issue that

4   you'll move forward and work together to kind of avoid the

5   areas that may trigger looking at the black box.  But if it's

6   inevitable because you just need to make that argument and

7   defendants need to look, then that's where we're going to end

8   up.  Okay?  Do you have a question, Mr. Lax?

9           MR. LAX:  Yeah.  I have one suggestion which is

10  there is a date I think next month for a demand to be

11  furnished to the defendants.  It might be useful to ask that

12  the plaintiffs include more than just a number with that so we

13  can actually assess some of these issues.

14          THE COURT:  You mean -- well, there are three

15  different cases.  So --

16          MR. LAX:  Yeah.  But I mean I think it applies for

17  each one.  I mean the -- we know what they're claiming, we

18  believe we know what they're claiming in the class action and

19  we can discuss that I suppose.

20          THE COURT:  Well, Mr. Emery has just said that it's

21  statutory damages.

22          MR. LAX:  Yeah, well but there's a legal issue which

23  is a statutory interpretation issue.

24          THE COURT:  I see.

25          MR. LAX:  I guess separate from that.  That's what I

44

1  was referencing.  But for the Lemieux and Stephanie Rosenfeld

2  matters, because we're -- this side is -- my side is clearly

3  signaling that we have some doubt as to what the exact nature

4  of what they're claiming is.  With the demand it might be

5  helpful just to get more than just the number because it would

6  give us a better sense of what it is they're claiming and

7  whether we are in a position to respond to it without any

8  further discussion of the things we discussed today.

9           THE COURT:  Right.  Okay.  And --

10          MR. LAX:  I don't remember what date that is and if

11 it needs to be pushed off a little longer obviously we have no

12 problem with that.

13          MR. GLASSER:  I would just look at -- I think the

14 date is next Friday for a demand.  I don't think we have a

15 problem with providing demand letter, something a little more

16 substantive.

17          THE COURT:  Well, okay, so tell me what you're

18 intending to put in the letter.

19          MR. GLASSER:  Well, I was going to say -- and I mean

20 I don't --

21          MR. EMERY:  Well, it depends whether it's

22 confidential or not.  Right?

23          MR. GLASSER:  Yeah.  I mean well it would be

24 provided for settlement purposes only and confidential under

25 that rule of evidence, right?  And we would expect it to be

1   kept attorneys eyes only.  I'm assuming that wouldn't be an

2   issue.  I mean not attorneys eyes only.  I understand you'd

3   have to share with your client.

4           THE COURT:  Well, okay.  So what were you planning

5   to put into this confidential letter?

6           MR. GLASSER:  Well, I'm not -- that I'd have to talk

7   to my colleagues about.

8           THE COURT:  Okay.  So what I'm --

9           MR. GLASSER:  But where I was going is if we could

10  have a little more time then to potentially do it.

11          THE COURT:  All right.  So if it's a timing issue

12  we'll look at that in a moment.  But what I hear Mr. Lax

13  saying is rather than a demand of X amount of money, if he

14  gets more information, but Mr. Lax, that's assuming that

15  there's some meeting of the minds as to what information

16  you're looking for.  So perhaps you could -- the parties are

17  here.  If you already have some questions in mind, why don't

18  you convey it to the plaintiffs and say it would helpful if we

19  understood blah blah blah blah blah, and then if you're in a

20  position to provide it, you will know that providing it will

21  be helpful.  And if there's a reason you don't want to provide

22  it, then you will understand that that may be a roadblock to

23  the success of the settlement.  Okay?

24          MR. GLASSER:  That's fair enough.

25          THE COURT:  So I think you should just have that

46

1   conversation to find out what exactly would be helpful for you

2   to know and for the plaintiffs, same thing, if there are

3   things that are burning issues for you that you would like to

4   have defendants answer for you, that that's a good time to put

5   that out there and then exchange that information in whatever

6   format you want before the settlement letters are sent to

7   chambers.  Okay?

8            MR. LAX:  All right.  Thank you, Your Honor.

9            THE COURT:  So now let's just look at the timing of

10  it.  What is the deadline that's currently in place that you

11  want to have moved?

12           MR. GLASSER:  I believe we currently have a deadline

13  of May 31st to provide a demand.

14           THE COURT:  All right.  And you need more time until

15  when?

16           MR. GLASSER:  If we are going to be doing a more

17  substantive letter, I think it would be helpful to have a

18  little more time, Your Honor.

19           THE COURT:  Sure.  I'm asking you how much time you

20  need.

21           MR. GLASSER:  Would June 14th be okay, Your Honor?

22           THE COURT:  When is the settlement conference?

23           MR. LAX:  I believe it's July 30th or thereabouts.

24           THE COURT:  Okay.  So does that give the defendants

25  enough time if you get a demand on June 14th?

47

1          MR. LAX:  I think for -- I speak for the folks in my

2    cases, that should be fine, Your Honor.

3          MR. KIMMEL:  No objection.

4          THE COURT:  Okay.

5          MR. SORKOWITZ:  Agreed.

6          THE COURT:  Great.  So the new deadline for a demand

7    letter with as many specifics as you can is now June 14th.  And

8    then when will you have an offer?

9          MR. LAX:  Probably, I think for me probably it would

10   be right after July, the July 4th weekend, whatever that

11   weekend is.  I don't have my calendar.

12         THE COURT:  Okay.  So July 8th?

13         MR. LAX:  I don't have it in front of me but perhaps

14   we could just move the existing date by the equivalent amount

15   of time.  Wouldn't that make sense?

16         MR. SORKOWITZ:  We'll be bound by the upcoming

17   settlement conference though so somewhere in that framework.

18         THE COURT:  Yes, as quickly as possible is better

19   because that gives you time to talk before the conference.

20         MR. LAX:  Do you have the date our response was

21   originally due in front of you?

22         THE COURT:  So the settlement conference is July

23   30th.  And so the settlement statements are due the week before

24   that.

25         MR. GLASSER:  You were going to make an offer by

48

1   June 18th is what I have.

2           MR. LAX:  Okay.

3           MR. GLASSER:  Originally.

4           THE COURT:  So if it's moved two weeks then we're

5   looking at July 12.

6           MR. LAX:  That works for me.

7           THE COURT:  So but that just means you're going to

8   have -- you'll have just a little over a week to prepare your

9   settlement letters to me.  And if that's fine then I'm okay

10  with that.

11          MR. GLASSER:  That's okay with us, Your Honor.

12          THE COURT:  Okay.

13          MR. LAX:  I will be away the following week so I'll

14  probably submit mine early anyway.

15          THE COURT:  Okay.  That's fine.  Great.  The more

16  time that people have to think about things the better.  And

17  what I would suggest is after the exchange of the demand and

18  offer that you have a conversation before the settlement

19  conference because my experience is that the offer and demand

20  is -- an offer and demand are often very far apart and so I

21  would like you to make an effort to get a little closer before

22  you walk in the door here.  That will make my job a lot

23  easier.  Okay?  And it will also give me an idea of the things

24  that lead you to your number and your perception of what is

25  causing a problem with the other side.  Okay?  So I'll move

49

1    those deadlines.  The demand deadline is now June 14th.  The

2    offer deadline is now July 12th.  You're free to move more

3    quickly than that.  Your settlement statements are still due

4    the week of the 22nd.  I forgot what day it is.  And then the

5    settlement conference will be July 30th at 2 o'clock.

6              Now, I said it up for three hours from 2 to 5.  Do

7    you want more time?  If you do, I can move it to the morning.

8              MR. GLASSER:  I would agree we should move to the

9    morning.

10             THE COURT:  All right.  Does that work?

11             MR. SORKOWITZ:  No objection.

12             THE COURT:  Okay.  Well, I'll advance that from 2

13   o'clock to 10 o'clock.  And then it'll give us a little more

14   time but I don't really want to go the whole day.  So I'm just

15   giving you the option of having some time in the afternoon.

16   But if we're on a roll, I'll make myself available.  Okay?

17   But if it becomes clear that things just aren't getting

18   anywhere, then we'll just end.  Okay?  So is there anything

19   else?

20             MR. GLASSER:  No, Your Honor.  Thank you.

21             MR. LAX:  None from mine.

22             THE COURT:  Okay.  Thank you everybody.

23             ALL:  Thank you.

24   (Proceedings concluded at 1:14 p.m.)

25                      *  *  *  *  *  *

50

1      I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                                    _Mary Greco_
                                    _____

6                                    Mary Greco

7   Dated:   May 29, 2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25